## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

In re:                                          :         Chapter 11
                                                :
LANDAUER HEALTHCARE HOLDINGS,    :         Case No. 13-_____ (___)
INC., *et al.*,[1]                              :
                                                :         (Joint Administration Requested)
                       Debtors.                 :
                                                :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## DECLARATION OF ALAN J. LANDAUER IN SUPPORT
## OF DEBTORS' FIRST DAY MOTIONS AND APPLICATIONS

I, Alan J. Landauer, hereby declare as follows:

1.       I am the Executive Chairman of Landauer-Metropolitan Inc. ("Landauer

Metro" or the "Company").   On the date hereof (the "Petition Date"), Landauer Metro and seven

of its subsidiaries (collectively with Landauer Metro, the "Debtors") filed voluntary petitions for

relief under Chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.* (the

"Bankruptcy Code").  I am familiar with the day-to-day operations, business, and financial

affairs of the Debtors, having founded Landauer Metro in 1999 and have served as a member of

its board of directors since its inception.  Prior to my latest role as Executive Chairman, I served

as Chief Executive Officer of Landauer Metro from 1999 to 2004.  I recently returned to the day-

to-day management of the Company following the sudden departure of several key executives

shortly before the Petition Date.  My educational and professional qualifications include a

---

[1]      The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax
identification number, are Landauer Healthcare Holdings, Inc. (9115), Landauer-Metropolitan, Inc. (9291), Miller
Medical & Respiratory, Inc. (3261), C.O.P.D. Services, Inc. (0336), American Homecare Supply New York, LLC
(7937), American Homecare Supply Mid-Atlantic LLC (0026), Denmark's, LLC (4588); and, Genox Homecare,
LLC (7361).  The Debtors' corporate headquarters and the mailing address for each Debtor is One Bradford Road,
Mount Vernon, NY 10553.

Bachelor of Science and over 40 years in the industry. I am also a former President of the American Association for Homecare.

2.      I submit this declaration (the "Declaration") to provide the Court and other parties in interest with an overview of the Debtors' businesses and to describe the circumstances compelling the commencement of these chapter 11 cases. I also submit this Declaration in support of the first day motions and applications (collectively, the "First Day Pleadings") filed by the Debtors contemporaneously herewith, or as soon as reasonably practicable hereafter, by which the Debtors seek relief enabling the Debtors to continue as going concerns, to operate their businesses effectively, to minimize certain of the potential adverse effects of the commencement of their Chapter 11 cases, and to preserve and maximize the value of the Debtors' estates.

3.      Except as otherwise indicated, the facts set forth in this declaration are based upon my personal knowledge, my review of relevant documents, information provided to me by employees with responsibility for the relevant business and corporate matters addressed in the First Day Motions, or my opinion based upon experience, knowledge, and information concerning the Debtors and the industry in which they operate. I am authorized to submit this declaration on behalf of each Debtor, and if called upon to testify, I would testify competently to the facts set forth herein.

## Overview of Debtors' Business

**A.      Corporate Structure**

4.      Landauer Metro is a provider of home medical equipment and related products and services to customers located in the northeast United States. The Debtors provide respiratory durable medical equipment ("DME"), enteral and mobility products and services to over 240,000 patients in eight states (Connecticut, Maryland, Massachusetts, New Jersey, New

2

York, Pennsylvania, Rhode Island and Virginia) and the District of Columbia. While the Debtors' operations extend throughout the northeast, they are heavily concentrated in New York and Pennsylvania. The Debtors' headquarters are located in Mount Vernon, New York.

5.      Landauer Metro is the ultimate parent of all the other Debtors. It owns 100% of Landauer Healthcare Holdings, Inc.; Miller Medical Respiratory, Inc.; and C.O.P.D. Services, Inc. Landauer Healthcare Holdings, Inc. is the sole member of the remaining four Debtors, American Homecare Supply New York, LLC; American Homecare Supply Mid-Atlantic, LLC; Denmark's LLC; and Genox Homecare LLC. An organizational chart is attached hereto as Exhibit A. In addition to Landauer Metro, the Debtors operate under the tradenames Young's Medical in Pennsylvania and New Jersey; Denmarks in Massachusetts; Vanguard in Rhode Island; American Homecare Supply in western New York; and Genox in Connecticut, among others.

6.      As of the Petition Date, the Debtors employed approximately 650 employees at approximately 32 operating locations. The Debtors maintain inventory in all of these locations, although approximately 50% of the Company's inventory is concentrated in just four locations: Mount Vernon, New York; Great Neck, New York; Warwick, Rhode Island; and Philadelphia, Pennsylvania. The Debtors have centralized billing and collection functions in 6 locations and customer service personnel at 20 locations. The Debtors also offer a 24-hour emergency call center, which is reflective of the personalized customer and referral relationships characteristic of the home health care business.

7.      The Debtors provide a full range of respiratory products and services from the simplest nebulizer or oxygen concentrators to the most complex ventilators and combination therapy equipment. The Debtors offer over 4,000 types of medical equipment and supplies. The

Debtors' product selection includes, among other things, hospital beds, wheelchairs, scooters, walkers, seat lifts, oxygen tanks, ventilators, monitors, tracheotomy tubes, CPM machines, nebulizers, urological supplies, and enteral feeding products, as discussed further below.

**B.      Services and Products**

8.      The Debtors' business is evenly split between the rental and sale of product with each accounting for approximately 50% of the Debtors' net revenues.  In terms of product type or category, the Debtors' revenues are derived primarily from: (i) the rental or sale of respiratory equipment (58%); (ii) sale of enteral products (13%); (iii) the sale of other consumable supplies (12%); (iv) the rental or sale of DME (12%); and (v) the rental or sale of rehabilitation products (5%).

**(i)      Oxygen and Other Respiratory Therapy Equipment and Services**

9.      The rental and sale of oxygen and other respiratory therapy equipment and services represents approximately 58% of the Debtors' net revenues.  Patients in need of oxygen and other respiratory therapy equipment and services typically suffer from breathing disorders, such as COPD, obstructive sleep apnea and other cardiopulmonary disorders.  Individuals diagnosed with COPD or similar diseases generally will require treatment for the rest of their lives.  The majority of Landauer Metro's oxygen and other respiratory therapy equipment is rented and reimbursed on a monthly basis.

10.      Typically, patients are referred to Landauer Metro by their physician or a hospital discharge planner.  Upon receipt of a referral, the Company's customer service representative obtains the necessary medical and insurance coverage information, and assignment of benefits, and coordinates equipment delivery.  Equipment delivery and setup are

4

performed in the patient's home by one of Landauer Metro's third-party, JCAHO[2]-certified

delivery technicians who then provide instruction and training to the patient and the patient's

family regarding appropriate equipment use and maintenance, and compliance with the

prescribed therapy.

11.     Following the initial delivery and setup, Landauer Metro's patient service

technicians or clinicians make periodic visits to the patient's home, the frequency of which is

dictated by the type of therapy prescribed and physician orders.  All services and equipment are

coordinated with the prescribing physician and, during the period that Landauer Metro provides

services and equipment for a patient, the patient remains under the physician's care and medical

supervision. Respiratory therapy is monitored by licensed respiratory therapists and other clinical

staff as prescribed by physicians and in accordance with applicable state laws.  Landauer Metro

provides 24-hour on-call support to its patients through a centralized after-hours call center.

    **(a)**     ***Home Oxygen Therapy***

12.     Landauer Metro offers a variety of oxygen delivery systems to

accommodate patients' needs.  Each system and combination has different characteristics that

make it more or less suitable to specific patient applications.

- *Oxygen Concentrator*: An oxygen concentrator is an electrically powered device that separates oxygen from room air and converts the oxygen into a more pure form.  It is small, reliable and generally provides the least expensive supply of oxygen to the patient.  The concentrator is not an ambulatory product.  It stays in the room in which it is placed, and patients use different lengths of oxygen tubing to continue to receive oxygen while moving around.

- *Portable Oxygen Concentrator*: A portable oxygen concentrator works in the same way as a regular oxygen concentrator, but with the addition of a battery and AC/DC adapter.  Portable concentrators are generally used for travel purposes and not as the primary oxygen system in the patient's home.

---

[2] JCAHO stands for the Joint Commission on Accreditation of Healthcare Organizations, which is an independent, not-for-profit organization that accredits and certifies more than 20,000 health care organizations and programs nationwide.

- *Liquid Oxygen*: Liquid oxygen is delivered to the patient's home in a base unit that may also serve as the patient's primary source of oxygen while at home and can be used to fill a smaller portable unit when the patient leaves home. Conventional liquid oxygen vessels require no power source to operate, making it an appropriate choice for patients in areas with frequent power outages. Conventional liquid oxygen systems are quiet and have no major moving parts. However, when the conventional liquid oxygen base unit is used as the primary oxygen source, it needs to be refilled approximately every two weeks, depending on the patient's consumption rate and liter flow.

- *High Pressure Oxygen Cylinders*: High Pressure Oxygen Cylinders come in various sizes and are used as backup systems and when an oxygen concentrator patient travels outside the home.

- *Homefill System*: A homefill system is used in conjunction with an oxygen concentrator. The homefill unit allows the patient to fill his or her own oxygen cylinders at home using oxygen generated by their oxygen concentrator.

**(b)    *Other Respiratory Therapy Equipment and Services***

13.    In addition to home oxygen, Landauer Metro also provides other home

respiratory therapy equipment and services to its patients, including:

- *Continuous Positive Airway Pressure ("CPAP") Devices:* CPAPs are primarily used for the home treatment of obstructive sleep apnea. Obstructive sleep apnea occurs when the upper airway becomes narrow as the muscles relax naturally during sleep. This reduces oxygen in the blood and causes arousal from sleep. The CPAP machine stops this phenomenon by delivering a stream of compressed air by a hose to a nasal pillow, nose mask or full-face mask, keeping the airway open under air pressure so that unobstructed breathing becomes possible, reducing and/or preventing apneas.

- *CPAP Supplies:* CPAPs include component parts and supplies which require routine replacement to ensure proper functioning of the CPAP device and infection control. The supplies include hoses, masks, filters, chin straps, pillows, cushions and humidification units. Hoses and masks accumulate exfoliated skin and particulate matter, and can develop mold, all of which may reduce the effectiveness of the unit or expose the patient to infection risk. Such parts need to be cleaned or replaced on a regular basis. Most units also employ some type of filtration, and the filters also require regular maintenance.

- *Bi-level Positive Airway Pressure ("BiPAP") Devices and Supplies:* BiPAPs are likewise used for the home treatment of sleep apnea for patients who cannot tolerate use of a CPAP. With a BiPAP, air delivered through a mask can be set at one pressure for inhaling and another for exhaling. This makes a BiPAP much easier for users to adapt to, as they do not have to exhale against extra air pressure as they do with a CPAP. Because of these dual settings, BiPAPs allow people to get more air in and out of the lungs without the natural muscular effort needed to do so. BiPAPs have been found to be especially useful for patients

with congestive heart failure and lung disorders. BiPAPs include the same component parts and supplies as a CPAP, which require routine replacement to ensure proper functioning.

- *Non-invasive Positive Pressure Ventilator ("NiPPV") Devices and Supplies:* NiPPV refers to delivery of mechanically assisted or generated breaths without placement of an artificial airway, such as an endotracheal tube. In most cases, ventilation is delivered via a tightly fitting nasal mask. NiPPVs include the same component parts and supplies as a CPAP and BiPAP, which require routine replacement to ensure proper functioning

- *Nebulizer Devices and Medications:* A nebulizer is a device used to administer medication to people in the form of a mist inhaled into the lungs. Nebulizer medications are distributed in unit dose vials.

### (ii)    Durable Medical Equipment and Other Supplies

14.    The balance of the Debtors' business involves the rental and sale of durable medical equipment ("DME") including hospital beds, wheelchairs, walkers, patient aids and the sale of other ancillary supplies and consumable products.

## C.    Revenue Sources

15.    Landauer Metro derives its revenues principally by reimbursement from third-party payors, including private insurers, Medicare, and Medicaid. Landauer Metro accepts assignment of insurance benefits from patients and, in most instances, invoices and collects payments directly from private insurers, Medicare, or Medicaid, as well as directly from patients under co-insurance provisions.

16.    For the fiscal years ended March 31, 2011, 2012, and 2013,[3] the Debtors reported net revenues of $139,656,000, $137,160,000, and $128,500,000, respectively. For those same years, the Company reported EBITDA of $12,034,000, $18,524,000, and $13,200,000, respectively. The decrease in revenues and EBITDA between 2012 and 2013 was attributable mainly to (i) the loss of a large managed care contract which entered into an exclusive

---

[3] The Company's 2011 and 2012 financial statements have been audited.

relationship with a competitor; (ii) a reduction in reimbursement rates from managed care organizations; and (iii) the impact of Hurricane Sandy which occurred in the fall of 2012.

17.    Historically, approximately 35% of the Debtors' revenues were derived from the Medicare and Medicaid programs.  As discussed further below, however, the Debtors learned in the first calendar quarter of 2013 that it did not win any contracts in a competitive bidding process conducted by the Center for Medicare Services ("CMS")—the agency responsible for administering the Medicare program—and therefore, would not be an approved supplier for new Medicare  patients subsequent to July 1, 2013.  As a result, the Company's revenues from this source is expected to decrease substantially —if not evaporate entirely—which was one of the primary factors in its need to seek bankruptcy protection.

**D.    Company History**

18.    Landauer Metro was founded in 1999 when I acquired a small publicly held company, Community Care Services, Inc. ("Community Care"), in a leveraged buy-out and then merged that company into my then-existing business operations to form the entity that is now the Landauer Metro.

19.    In acquiring Community Care, Landauer Metro became a privately held company with approximately $50 million in annual revenues and operations in New York.  Since that time, Landauer Metro has continued to grow organically and through acquisitions. Beginning in 2003, Landauer Metro expanded its business geographically by embarking on a series of acquisitions, including the acquisitions of (i) All Island Medical in 2003; (ii) Low Surgical & Medical Supply in 2005; (iii) Miller Medical & Respiratory and Home Care Services, Inc. in 2007; (iv) Atlas Respiratory, A&J, and C.O.P.D. in 2008; and (v) Genox, Mid-Atlantic Healthcare (including d/b/a Young's Medical), American Homecare Supply, and Denmark's

(including d/b/a as Vanguard), all in 2009. By 2011, Landauer Metro had become the largest independent regional home medical equipment supplier in the northeastern United States with over $137 million in annual revenues.

20.    The capital to fund these acquisitions was obtained primarily from (i) CIT Healthcare LLC, which provided a series of loans totaling $40 million from 2005 through 2009 that were later refinanced into the Debtors' existing senior secured debt owed to the Senior Secured Lenders (as defined below); (ii) Clairvest Equity Partners Limited Partnership and Clairvest Acquisition LLC (together, "Clairvest"), which provided debt and equity financing of approximately $15.3 million between 2002 and 2013, as discussed further below; and (iii) other shareholders, including myself.

21.    Two years after Clairvest's initial investment, I left my position as Chief Executive Officer, although I continued to serve as a board member and remained a significant shareholder of Landauer-Metro. I was succeeded as Chief Executive Officer by Louis Rocco until his departure (along with virtually every other member of the senior management team) shortly before the Petition Date. Upon Mr. Rocco's departure, I returned to manage the Debtors' day-to-day operations. I continue to serve as Chairman of the Board.

E.    **Capital Structure**

22.    On February 9, 2011, Landauer Metro and each of its subsidiaries entered into that certain Credit Agreement by and among Landauer-Metropolitan, Inc., the Subsidiary Borrowers party thereto, the Lenders party thereto (the "Senior Secured Lenders") and TD Bank, N.A. as Administrative Agent, and TD Securities (USA) LLC and RBS Citizens N.A., as Joint Lead Arrangers (the "Credit Agreement"). Pursuant to the Credit Agreement, the Senior Secured Lenders provided the Debtors with (i) a term loan of $35 million with a maturity date of

February 9, 2016; (ii) a revolving line of credit in the maximum amount of $10 million with a

maturity date of February 9, 2016; and (iii) certain other loans in the amount of $5 million for

acquisition and capital expenditures (collectively, the "Senior Secured Loans"). A substantial

portion of the proceeds of the Senior Secured Loans were used to refinance the Debtors' existing

senior secured debt with CIT Healthcare LLC. No amounts were drawn on the acquisition and

capital expenditure facility and the draw period was closed as of March 31, 2013.

23.    As of the Petition Date, $29,360,747.60 was owed on account of the

Senior Secured Loans.

24.    The Debtors' obligations to the Senior Secured Lenders are secured by

first priority liens on all of the Debtors' assets.

25.    Also on February 9, 2011, Landauer Metro entered into an agreement with

certain participating shareholders—Clairvest, Thomas Blum, Louis Rocco, Saverio Burdi, and

myself—pursuant to which we collectively loaned the company $3 million (the "Subordinated

Secured Shareholder Loan").[4] The Subordinated Secured Shareholder Loan is expressly

subordinated to the Senior Secured Loans.

26.    As of the Petition Date, $3,754,658.00 was owed on account of the

Subordinated Secured Shareholder Loan.

27.    On February 9, 2011, Landauer Metro and each of the other Debtors

entered into a Security Agreement granting Clairvest a junior security interest in all of the

Debtors' assets, which was intended to secure three separate loans that Clairvest had made to the

Company including: (i) the Subordinated Secured Shareholder Loan, dated February 9, 2011, in

the amount of $3 million; (ii) a prior loan by Clairvest, dated March 23, 2010, in the amount of

---

[4] The participating shareholders' respective portions of the $3 million loan were: Clairvest Equity Partners Limited Partnership ($1,899,000); Clairvest Acquisition LLC ($633,000); Thomas Blum ($116,000); Louis Rocco ($126,000); Saverio Burdi ($126,000); and me ($100,000).

$750,000;[5] and (iii) a prior loan by Clairvest, dated September 24, 2010, in the amount of $300,000.[6]

28.     In total, between its portion of the Subordinated Shareholder Loan and its prior loans, the debt owed to Clairvest totaled $5,122,455 as of the Petition Date.  The balance of the Subordinated Shareholder Loan (held by others) totaled $585,727 as of the Petition Date.

29.     The Subordinated Shareholder Loan, along with Clairvest's prior loans, are expressly subordinated to the Senior Secured Loans.[7]

30.     The Debtors' obligations to Clairvest are secured by second priority liens on all of the Debtors' assets.

31.     The Debtors also have secured financing relationships with Phillips Medical Capital in the approximate amount of $1.4 million pursuant to which they finance purchases of equipment related to the Debtors' rental fleet of equipment

32.     The Debtors also lease certain equipment from various third-parties, which have filed UCC financing statements securing their purported liens in that specified equipment should such leases be deemed true sales.  These third-parties include: Philips Medical Capital, Wells Fargo Bank, N.A., Cannon Financial Services, and AirSep Corporation.

33.     As of the Petition Date, the Debtors owed approximately $15 million in unsecured debt to a variety of trade creditors.

---

[5] The principal balance of Clairvest's $750,000 loan (together with accrued interest) was $1,734,531 as of the Petition Date.

[6] The principal balance of Clairvest's $300,000 loan (together with accrued interest) was $420,409 as of the Petition Date.  Although the Security Agreement references the September 24, 2010 loan as being for $2.1 million, Clairvest only advanced $300,000.

[7] In making its first loan to the Company, Clairvest executed an Intercreditor and Subordination Agreement dated March 26, 2010 with the Debtors' senior secured lender at the time, CIT Healthcare LLC, agreeing to subordinate any loans, whether then existing or thereafter arising, that it made to the Company.  Upon the refinancing of the Debtors' senior secured debt, this Intercreditor and Subordination Agreement was assigned by CIT Healthcare LLC to the Senior Secured Lenders.

34.    Landauer Metro has common, Series A preferred, and Series B preferred stock, with the last of these ranking senior to all other classes.  As of the Petition Date, there were 11 shareholders, including myself.[8]  Clairvest owns a majority of the Company with 61.5% of its stock on a fully diluted basis.  I own 22.2%.  Most of the other shareholders are board members or former executives and none of them own more than 5% of the Company's stock.

### Events Leading To Chapter 11

35.    In 2013, and particularly in the past 60 days, the Debtors have encountered several financial and operational issues, which have collectively caused a rapid and significant deterioration of the Debtors' business operations and financial condition.

36.    First, in January 2013, the Debtors learned that they would no longer be eligible to provide equipment and services to Medicare patients after July 1, 2013, which had an immediate and drastic impact on its business.

37.    CMS, the agency responsible for administering the Medicare program, issued the results for "Round 2" of its competitive bidding process– a process which was intended to result in a financial savings to both the Medicare Part B Trust Fund and its beneficiaries. According to CMS's website:

> suppliers compete to become Medicare contract suppliers by submitting bids to furnish certain items in competitive bidding areas, and [CMS] awards contracts to enough suppliers to meet beneficiary demand for the bid items.  The new, lower payment amounts resulting from the competition replace the Medicare [DME] fee schedule amounts for the bid items in these areas . . . .  The program sets more appropriate payment amounts for [DME] items while ensuring continued access to quality items and services, which will result in reduced beneficiary out-of-pocket expenses and savings to taxpayers and the Medicare program.

---

[8] In decreasing order in terms of their respective holdings, the Company's shareholders include: Clairvest Equity Partners Limited Partnership, Clairvest Acquisition LLC, me, Thomas Blum (director), Thomas Blum IRA, Louis Rocco (former President and Chief Executive Officer), Saverio Burdi (former Executive Vice President), Joe Luceri (former Chief Financial Officer), Scott Sommer (former employee), Mona Zeliger (former employee), and Bill Simonds (deceased former employee).

See http://www.cms.gov/Medicare/Medicare-Fee-for-Service-
Payment/DMEPOSCompetitiveBid/index.html

38.     Through the competitive bidding process, CMS selects the suppliers who
are eligible to supply Medicare patients with oxygen, CPAP devices, DME, prosthetics,
orthotics, and supplies.  Such suppliers agree to receive as payment, the "single payment
amount" calculated by CMS after bids are submitted.

39.     Landauer Metro competed with many other companies for the right to
provide items to patients in defined geographic regions.  When CMS announced the results for
"Round 2" competitive bidding, however, Landauer Metro unfortunately lost all of the
competitive bidding areas in which it sought to be selected as a supplier.  Although Landauer
Metro's pricing was competitive in some areas, CMS apparently disqualified the Debtors for
other reasons.  The Debtors sought to appeal CMS's determination, but the decision was final
and no appellate process was available, leaving the Debtors with the only option of reapplying in
the next competitive bidding process two or three years from now.  The overall impact of the
outcome of this competitive bidding process on the Debtors' business will be substantial and is
likely to result in a decrease in annual revenues of approximately $26 million.

40.     Almost immediately after it took effect on July 1, 2013, the Debtors'
ineligibility to serve Medicare patients began to impact the Debtors' ability to attract new
customers.  When a patient is discharged from a hospital and is in need of certain medical
equipment or supplies, the hospital discharge coordinator refers those patients to CMS's list of
preferred providers.  Not being on the list of preferred providers means the Debtors are unable to
share in that business.  Further, while the Debtors can continue to service their existing
Medicare/Medicaid customers who receive refills of supplies (such as oxygen), the ongoing

rental of equipment to those patients was terminated, thereby eliminating another source of revenue.

41.     Without the designation of preferred provider status and facing rapid decline in their business, the Debtors began, once again, to explore a sale transaction during the spring of 2013.  The Debtors had previously sought a buyer for their business during 2012 and had enlisted the services of the investment banking arm of the Royal Bank of Canada, RBC Capital Markets, to lead that process.  Unfortunately, that process resulted in no viable bids for the Company.

42.     On April 29, 2013, the Debtors entered into a letter of intent to sell substantially all of their assets to a competitor, Passaic Healthcare Services, LLC, d/b/a Allcare Medical ("Allcare") but the transaction failed to close and in fact, resulted in contentious litigation between the parties, which is currently pending in the state courts of New York.

43.     As part of that litigation, the Debtors have alleged that Allcare lured away a significant portion of the Debtors' senior management team, including its former Chief Executive Officer and Executive Vice President, Messrs. Rocco and Burdi (who remain shareholders of the Company) in violation of an agreement between the Debtors and Allcare entered into while they were in the process of negotiating the ultimately failed transaction. Between June 2013 (when the proposed Allcare transaction fell apart) and the Petition Date, more than 75 of the Debtors' employees, including a substantial portion of the Company's upper and middle management have resigned.  The Debtors believe that many of those former employees were actively solicited, and are now employed, by Allcare.  On August 1, 2013, a temporary restraining order was issued in the state court litigation between the Debtors and Allcare, *inter alia*, barring Allcare from soliciting any current employees of the Debtors.

Despite the existence of that injunction, the Debtors believe that Allcare has continued to actively solicit and hire employees of the Debtors through the Petition Date. In a subsequent written decision in the state court litigation (dated August 13, 2013), the court ruled (i) that the temporary restraining order would remain in effect, (ii) that the Debtors had demonstrated a likelihood of success on the merits with respect to their claims against Allcare, and (iii) that Allcare had failed to demonstrate a likelihood of success on the merits with respect to its various claims against the Debtors.

44.      The failed Allcare transaction, and the events that followed—including Allcare's improper solicitation and hiring away of the Debtors' senior employees—irreparably harmed the Debtors' business and were a primary cause of the Debtors' need to seek bankruptcy protection.

45.      Around the same time, in May 2013, the Company received a civil investigative demand from the New York City office of the U.S. Attorney's Office for the Southern District of New York seeking records related to DME billing and collection. As of the Petition Date, the precise nature of this inquiry is unclear, although the Debtors are cooperating fully in the government's investigation.

46.      Approximately two years prior, in 2011, the Company received a federal grand jury subpoena from the White Plains office of the U.S. Attorney's Office for the Southern District of New York seeking documentation relating to specifically identified patients, certain employee records for the period of January 1, 2007 through the date of the subpoena, and certain other agreements and contracts entered into by the Company. The Company is not aware of any wrongdoing and fully cooperated with the government's requests in response to the subpoena.

All requested documentation has been provided and there has been no further communications from the U.S. Attorney's office on this matter since 2012.

47.    In July 2013, the Senior Secured Lenders advised the Debtors of their belief that an event of default had occurred under the Credit Agreement by reason of a material adverse change in the Debtors' business, specifically related to the departure of numerous senior managers and sales personnel of the Debtors, as discussed above. As a result of this asserted event of default under the Credit Agreement, during July 2013, the Senior Secured Lenders began to significantly restrict the Debtors' ability to access the cash generated by their businesses, including for purposes of purchasing supplies and inventory crucial to the ongoing operation of the Debtors' business.

48.    In the face of the severe financial and operational challenges described above, the Debtors made a concerted effort to consider all of their strategic alternatives. In July 2013, the Debtors retained Carl Marks to analyze and determine the Debtors' cash flow and sale prospects. Since that time, with no realistic opportunity to obtain replacement debt or equity financing to support its business operations, the Debtors' Board of Directors determined, in consultation with the Debtors' advisors, that the only option for preserving the value of the Debtors' business was to pursue a going-concern sale of the assets comprising the Debtors' business.

49.    Accordingly, the Debtors began to re-market their assets. As a result of earlier efforts undertaken by the Debtors in 2012 with the assistance of an investment banker to identify and negotiate with potential financial and strategic buyers for the Debtors' business, the Debtors were already familiar with the universe of likely interested buyers. Beginning in late July 2013 and continuing until shortly before the Petition Date, the Debtors' advisors reached out

to these likely buyers to determine their potential interest in acquiring the Debtors' business

and/or assets. Through those discussions, three potential buyers emerged as possible stalking

horse bidders. After intensive negotiations with each of these three entities, the Debtors

determined that the bid submitted by Quadrant Management Inc. ("Quadrant") was the best bid

to serve as a stalking horse for an auction sale of the Debtors' business to be consummated in the

context of a chapter 11 bankruptcy case. The Debtors then proceeded to finalize the negotiation

of an Asset Purchase Agreement with Quadrant in the days leading up to the Petition Date. and

have since reached agreement with Quadrant on a form of Stalking Horse Purchase Agreement

that contemplates a sale of the assets pursuant to section 363 of the Bankruptcy Code, subject to

higher and better offers received after the commencement of these Chapter 11 Cases.

      50.     To fund this process, the Debtors have reached agreement with the Senior

Secured Lenders on the use of their cash collateral, as set forth in the Cash Collateral Motion

described more fully below. As set forth in the proposed Interim Cash Collateral Order, the

Senior Secured Lenders have conditioned the use of their cash collateral on, among other things,

approval of a Sale Procedures Order, in form and substance satisfactory to the Senior Secured

Lenders, by no later than August 31, 2013.

      51.     Accordingly, after considering all available options, the Debtors

determined that commencement of these cases would be in their best interests, as well as those of

their creditors and other parties in interest.

### Support for Relief Requested in the First Day Pleadings

      52.     Concurrently with the filing of their Chapter 11 petitions, or as soon as

practicable thereafter, the Debtors have filed (or will file) several pleadings and applications (the

"First Day Pleadings") and a number of accompanying proposed orders (the "First Day Orders"),

pursuant to which the Debtors request relief they believe is critical to enable them to preserve
their going concern value for creditors.

53.    The First Day Pleadings were prepared with my input and assistance, or
the input and assistance of employees working under my supervision.  A brief description of the
relief requested and the facts supporting each of the First Day Pleadings and First Day Orders is
set forth below.  As set forth more fully below, I believe that the relief requested in these motions
and applications is critical to the Debtors' ability to preserve the value of their estates and
facilitate their efforts to achieve the best outcome for all stakeholders in these chapter 11 cases.

**(i)    Debtors' Motion for an Order Authorizing Joint Administration**

54.    As an initial matter, the Debtors are requesting joint administration of their
cases for procedural purposes only. Joint administration avoids the preparation, service, and
filing of duplicative notices, pleadings, and orders in each Debtor's case.  This will save
considerable expense, time and resources, and facilitate the ability of parties in interest to
monitor these chapter 11 cases.

55.    I believe joint administration of the Debtors' chapter 11 cases is in the best
interests of the Court and its Clerk's Office, the Debtors, their estates, and all parties in interest.

**(ii)    Debtors' Motion Pursuant to Sections 105(a), 361, 362, and 363 of the
Bankruptcy Code and Bankruptcy Rules 2002, 4001, and 9014 for Entry of
Interim and Final Orders (I) Authorizing Debtors to Use Cash Collateral;
(II) Granting Adequate Protection; and (III) Scheduling a Final Hearing (the
"Cash Collateral Motion")**

56.    The Debtors intend to finance their post-petition operations through the
use of cash collateral in which the Senior Secured Lenders assert a security interest.

57.    The Debtors have an immediate need for use of cash collateral to support
their working capital requirements, make payments to vendors, employees and other third
parties, and to pay other administrative expenses.  Such financing is critical to preserve the going

concern value of the Debtors' estates, and to achieve the consummation of the proposed sale transaction.

58.    Because virtually all of the Debtors' assets are encumbered by the liens of the Senior Secured Lenders, the Debtors have no unencumbered funds with which to pay ongoing wages, salaries and other operating expenses, including, but not limited to, rent and utility obligations.  Due to the nature of the Debtors' operations, which are dependent upon uninterrupted access to necessary working capital to continue to service their patents, immediate access to cash collateral is essential to prevent irreparable harm to the Debtors' estates.  Use of cash collateral is also necessary to provide assurance to employees, landlords, suppliers and other parties that they will be paid on a timely basis for post-petition services, and to assure patients that they will have uninterrupted access to the Debtors' products and related services.  Without immediate access to cash collateral, the Debtors' day-to-day operations would come to a halt, jeopardizing the Debtors' prospects of consummating the proposed sale transaction.

59.    The Debtors submit that there are no viable financing alternatives available to them under the circumstances.  In that regard, I am aware that, prior to the Petition Date, the Debtors unsuccessfully explored other financing options. Such efforts were complicated by several factors, including, among others, the deterioration of the Debtors' business resulting from its loss of preferred provider status with Medicare, the loss of virtually its entire senior management team, and continued poaching of the Debtors' sales and marketing personnel by Allcare.

60.    As a result, the Debtors focused their efforts on negotiating the use of cash collateral.  In the days prior to the Petition Date, the Debtors and the Senior Secured Lenders exchanged several iterations of proposed orders and supporting budgets and continued to

negotiate and finalize such documents up until the Petition Date. Thus, the terms and conditions of the proposed cash collateral order were the product of extensive good faith, arm's length negotiations among the Debtors, the Senior Secured Lenders and their respective professional advisors.

61.    Accordingly, and based on my discussions with the Debtors' professional advisors, I believe that the use of cash collateral is the best and only viable financing option available to the Debtors under the circumstances. I further believe that it provides the Debtors with access to liquidity that is critical to maintaining the going concern value of these estates while the Debtors pursue an expeditious sale transaction.

62.    In connection therewith, the Debtors propose to provide adequate protection to the Senior Secured Lenders in the manner specified in the Interim Order. As more fully described in the Cash Collateral Motion and the Interim Order, such adequate protection measures include the following: (i) maintenance of the pre-petition liens of the Senior Secured Lenders; (ii) the granting of replacement liens and allowed claims under section 507(b) of the Bankruptcy Code to the Senior Secured Lenders, in each case to the extent and with the priorities specified in the Cash Collateral Motion; and (iii) the payment of principal and interest on the Term Loan Facility. Such measures were negotiated in good faith and at arm's length among the Debtors and the Senior Secured Lenders. I am advised that the Senior Secured Lenders support and consent (or are deemed to have consented) to the use of cash collateral and the form of adequate protection to be provided to them as specified in the Cash Collateral Motion and the Interim Order.

63.    Overall, I believe that the relief requested in the Cash Collateral Motion is in the best interests of the Debtors' estates.

(iii)    **Debtors' Motion for Entry of an Order Authorizing (I) Continued Use of Existing Cash Management System; (II) Honoring Certain Pre-Petition Obligations Related to The Use of the Cash Management System; (III) Maintenance of Existing Bank Accounts; (IV) Continued Use of Existing Business Forms; (V) Limited Waiver of the Deposit and Investment Requirements of Section 345(b) of the Bankruptcy Code (the "Cash Management Motion")**

64.    To manage their businesses and operations efficiently, the Debtors utilize a largely centralized cash management system (the "Cash Management System") to collect and transfer funds from numerous sources and accounts, and disburse funds to satisfy obligations arising from the daily operation of their businesses.  To facilitate the Debtors' transition into chapter 11 and the uninterrupted operation of their Cash Management System, the Debtors request authority to (i) continue using their Cash Management System and maintain the existing bank accounts and business forms currently in use, and (ii) forgo compliance with the restrictive deposit and investment requirements outlined in the Office of the United States Trustee (the "U.S. Trustee") guidelines.

65.    In the ordinary course of business, the Debtors use the Cash Management System, which is similar to those utilized by other large companies, to streamline collection, transfer, and disbursement of funds generated by the Debtors' business operations.  The Cash Management System is operated and maintained by Landauer Metro, the Debtors' primary operating entity. All receivables are received by, and all payables are paid by, Landauer Metro on behalf of each of the Debtors in the ordinary course of business.  The Debtors track the billings, collections, transfers, and disbursements made on behalf of the Debtors in the ordinary course of business.  As such, the Debtors have the ability to determine at any given moment the amount of cash held by Landauer Metro that is attributable to each of the subsidiaries, and the prepetition and post-petition amounts owed by each entity to each Debtor.

66.     The Cash Management System is comprised of 21 bank accounts, a list of which is attached to the Cash Management Motion as <u>Exhibit B</u>.  The Cash Management System has three main components: (a) cash collection, including the collection of payments made to the Debtors by payors; (b) cash concentration; and (c) cash disbursements to fund the Debtors' operations.

**A.     Cash Collection**

67.     All checks, cash, and electronic fund transfers received by the Debtors are currently deposited each day into one of the Debtors' 16 lockbox accounts (the "<u>Cash Collection Accounts</u>").  With the exception of the commercial lockbox account held by Landauer Metro (the "<u>LMI Commercial Account</u>"), each of these accounts is a zero balance account, meaning that money is swept into a central account at the close of each day, as further explained below. Certain of the Cash Collection Accounts only receive Medicare payments; these accounts are labeled as the "government" lockboxes.

**B.     Cash Concentration**

68.     All of the cleared amounts in the Cash Collection Accounts (other than those already in the LMI Commercial Account) are "swept" into the LMI Commercial Account, the Debtors' central depository account.  By sweeping the funds in the lockbox accounts into the LMI Commercial Account, the Debtors are easily able to monitor their overall cash position. Further, utilizing the lockbox accounts (as opposed to having all funds deposited directly into the LMI Commercial Account) allows the Debtors to better monitor the cash generation of each individual subsidiary or location.

C.      **Cash Disbursements**

69.      Upon Landauer Metro's request, cash is transferred from the LMI Commercial Account to fund operations and payroll obligations.  The Debtors currently maintain one account for the purpose of funding the Debtors' payroll obligations and one account for the purpose of funding certain other obligations, including, among other things, payments for supplies, taxes, and operating expenses.

70.      In addition to these two disbursement accounts, the Debtors have three additional, less frequently used operating accounts. Landauer Metro has an operating account with Citizens Bank that services the Credit Agreement and is used to make interest payments on the Credit Agreement.  Genox Homecare, LLC has a commercial operating account with TD Bank that is used to disburse bank fees.  Denmark's LLC has a currently inactive operating account.

71.      The Debtors' also maintain a Flexible Spending Account, managed by Ameriflex Business Solutions ("Ameriflex"), which retains a minimum $75 (or $4.95 per person) balance and makes disbursements to employees for health and child care expenses, as well as a United Healthcare Deductible Reimbursement Account with United Healthcare, which maintains a $2,000 minimum balance and makes disbursements to employees for a portion of the health care deductibles.

D.      **Existing Bank Accounts and Business Forms**

72.      If the Debtors were required to close the bank accounts comprising the Cash Management System (the "Bank Accounts") and open new accounts, it would be unduly burdensome and disruptive.  The transition to chapter 11 will be more efficient and orderly if the Debtors have the discretion to continue use of the Bank Accounts following the Petition Date

with the same account numbers, and to pay any bank fees that may be incurred in connection
with the Bank Accounts or any other new account that may be opened in the ordinary course of
business.

73.     Additionally, to minimize administrative expense and delay, the Debtors
request authority to continue to use their checks and existing business correspondence and forms,
including letterhead, wire transfer instructions, and other business forms (collectively, the
"Business Forms") substantially in the form existing before the Petition Date, without reference
to the Debtors' status as debtors in possession.  If the Debtors need to purchase new check stock
or additional other Business Forms during the pendency of these chapter 11 cases, such check
stock and/or other Business Forms will include a legend referring to the Debtors as "Debtors in
Possession" or "DIP." Any business parties doing business with the Debtors undoubtedly will be
aware, as a result of the size of these cases and the nature of the industry, of the Debtors' status
as debtors in possession.

E.     **Intercompany Cash Flows**

74.     Landauer Metro collects receipts and makes disbursements on behalf of all
the Debtors, and thus distributions and receipts may reflect cash balances due and owing from
one Debtor to another Debtor.  These balances represent extensions of intercompany credit made
in the ordinary course of business.

75.     To ensure that each individual Debtor will not, at the expense of their
creditors, fund the operations of an affiliated entity, the Debtors respectfully request that the
Court authorize the Debtors to treat all such obligations (the "Intercompany Claims") arising
after the Petition Date in the ordinary course of business as administrative expenses.  If the court
authorizes the Debtors to treat the Intercompany Claims as administrative expenses, then each

24

entity utilizing funds flowing through the Cash Management System and receiving services through the intercompany arrangements should continue to bear ultimate repayment responsibility for such ordinary course transactions and their related share of the cost of services provided.

**F.      Waiver of Section 345 Requirements**

76.      In connection with this Declaration, I was provided with a copy of, and have reviewed, the U.S. Trustee's deposit and investment guidelines. The Debtors believe they are in compliance with these guidelines, however, we are requesting a 60-day initial waiver to evaluate our ability to comply with the deposit and investment guidelines. If there are any accounts that do not meet the guidelines, the Debtors are requesting the preservation of their ability to seek a further interim waiver or a final waiver of this requirement.

77.      I submit that the Cash Management System is an ordinary course, essential business practice that provides significant benefits to the Debtors. In my opinion, any disruption of the Cash Management System at this critical juncture would irreversibly and irreparably harm the Debtors' business operations, and the value thereof. Therefore, I believe the maintenance of the existing Cash Management System, as well as the various related relief requested in the Cash Management Motion, is in the best interests of the Debtors' estates and all parties in interest.

**(iv)      Debtors' Motion for Entry of an Order Pursuant to Sections 105(a), 363, 503, 507(a), 1107(a) and 1108 of the Bankruptcy Code Authorizing the Debtors to Pay Prepetition Wages, Compensation, Employee Benefits, and Other Related Obligations and Directing Banks to Honor Related Transactions (the "Wage Motion")**

78.      The Debtors are requesting authority to pay, in their discretion, any and all obligations and costs incurred in respect of or related to employee obligations, including prepetition Unpaid Wages and Salaries, Employer Payroll Taxes, Reimbursable Expenses, Employee Benefits, Third-Party Administrative Costs, and other related obligations (each as

defined in the motion and collectively, the "Employee Obligations"), and to maintain and continue their prepetition employee-related practices, programs, and policies comprising such Employee Obligations, as such may be modified, amended, or supplemented from time to time in the ordinary course. Additionally, to facilitate the required payments and maintenance of these programs, the Debtors are requesting the Court to authorize applicable banks and other financial institutions to receive, honor, process, and pay any and all checks and electronic transfers drawn on the Debtors' accounts, to the extent that such checks or transfers relate to any Employee Obligation.

79.    In the ordinary course of their businesses, the Debtors incur payroll and various other obligations, such as expense reimbursements, and provide healthcare coverage, and other benefit plans to approximately 649 employees and Landauer-Metro's two temporary workers, as described in detail in the Wage Motion. The Debtors estimate that the aggregate amount of the prepetition Unpaid Wages, Salaries, and Commissions, PTO Benefits, Employer Payroll Taxes, Reimbursable Expenses, Employer Medical and Dental Plan Premiums, and Third-Party Administrative Costs accrued and unpaid as of the Petition Date, including all costs incident to such obligations, does not exceed approximately $1.25 million.

80.    To the extent there are prepetition amounts outstanding as of the Petition Date for wages, the Debtors believe these are priority claims that must be paid in full before any general unsecured obligations of the Debtors may be satisfied. Further, for amounts exceeding the priority claim limits of $12,475 and for Employee Obligations not otherwise entitled to priority, the Debtors request authority to pay such prepetition amounts due to the employees, because such payments are essential to the Debtors' operations and the benefits achieved by such payments far exceed the negative effects resulting from failure to make such payments. The

Debtors do not believe that any wage or benefit payments subject to the statutory priority cap of Bankruptcy Code sections 507(a)(4) and 507(a)(5) will be made in excess of $12,475.00 to any individual employee.

81.    In this case, the Debtors believe any delay in payment or failure to continue to honor the programs and policies comprising the Employee Obligations would cost the Debtors' estates more than the requested payments due to factors such as the cost of losing an employee's knowhow and the cost of replacement of some employees who would be inclined to accept other jobs.  Failure to make these payments is likely to irreparably impair the employees' morale, dedication, confidence, and cooperation, and would adversely impact the Debtors' relationship with its employees at a time when the employees' support is critical to the Debtors' chapter 11 cases and ongoing business operations. Further, absent the relief requested, the employees may suffer undue hardship and, in many instances, serious financial difficulties, as many employees rely on their wages and benefits to meet their personal financial obligations.

82.    In addition, it would be inequitable to require the Debtors' employees to personally bear the cost of any business expenses they incurred prepetition for the benefit of the Debtors.  I submit that payment of all Employee Obligations in accordance with the Debtors' prepetition business practices is in the best interests of the Debtors' estates and their creditors and will enable the Debtors to continue to operate their businesses in an economic and efficient manner without disruption.

83.    For all the foregoing reasons, I submit that the payment of the Employee Obligations, and the other relief requested in the Wage Motion, is in the best interests of the Debtors' estates and their creditors and will enable the Debtors to continue to operate their businesses without disruption.

     **(v)**     **Debtors' Motion For Entry of an Order under 11 U.S.C. §§ 105(a), 361 and 363(b) Authorizing the Debtors to (I) Maintain Existing Insurance Policies and Pay All Policy Premiums and Brokers' Fees Arising Thereunder or in Connection Therewith, (II) Continue Honoring Prepetition Insurance Premium Finance Agreement, and (III) Continue Grant of Security Interests to Insurance Premium Finance Company (the "<u>Insurance Motion</u>")**

     84.     The Debtors are requesting authority to (i) maintain their existing insurance policies and pay all policy premiums and brokers' fees arising thereunder or in connection therewith; (ii) continue honoring their obligations pursuant to prepetition insurance premium financing agreements for the purpose of financing the purchase of several forms of insurance coverage; and (iii) continue to grant security interests to Premium Corp. (as defined below). The Debtors are also asking the Court to authorize and direct applicable banks to process, honor, and pay all related checks and electronic fund transfers.

     85.     Attached to the Insurance Motion is a chart setting forth the Debtors' various insurance policies, premiums (the "<u>Insurance Program Premiums</u>"), relevant policy expiration dates, and whether the premium has been financed.

     86.     In the ordinary course of business, the Debtors maintain several insurance policies to protect against adverse occurrences (each, an "<u>Insurance Policy</u>", and together, the "<u>Insurance Programs</u>"). Through the individual Insurance Policies, the Insurance Programs provide coverage for a variety of potential liabilities and casualties, including but not limited to: general liability, umbrella, automobile, property, workers' compensation, and director and officer liability.

     87.     The Debtors employ Szerlip & Co.("<u>Szerlip</u>") as their broker to assist with the procurement and negotiation of the Insurance Programs. Generally, Szerlip charges standard industry commission rates for each policy, which are included in the Debtors' policy premiums, and paid as a lump sum or as otherwise required by Szerlip with respect to a particular Insurance

Policy. The Insurance Programs are typically obtained by means of an annual competitive bid process timed to end during April, which marks the beginning of the Debtors' policy year. Szerlip and the Debtors recently completed the competitive bidding and renewal process, securing the bulk of the Debtors' Insurance Programs for the 2013-2014 policy year.

88.     The Debtors finance the premiums on their Directors and Officers policy (the "D&O Policy") under a premium financing agreement with Premium Assignment Corporation ("Premium Corp.") dated as of May 20, 2013 (the "D&O Finance Agreement"). Premium Corp. pays the insurance premiums due under the D&O Policy in exchange for an upfront down payment and ten monthly payments from the Debtors, with the first monthly payment made on June 20, 2013 and subsequent payments being due on the 20th of each month. The Debtors' obligations to Premium Corp. under the D&O Finance Agreement are secured by all sums due under the D&O Finance Agreement and any unearned premiums or other sums which may become payable under the D&O policy.  The D&O Policy subject to the D&O Finance Agreement is essential to the preservation of the Debtors' businesses.

89.     In my business judgment, the terms of the D&O Finance Agreement represent the best possible terms for financing the premiums of the D&O Policy.  The Debtors' estates will benefit by maintaining this low-cost financing from Premium Corp.  Moreover, any interruption of payments might adversely affect the Debtors' ability to obtain financing for future policies on favorable terms.  In some cases the coverage is required by regulations, laws, and/or contracts that govern the Debtors' business obligations.  Thus, the Debtors request the authority to continue honoring their obligations pursuant to the Finance Agreement and to continue the grant of security interests to Premium Corp.

90.     The Debtors are required under the laws of the various states in which they operate to maintain workers' compensation insurance that provides their employees with coverage for injuries arising from or related to their employment with the Debtors. The Debtors maintain workers' compensation polices in Connecticut, Maryland, Massachusetts, New Hampshire, New Jersey, New York, Pennsylvania, and Virginia (the "Workers' Compensation Policies"). The Debtors currently maintain the Workers' Compensation Policies with insurers as arranged by their insurance broker, Szerlip. The Debtors pay annual premiums in connection with the Workers' Compensation Policies of approximately $347,103.00. As of the Petition Date, the Debtors believe there are open claims under the Workers' Compensation Policies.

91.     In addition to the D&O Policy and Workers' Compensation Policies, the Debtors also maintain general liability, umbrella, property and automobile coverage. The Debtors are generally current on the payments due for such policies, however, the Debtors have not made payment of $12,920.41 due on account of commercial automobile insurance on or about August 11, 2013, and several other premiums are due within the next ten days.

92.     I believe that granting the authority to pay expenses relating to the Insurance Programs in accordance with the Debtors' prepetition business practices is in the best interests of the Debtors and their estates and will enable the Debtors to continue to operate their business in chapter 11 without disruption. The nature of the Debtors' businesses makes maintaining the Insurance Programs on an uninterrupted basis essential. The nonpayment of any expenses related to the Insurance Programs could result in insurance carriers declining to renew the Debtors' existing policies or refusing to enter into new agreements with the Debtors. If the Insurance Programs lapse, the Debtors could be exposed to substantial liability, to the detriment of the Debtors' estates and all parties in interest, as the Debtors would be required to obtain

30

replacement coverage on an expedited basis, likely at significant additional cost. Moreover,

certain of the Insurance Policies protect collateral pledged to the Senior Secured Lenders.

93.     For all the foregoing reasons, I submit that the payment of all expenses

related to the Insurance Programs, and the other relief requested in the Insurance Motion is in the

best interests of the Debtors' estates and their creditors and will enable the Debtors to continue to

operate their businesses without disruption.

      **(vi)    Debtors' Motion For Entry of an Order (I) Authorizing the Debtors to Pay
      Petition Taxes and Fees to Governmental Entities, and (II) Authorizing Financial
      Institutions to Honor and Process Related Checks and Transfers (the "<u>Tax
      Motion</u>")**

94.     The Debtors are requesting authority (i) to pay certain prepetition (a) sales,

use, and personal property taxes, and (b) franchise, regulatory, permit, and annual reporting taxes

and fees (as well as any penalties and interest related to (a) and (b)) to various federal, state, and

local authorities (collectively, the "<u>Taxing Authorities</u>"), including those obligations

subsequently determined upon audit or otherwise to be owed for periods prior to the Petition

Date; and (ii) to authorize banks and other financial institutions (collectively the "<u>Banks</u>") to

honor and process related checks and transfers.

95.     In the ordinary course of business, the Debtors incur certain sales, use,

personal property and other taxes (collectively, the "<u>Taxes</u>"), as well as certain franchise,

regulatory, permit, and annual report fees (the "<u>Fees</u>" and collectively with the Taxes, the "<u>Taxes
and Fees</u>"), that are payable directly to the Taxing Authorities as such payments become due.

The Taxes and Fees are paid monthly, quarterly, or annually to the respective Authorities,

depending on the given Tax or Fee and the relevant Taxing Authority to which they are paid.  In

addition, from time to time, the Taxes and Fees may be subject to an audit performed by the

relevant Taxing Authority for prior tax periods (each an "<u>Audit</u>") and the relevant authority may

determine that additional amounts may be due as a result of such Audit (each an "Audit

Amount").

**A.    Sales and Use Tax**

96.    A "sales tax" is a consumption tax calculated as a percentage of the sale

price that is charged at the point of purchase for certain goods and services (the "Sales Taxes").

Most of the Debtors' customer invoices do not include Sales Taxes because of various

exemptions, so the Debtors typically pay Sales Taxes from their own funds.

97.    A "use tax" is a type of excise tax.  It is assessed upon otherwise "tax

free" personal property purchased by a resident of the assessing state for use, storage, or

consumption of goods in that state, regardless of whether the purchase took place in that state.

Vendors are not obligated to charge or remit Sales Taxes for sales to parties outside the state of

the vendor's operations.  Nevertheless, a purchaser (such as the Debtors) is obligated to self-

assess and pay use taxes, when applicable, to the states in which the purchaser operates (the "Use

Taxes," and together with the Sales Taxes, the "Sales & Use Taxes").  The Debtors incur and

remit Use Taxes when they purchase property or services from vendors that have no nexus to the

state in which the purchasing Debtor operates, and thus no Sales Taxes were collected by the

vendor.

98.    As a result of the commencement of these cases, a portion of the monthly

Sales & Use Taxes may remain due for the period before the Petition Date.

**B.    Property Taxes**

99.    In the course of their operations, the Debtors pay property taxes (the

"Property Taxes,") in respect of personal property owned by the Debtors in certain states.  The

Debtors do not pay real property taxes, as they do not own any real property.  The Debtors are

often billed for Property Taxes in advance at the beginning of the fiscal year or fiscal quarter by each respective taxing authority, and a number of the Property Taxes are prepaid in advance. There may be, however, a portion of the Property Taxes that is accrued and unpaid as of the Petition Date if the Debtors do not pay certain bills immediately.

C.      **Franchise, Regulatory, Permit, and Annual Report Taxes and Fees**

100.    The Debtors are required to pay certain fees in certain states to (i) operate their business (the "Franchise Fees"), (ii) procure and maintain a business license and remain in good standing to operate their facilities (the "Regulatory Fees"), (iii) file required annual reports (the "Annual Report Fees"), and (iv) maintain licenses and permits, such as those governing the regulation of the manufacturing of oxygen, the operation of a business in a city or state, and the dispensing of oxygen and/or medication (the "Permit Fees"). Because the Debtors often pay these Fees in advance, the Debtors do not expect significant Fees to be due and owing as of the Petition Date.

101.    The Debtors are generally current on Taxes and Fees that are due and payable, but estimate that outstanding prepetition liabilities owing to the various Taxing Authorities for Taxes and Fees will not exceed approximately $275,000.00 exclusive of any Taxes and Fees that may have been paid prior to Petition Date but had not cleared as of the Petition Date, and any Audit Amounts.

102.    I believe payment of the prepetition Taxes and Fees is critical to the Debtors' uninterrupted business operations. Nonpayment of these obligations may cause Taxing Authorities to take precipitous action, including, but not limited to, preventing the Debtors from conducting ongoing business in the applicable jurisdictions, increasing audits, and requesting termination of the automatic stay, any of which would disrupt the Debtors' day-to-day

operations.  Indeed, paying the Taxes and Fees may reduce the aggregate amount ultimately paid to the Taxing Authorities because penalties and interest are often severe and may be avoided by prompt payment.

103.    Also, I am advised that nonpayment of some of these obligations will likely result in unwarranted penalties, audits, and the potential imposition of personal liability on the officers and directors of the Debtors for Taxes collected but not paid to the applicable authorities.  Thus, to the extent any Taxes remain unpaid, the Debtors' officers and directors may be subject to audits, lawsuits, or even criminal prosecution on account of such nonpayment during the pendency of these chapter 11 cases.  Such proceedings would constitute a significant distraction for such officers and directors at a time when they should be focused on stabilizing post-petition business operations and implementing a successful sale strategy.  I am also advised that the Taxes are afforded priority payment status in a chapter 11 case.  Therefore, the relief requested will only affect the timing of the payment of Taxes and will not prejudice the rights of general unsecured creditors or other parities in interest. Finally, certain of the Taxes may be so-call "trust-fund" taxes that the Debtors are required to collect from third parties and hold in trust for the benefit of the Taxing Authorities.  Such "trust-fund" taxes may not constitute property of the estate.

104.    Based on the foregoing, I submit that paying the Taxes and Fees is well within the Debtors' sound business judgment and is in the best interest of the Debtors' estates.

(vii)    **Debtors' Motion for an Order Pursuant to Section 366 of the Bankruptcy Code (I) Prohibiting Utility Companies from Altering, Refusing, or Discontinuing Utility Services, (II) Deeming Utility Companies Adequately Assured of Future Performance, (III) Establishing Procedures for Determining Adequate Assurance of Payment, and (IV) Setting a Final Hearing Related Thereto (the "Utilities Motion")**

105.    The Debtors are requesting relief to prohibit their utility providers (the "Utility Providers"), identified on Exhibit C to the Utilities Motion, from altering, refusing, or discontinuing utility services to the Debtors as a result of the commencement of these chapter 11 cases, or the existence of any unpaid prepetition invoices, including the making of demands for security deposits or accelerated payment terms. The Debtors have proposed adequate assurance for the Utility Providers, and proposed procedures for resolving Utility Providers' objections to such procedures and the proposed adequate assurance.

106.    In connection with their ongoing business operations, the Debtors incur utility expenses in the ordinary course for, among other things, the use of natural gas, electricity, water, sewer service, local and long-distance telephone service, waste disposal, and other similar services (collectively, the "Utility Services"). Uninterrupted Utility Services are essential to the Debtors' ongoing operations. Moreover, replacement Utility Providers would be difficult to identify and, in some locations, impossible to find, given that many utilities enjoy a virtual monopoly in certain regions, leaving consumers with no alternatives. The business disruption that would likely result from interruption of the Utility Services would negatively impact the Debtors' operations, and would adversely affect the Debtors' patients, estates, creditors, and employees. Accordingly, to continue as a going concern, the Debtors must continue to receive uninterrupted Utility Services. While there is seasonal fluctuation, on average, the Debtors spend approximately $48,000 per month on their Utility Services.

107.    In general, the Debtors have established a good payment history with their Utility Companies and have made payments on a regular and timely basis.  To the best of my knowledge, there are no material defaults or arrearages of any significance with respect to the Debtors' undisputed Utility Services invoices, except as may be caused in connection with the commencement of these chapter 11 cases.

108.    The Debtors intend to pay all postpetition obligations owed to the Utility Providers in a timely manner, consistent with the ordinary course of operating their businesses. To provide adequate assurance of payment, as set forth in Bankruptcy Code sections 366(b) and (c), the Debtors propose to deposit a sum of $24,000, equal to 50% of the Debtors' estimated monthly cost of the Utility Services, into a segregated bank account within twenty (20) days of the Petition Date (the "Utility Deposit") as Adequate Assurance.  The Utility Deposit will be either interest-bearing or non-interest-bearing, at the Debtors' election.

109.    The Debtors further propose to maintain the Utility Deposit until there is a further hearing on this matter.  Thereafter, the Debtors propose to adjust the amount of the Utility Deposit to maintain a Utility Deposit that consistently provides the Utility Providers with coverage for half of an average month's usage of the applicable Utility Services, and any additional amounts deemed necessary to adequately protect the Utility Services.

110.    I believe that the Utility Deposit, taken together with the facts and circumstances of the Debtors' chapter 11 cases (together, the "Adequate Assurance"), constitute sufficient adequate assurance to the Utility Providers.  If any Utility Provider believes adequate assurance is required beyond the Proposed Adequate Assurance, however, it must request such additional assurance pursuant to the procedures set forth in the Utilities Motion (the "Adequate Assurance Procedures").

36

111.    The relief requested ensures the Debtors' business operations will not be disrupted by the lack of critical Utility Services.  Absent approval of the proposed Adequate Assurance Procedures, the Debtors could be forced to negotiate with each Utility Provider individually with the risk that a Utility Provider will delay until they have the ability to terminate service.  During this critical post-petition period, the Debtors' efforts and resources would unquestionably be more productive if focused on maximizing the value of the Debtors' estates.

112.    The Debtors request a further hearing on the Utilities Motion to be held within 25 days of the Petition Date to ensure that, if a Utility Provider argues it can unilaterally refuse service to any of the Debtors on the 31st day after the Petition Date, the Debtors will have had the opportunity to request modifications to the proposed Adequate Assurance Procedures to avoid any potential termination of Utility Services.

**(viii)   Debtors' Application for Entry of an Order Appointing Epiq Bankruptcy Solutions, LLC as Claims and Noticing Agent Pursuant to 28 U.S.C. § 156(c), § 105(a) of the Bankruptcy Code, Bankruptcy Rule 2002(f) and Local Rule 2002-1(f)**

113.    The Debtors request authority to employ and retain Epiq Bankruptcy Solutions LLC ("Epiq") as claims and noticing agent for the Debtors and to appoint Epiq as agent of this Court.

114.    The Debtors anticipate that there will be more than 1,000 entities to be noticed. Retaining Epiq as claims and noticing agent is in the best interest of the Debtors and their estates, because use of Epiq is the most effective and efficient manner of providing notice to the Debtors' creditors and other parties in interest of the commencement and other developments of these chapter 11 cases.  In that capacity, Epiq will transmit, receive, docket and maintain proofs of claims filed in connection with these chapter 11 cases.

115.    I am advised that Epiq is a bankruptcy administration provider that specializes in comprehensive chapter 11 administrative services including noticing, claims processing, balloting and other related services critical to the effective administration of chapter 11 cases.  Indeed, Epiq has developed efficient and cost-effective methods to handle properly the voluminous mailings associated with the noticing, claims processing and balloting portions of chapter 11 cases to ensure the orderly and fair treatment of creditors, equity security holders and all parties in interest.  Further, Epiq will work with the Clerk to ensure that such methodology conforms with the Court's procedures, the Local Rules and the provisions of any orders entered by this Court.

I, the undersigned, declare under penalty of perjury that the foregoing is true and correct.

Dated: August 16, 2013.

_____
Alan I. Landauer

# EXHIBIT A

