UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

```
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -   X
                                              :
In re:                                        :        Chapter 11
                                              :
LANDAUER HEALTHCARE HOLDINGS,                 :        Case No. 13-12098 (CSS)
INC., et al.,¹                                :
                                              :        Jointly Administered
                    Debtors.                  :
                                              :  Hearing Date: October 22, 2013 at 2:00 p.m.
                                              .  Obj. Deadline: October 15, 2013 at 4:00 p.m.
```

## DEBTORS' MOTION FOR APPROVAL OF COMPROMISE AND SETTLEMENT AGREEMENT RESOLVING CERTAIN DISPUTES WITH INFINITE CORPORATION

Pursuant to Rule 9019 of the Bankruptcy Rules of Procedure, the debtors and debtors in

possession (collectively, the "Debtors") hereby move the Court to approve a compromise and

settlement agreement (the "Settlement Agreement") resolving certain disputes between the

Debtors and Infinite Corporation ("Infinite").

### I.      PRELIMINARY STATEMENT

By this Motion, the Debtors respectfully request that the Court approve a Settlement

Agreement that is essential to the protection of their ongoing business. Specifically, under the

Settlement Agreement, Infinite has agreed to an extension of the license, maintenance and

support agreement concerning software upon which the Debtors' billing and accounts receivable

systems operate. Without the software in question (and related maintenance and support), the

license for which Infinite claims would expire, the Debtors will be unable to continue billing

---

[1]      The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification number, are Landauer Healthcare Holdings, Inc. (9115), Landauer-Metropolitan, Inc. (9291), Miller Medical & Respiratory, Inc. (3261), C.O.P.D. Services, Inc. (0336), American Homecare Supply New York, LLC (7937), American Homecare Supply Mid-Atlantic LLC (0026), Denmark's, LLC (4588); and, Genox Homecare, LLC (7361). The Debtors' corporate headquarters and the mailing address for each Debtor is One Bradford Road, Mount Vernon, NY 10553.

01:14190150.1

patients and third party payors, and the Debtors will be unable to collect ongoing revenues or manage their cash flow.  In sum, the Settlement Agreement should be approved because it preserves one of the Debtors' critical business functions (i.e. billings and collections) at a cost which the Debtors (and their major stakeholders) believe is quite reasonable under the circumstances.

## II.    JURISDICTION AND VENUE

1.    The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the Amended Standing Order of Reference from the United States District Court for the District of Delaware dated as of February 29, 2012.  This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2), and the Court may enter a final order consistent with Article III of the United States Constitution.  Venue is proper in this District and before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

2.    The statutory predicates for the relief requested herein are Section 105 of the Bankruptcy Code and Bankruptcy Rule 9019.

## III.    GENERAL BACKGROUND

3.    On August 16, 2013, the Debtors commenced the above-captioned chapter 11 cases (the "Chapter 11 Cases") by each filing a voluntary petition for relief under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware (the "Court").

4.    The Debtors continue to operate their business and manage their properties as debtors-in-possession, pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  On August 26, 2013, Office of the United States Trustee for the District of Delaware (the "U.S. Trustee") appointed an official committee of unsecured creditors (the "Committee") [Docket No.

01:14190150.1

2

62].  As of the date of this Motion, no trustee or examiner has been appointed in the Chapter 11

Cases.

       5.      A detailed description of the Debtors' business and the reasons for filing these

Chapter 11 Cases are set forth in the *Declaration of Alan J. Landauer in Support of Debtors'*

*First Day Motions and Applications* (the "First Day Declaration") [Docket No. 3], which is

incorporated herein by reference.

## IV.    SPECIFIC BACKGROUND

### A.    The License Agreement Between the Debtors and Infinite

       6.      Infinite is a global information technology ("IT") integrator that assists businesses

in modernizing and migrating their IT infrastructure.

       7.      In July of 2012, Landauer-Metropolitan, Inc. ("LMI") and Infinite entered into an

agreement entitled "Infinite Corporation License, Maintenance and Use Agreement for End

User" ("License Agreement").  A true and correct copy of the License Agreement is attached as

Exhibit B.

       8.      Under the License Agreement, Infinite agreed to provide certain IT support and

maintenance services to the Debtors on an annual basis and at pre-specified costs.[2]

       9.      As part of these services, Infinite licenses a software (also called "Infinite 36") to

the LMI which supports the operation of the Debtors' Dataline application.  In turn, the Dataline

application operates the Debtors' billing and accounts receivable system.  Without Infinite 36,

Dataline could not operate and the Debtors' billing and accounts receivable system would not

---

[2]     These services and products were to be provided in phases as outlined in a document entitled "Proposal for Software and Services" (the "Proposal") signed by the Parties on July 22, 2012, which became part of the License Agreement as an addendum.  A true and correct copy of the Proposal is attached as Exhibit C.  The costs for each phase are also itemized in the Proposal.

01:14190150.1

function.  As a result, the Debtors could not bill or collect revenue, manage cash flow or pay

bills.

**B.      The Dispute Between the Debtors and Infinite**

10.      Sometime after the Petition Date in these cases, Infinite demanded that LMI make

a $391,417.00 payment which it claimed was owed in connection with the License Agreement.

11.      On September 19, 2013, an Infinite representative informed the Debtors' counsel

by email that the Infinite 36 license would expire on September 30, 2013, if LMI did not make

the $391,417 payment.  A true and correct copy of an email dated September 19, 2013 of Carol

Conway is attached as Exhibit D.

12.      Allowing the Infinite 36 license to expire would be disastrous to the Debtors'

ongoing operations as they would be unable to collect revenue, manage cash flow and pay bills.

13.      The Debtors disputed that any money was owed to Infinite or that the License

Agreement would expire on September 30.  Nevertheless, the Debtors were concerned that the

failure to extend the Infinite 36 license would be harmful to their business (if indeed an extension

was required).

**C.      The Compromise and Settlement Agreement Between the Debtors and Infinite**

14.      After extensive discussions between the Debtors and Infinite, the Parties

ultimately agreed to resolve and settle their claims and disputes.

15.      The Settlement Agreement was executed on September 30, 2013, and can be

summarized as follows:

(a)      The License Agreement and all software, license maintenance, support
and other rights related to the License Agreement, including but not
limited to Infinite 36, will be extended through December 31, 2016.

(b)      Infinite will take all actions necessary to maintain continuous operation of
Infinite 36 and the Debtors' Dataline system through December 31, 2016.

01:14190150.1

4

(c)     Infinite consents to the assumption and/or assignment of the License
        Agreement when and if the Debtors seek to assume or assign same.

(d)     The Debtors will pay $130,000.00 to Infinite and will have no further
        obligation to make payments for annual maintenance fees under the
        License Agreement.

(e)     Infinite agreed to release all claims against the Debtors and their estates,
        and the Debtors likewise agreed to release their claims against Infinite.

A true and correct copy of the Settlement Agreement is attached as Exhibit E.

16.     Prior to filing this Motion, the Debtors outlined the terms of the Settlement

Agreement with the buyer, Quadrant Management, Inc. ("Quadrant"), and the Official

Committee of Unsecured Creditors ("Committee"). The Debtors believe that Quadrant and

Committee will assent to the Settlement Agreement.

17.     The Debtors now respectfully request that the Court approve the Settlement

Agreement.

## V.     RELIEF REQUESTED

18.     The Debtors seek entry of an order under section 105 of the Bankruptcy Code and

Bankruptcy Rule 9019 approving the Settlement Agreement.

## VI.     BASIS FOR RELIEF

### A.     Rule 9019 Standard

19.     The Court should approve the Settlement Agreement pursuant to Rule 9019(a)

because the resolution will protect one of the Debtors' most critical business function, its ability

to bill and collect receivables.

20.     Rule 9019(a) provides, in relevant part, that "[o]n motion by the trustee and after

notice and a hearing, the court may approve a compromise or settlement." Fed. R. Bankr. P.

9019(a). Settlements and compromises are generally favored in bankruptcy cases. See, e.g.,

Myers v. Martin (In re Martin), 91 F.3d 389, 393 (3d Cir. 1996) (quoting 9 COLLIER ON

BANKRUPTCY, ¶ 9019.03[1] (15th ed. 1993)).  Indeed, settlements are "'a normal part of the

reorganization process.'"  Group of Institutional Investors v. Chicago, M., S. P. & P. R. Co., 318

U.S. 523, 565 (1943).

      21.     To approve a compromise and settlement under Rule 9019(a), a bankruptcy court

must independently determine that the compromise and settlement is in the best interests of the

debtor's estate.  See In re Marvel Entnm't Group, Inc., 222 B.R. 243, 249 (D. Del. 1998) (citing

Anderson, 390 U.S. at 424); In re Louise's, Inc., 211 B.R. 798, 801 (D. Del. 1997).  See also

Vaughn v. The Drexel Burnham Lambert Gr., Inc., 134 B.R. 499, 505 (Bankr. S.D.N.Y. 1991)

(bankruptcy judge has discretion whether to accept or reject compromise and settlement).

Exercise of such discretion is typically warranted "in light of the general public policy favoring

settlements."  In re Hibbard Brown & Co., 217 B.R. 41, 46 (Bankr. S.D.N.Y. 1998).

      22.     In making its independent determination, the bankruptcy court "should canvass

the issues to see whether the settlement falls below the lowest point in the range of

reasonableness."  Key3Media Group, Inc. v. Pulver.com, Inc., 336 B.R. 87, 93 (Bankr. D. Del.

2005) (citing In re Jasmine, Ltd., 258 B.R. 119, 123 (D.N.J. 2000)); In re Coram Healthcare

Corp., 315 B.R. 321, 330 (Bankr. D. Del. 2004) ("[C]ourt must only conclude that the

compromise or settlement falls within the reasonable range of litigation possibilities.") (citing In

re Penn Central Transp. Co., 596 F.2d 1102, 1114 (3d Cir. 1979); see, e.g., In re Nutritional

Sourcing Corp., 398 B.R. 816, 833 (Bankr. D. Del. 2008) ("[T]he court's duty is to determine

whether the compromise is reasonable, not whether the compromise is the best possible

settlement."); In re Sea Containers Ltd., No. 06-11156, 2008 WL 4296562, at *5 (Bankr. D. Del.

Sept. 19, 2008) ("[The] court . . . need not be convinced that the settlement is the best possible

compromise.").  Rule 9019 does not require a full evidentiary hearing to determine the merits of

the underlying dispute.  See In re Capmark Fin. Gr. Inc., 438 BR 471, 515 (Bankr. D. Del. 2010)

(citing Jasmine, 258 B.R. at 123); Key3 Media, 336 B.R. at 93.

23.    In deciding whether a particular settlement falls within the "range of

reasonableness," courts consider the following factors:  (i) the probability of success in the

litigation; (ii) the difficulties associated with collection; (iii) the complexity of the litigation, and

attendant expense, inconvenience and delay; and (iv) the paramount interests of creditors.  See,

e.g., Martin, 91 F.3d at 393; In re Nutraquest, Inc., 434 F.3d 639, 644 (3d Cir. 2006); In re RFE

Indus., Inc., 283 F.3d 159, 165 (3d Cir. 2002).

**B.      The Settlement Agreement Serves the Best Interests of the Estate**

24.    Here, approval of the Settlement Agreement is warranted because it serves the

best interests of the estate.

25.    Pursuant to the Settlement Agreement, Infinite has agreed to an extension of the

Infinite 36 license, thereby ensuring the continued long-term ability of the Debtors to bill

patients and third party payors, collect ongoing revenue and manage its cash flow.

26.    This result is critical to the Debtors' financial stability and necessary to effectuate

a reorganization plan.

27.    Importantly, through the Settlement Agreement, Infinite consented to the Debtors

assuming and assigning the contract in the future (if it chooses to do so), thus removing a

potential obstacle that could hinder the reorganization down the line.

28.    Approving the Settlement Agreement would also avoid expensive litigation

resulting from a long and protracted adversary proceeding involving complex contractual and

technological issues.

01:14190150.1

**C.      The Settlement Agreement Is Reasonable**

29.      The Settlement Agreement is also reasonable under the circumstances as it avoids a disaster in the short run and ensures the long-term stability of the Debtor's billing and accounts receivable system.

30.      The Debtors' financial obligation under the Settlement Agreement is modest at best when compared to the severe consequences of an expired license.  In fact, the amount to be paid by the Debtors pursuant to the Settlement Agreement represents only a prepayment of the annual maintenance fees that the Debtors would have had to pay under the License Agreement, albeit at later times.

31.      Even as a matter of bargain, the settlement amount is approximately only one third of that demanded by Infinite.

32.      The mutual releases set forth in the Settlement Agreement are also reasonable under the circumstances and should be approved.  The release for the benefit of Infinite was required by Infinite in exchange for its release of the Debtors, and the Debtors believe that the only claims they possess against Infinite are potential preference claims that may be subject to partial or complete defenses by Infinite.  Accordingly, the mutual releases contemplated by the Settlement Agreement, and the settlement Agreement generally, are in the best interests of the Debtors' estates after consideration of (i) the probability of success in litigation against Infinite; (ii) the difficulties associated with collection; (iii) the complexity of the litigation, and attendant expenses, inconvenience and delay; and (iv) the paramount interests of creditors.

01:14190150.1

**D.      The Settlement Agreement Protects the Committee**

33.      Finally, the Settlement Agreement would also protect the interests of the creditors by ensuring that the reorganization plan remains intact.  After all, the financial well-being of the Debtors is closely tied to its ability to satisfy claims.

34.      More significantly, the Debtors believe that Quadrant and the Committee will assent to the Settlement Agreement.

35.      Therefore, the Court should approve the Settlement Agreement.

## VII.      CONCLUSION

For the foregoing reasons, the Court should grant this Motion and should approve the Settlement Agreement between the Debtors and Infinite.

## VIII.      NOTICE AND PRIOR REQUEST

Notice of this Motion has been given to the following parties or, in lieu thereof, to their counsel, if known:  (a) The Committee; (b) the U. S. Trustee; (c) Quadrant; (d) Infinite; and (e) any party requesting notice pursuant to Bankruptcy Rule 2002.  In light of the nature of the relief requested herein, the Debtors submit that no other or further notice is required.

The Debtors have not previously requested the relief sought in this Motion.

01:14190150.1

Respectfully submitted,

Dated: October 1, 2013
      Wilmington, Delaware

YOUNG CONAWAY STARGATT & TAYLOR, LLP

*/s/ Justin H. Rucki*
Michael R. Nestor (No. 3526)
Matthew B. Lunn (No. 4119)
Justin H. Rucki (No. 5304)
Rodney Square
1000 North King Street
Wilmington, Delaware  19801
Telephone:  (302) 571-6600
Facsimile:  (302) 576-1253

and

K&L GATES LLP

John A. Bicks
599 Lexington Avenue
New York, New York  10022-6030
Tel:  (212) 536-3900
Fax: (212) 536-3901

and

Charles A. Dale III
Mackenzie L. Shea
One Lincoln Street
Boston, Massachusetts 02111
Tel:  (617) 261-3100
Fax: (617) 261-3175

*Counsel to the Debtors and*
*Debtors-in-Possession*

01:14190150.1