**EXHIBIT A**

01:14599555.1

*Execution Version*

# ASSET PURCHASE AGREEMENT

**By and Among**

**LANDAUER-METROPOLITAN, INC. AND SUBSIDIARIES**

**-AND-**

**LMI DME HOLDINGS LLC**

01:14018665.1

## ASSET PURCHASE AGREEMENT

ASSET PURCHASE AGREEMENT, dated as of August 16, 2013 (this "Agreement") by and among Landauer-Metropolitan, Inc., a New York corporation; Landauer Healthcare Holdings, Inc., a Delaware corporation; Miller Medical & Respiratory, Inc., a Pennsylvania corporation; C.O.P.D. Services, Inc., a New Jersey corporation; American Homecare Supply New York, LLC, a Delaware limited liability company; American Homecare Supply Mid-Atlantic LLC, a Delaware limited liability company; Denmark's, LLC, a Delaware limited liability company; and Genox Homecare, LLC, a Delaware limited liability company (referred to individually herein as "Seller," and collectively as "Sellers") and LMI DME Holdings LLC, a Delaware limited liability company ("Purchaser" and together with Sellers, the "Parties").

WITNESSETH:

WHEREAS, Sellers operate a home medical equipment business with operations in Connecticut, Maryland, Massachusetts, New Jersey, New York, Pennsylvania, Rhode Island, Virginia, and Washington, D.C. (the "Business");

WHEREAS, on the date hereof (the "Petition Date"), each of the Sellers filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §101 *et seq.* (the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"), Case No. 13-12098 (collectively, the "Bankruptcy Case");

WHEREAS, Sellers desire to sell, transfer, and assign to Purchaser, and Purchaser desires to purchase, acquire, and assume from Sellers, all of the Purchased Assets and Assumed Liabilities;

WHEREAS, this Agreement is subject to solicitation of higher or otherwise better bids and approval by the Bankruptcy Court; and

NOW, THEREFORE, in consideration of the promises and the mutual covenants and agreements hereinafter contained, the receipt and sufficiency of which is hereby acknowledged, the Parties hereby agree as follows:

## ARTICLE I: DEFINITIONS

1.1    Certain Definitions.For purposes of this Agreement, the following terms shall have the meanings specified in this Section 1.1.

"Accounts Receivable" means (a) all of Sellers' present and future accounts, payment intangibles, instruments, chattel paper and all other rights of Sellers to receive payments, including, without limitation, all rights to receive any payment, refund or credit in connection with any audit appeal, litigation, action, award, or other recovery, whether administrative or judicial, including, but not limited to, those pertaining to or in connection with Medicaid, Medicare, Medical Reimbursement Program, insurance company, managed care company, or other third-party insurance payments or reimbursements or private payor payments or reimbursements, and all amounts, including, but not limited to, the third party reimbursable

portion of accounts receivable owing to Sellers arising out of the delivery by the Business of medical, surgical, diagnostic, treatment or other professional or medical or healthcare related services, supplies or equipment or any other service and/or the supply of goods related to any of such services (whether such services are supplied by the Business in an inpatient or outpatient setting, whether on-site or offsite at the Business or by a Third Party), including, without limitation all health care insurance receivables, and all other rights to payment or reimbursement under any memoranda, letters of understanding or agreements (whether private or governmental), (b) all accounts, accounts receivable, general intangibles, rights, remedies, guarantees, supporting obligations, letter-of-credit rights, deposit accounts, collection accounts and security interests in respect of the foregoing (including bills of lading, warehouse receipts and other documents of title, whether negotiable or non-negotiable), and all rights of enforcement and collection and all books and records evidencing or related to the foregoing, (c) all information and data compiled or derived by Sellers in respect of such accounts receivable (other than any such information and data subject to legal restrictions of patient confidentiality), and (d) all proceeds of any of the foregoing, whether received or accruing before or after the Closing Date.

"Accounts Receivable Target" means Fifteen Million Dollars (US) ($15,000,000).

"Affiliate" means, with respect to any Person, any other Person that, directly or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, such Person, and the term "control" (including the terms "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through ownership of voting securities, by contract or otherwise.

"Agreement" as defined in the Recitals.

"Allcare Claims" as defined in Section 2.1(n) below.

"Asset Acquisition Statement" as defined in Section 11.2 below.

"Assigned Contracts" means the Contracts identified on Schedule 2.1(c) below.

"Assigned Intellectual Property Licenses" means the Intellectual Property Licenses identified on Schedule 2.1(f).

"Assigned Personal Property Leases" means the Personal Property Leases identified on Schedule 2.1(e).

"Assigned Real Property Leases" means the Real Property Leases identified on Schedule 2.1(d).

"Assumed Liabilities" as defined in Section 2.3 below.

"Auction" means that auction to be conducted in accordance with the Bid Procedures Order concerning the sale of the Purchased Assets and to be held no later than September 18, 2013.

01:14018665.1

"Avoidance Actions" as defined in Section 2.1(m) below.

"Bankruptcy Case" as defined in the Recitals.

"Bankruptcy Code" as defined in the Recitals.

"Bankruptcy Court" as defined in the Recitals.

"Bankruptcy Rules" means, collectively, the Federal Rules of Bankruptcy Procedure and the Official Bankruptcy Forms, as now in effect or hereafter amended.

"Bid Procedures Order" means the Order of the Bankruptcy Court, in form and substance reasonably acceptable to Purchaser and Sellers, establishing bidding procedures for the solicitation of higher or otherwise better bids for the Business.

"Break-Up Fee and Expense Reimbursement" as defined in Section 7.4(a) below.

"Business" as defined in the Recitals.

"Business Day" means any day of the year on which national banking institutions in Delaware are open to the public for conducting business and are not required or authorized to close.

"Cash" means all cash, cash equivalents (including bonds, certificates of deposit, U.S. Treasury bills and similar investments that are marketable securities and short-term investments), bank deposits (including deposits that have not cleared at the bank), checks received but not yet deposited, or similar cash items of Sellers.

"Closing" as defined in Section 4.1 below.

"Closing Date" as defined in Section 4.1 below.

"Closing Date Accounts Receivable Statement" as defined in Section 3.1(b) below.

"Code" means the Internal Revenue Code of 1986, as amended.

"Competing Transaction" as defined in Section 7.2(a) below.

"Confidentiality Agreement" as defined in Section 8.4 below.

"Contract" means any oral or written contract, indenture, note, bond, lease, license or other agreement, arrangement or understanding, other than a Real Property Lease, a Personal Property Lease or an Intellectual Property License.

"Copyrights" as defined in the "Intellectual Property" definition.

"Cure Amounts" as defined in Section 2.5(a) below.

-4-

"Current Accounts Receivable" means, as of the Closing Date, all billed Accounts Receivable that have been outstanding for ninety (90) days or less determined in accordance with GAAP.

"Current Accounts Receivable Target" means Thirteen Million Dollars (US) ($13,000,000).

"Deposit" means Two Million Two Hundred Thousand Dollars (US) ($2,200,000) in cash.

"Deposit Escrow Agreement" means that certain escrow agreement to be entered into by and among Sellers, Purchaser and Wilmington Trust, as escrow agent, in connection with the Deposit.

"Documents" means all files, documents, instruments, papers, books, reports, records, tapes, microfilms, photographs, letters, budgets, forecasts, ledgers, journals, title policies, customer lists, regulatory filings, operating data and plans, technical documentation (design specifications, functional requirements, operating instructions, logic manuals, flow charts, etc.), user documentation (installation guides, user manuals, training materials, release notes, working papers, etc.), marketing documentation (sales brochures, flyers, pamphlets, web pages, etc.), and other similar materials related to the Business or the Purchased Assets in each case whether or not in electronic form.

"Employee Benefit Plan" means any "employee benefit plan" (as defined in ERISA § 3(3)) and any other benefit or compensation plan, program, agreement or arrangement maintained, sponsored, or contributed or required to be contributed to by Sellers or any ERISA Affiliate or with respect to which Sellers or any ERISA Affiliate has any Liability, including any executive employee compensation program.

"Employees" means all individuals, as of any date specified herein, whether or not actively at work as of such date, who are employed by Sellers in the conduct of the Business, together with individuals who are hired in respect of the conduct of the Business after the date hereof and prior to the Closing.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended, and all Laws issued thereunder.

"ERISA Affiliate" means any Person that, at any relevant time, is or was treated as a single employer with Sellers for purposes of Code § 414.

"Escrow Account" as defined Section 3.2 below.

"Escrow Agent" as defined in Section 3.2 below.

"Escrow Agreement" as defined in Section 3.2 below.

"Escrow Amount" as defined Section 3.2 below.

01:14018665.1

"Escrow Deposit" as defined in Section 3.2 below.

"Excluded Assets" as defined in Section 2.2 below.

"Excluded Liabilities" as defined in Section 2.4 below.

"Final Order" means an order, ruling, judgment, the operation or effect of a judgment or other decree issued and entered by the Bankruptcy Court or by any state, commonwealth or other federal court or other court of competent jurisdiction which has not been reversed, vacated, stayed, modified or amended in any manner and as to which (a) the time to appeal or petition for review, rehearing, certiorari, reargument or retrial has expired and as to which no appeal or petition for review, rehearing certiorari, reargument or retrial is pending or (b) any appeal or petition for review, rehearing, certiorari, reargument or retrial can be taken or granted.

"Furniture and Equipment" means all furniture, fixtures, furnishings, machinery, appliances, leasehold improvements, and other tangible personal property owned or used by Sellers in the conduct of the Business including, without limitation, all such desks, chairs, tables, Hardware, copiers, telephone lines, telecopy machines and other telecommunication equipment, cubicles and miscellaneous office furnishings and supplies.

"GAAP" means generally accepted accounting principles in the United States as of the date hereof.

"Governmental Body" means any government or governmental or regulatory body thereof, or political subdivision thereof, whether foreign, federal, state, or local, or any agency, instrumentality or authority thereof, or any court or arbitrator (public or private).

"Hardware" means any and all computer and computer-related hardware, including computers, file servers, facsimile servers, scanners, color printers, laser printers and networks.

"Initial Incremental Bid Amount" means $22,750,000.

"Intellectual Property" means all intellectual property rights used by Sellers in connection with the Business and arising from or in respect of the following:  (i) all patents and applications therefor, including continuations, divisionals, continuations-in-part, or reissues of patent applications and patents issuing thereon (collectively, "Patents"), (ii) all trademarks, service marks, trade names, service names, brand names, all trade dress rights, logos, Internet domain names and corporate names and general intangibles of a like nature, together with the goodwill associated with any of the foregoing, all applications, registrations and renewals thereof, and material unregistered trademarks (collectively, "Marks"), (iii) copyrights and registrations and applications therefor, works of authorship, and mask work rights and, material unregistered copyrights, in each case used primarily in connection with the Business, (collectively, "Copyrights"), and (iv) all Software and Technology of Sellers used in connection with the Business.

"Intellectual Property Licenses" means (i) any grant by Sellers to a third Person of any right to use any of the Purchased Intellectual Property owned by Sellers and (ii) any grant to

01:14018665.1

Sellers of a right to use another Person's intellectual property rights, which is necessary for the use of any Purchased Intellectual Property which is not owned by Sellers.

"Inventory" means all medical equipment, therapy equipment, supplies, consumables, and other items held for sale or rental to Patients of Sellers.

"Law" means any federal, state, local or foreign law, statute, code, ordinance, rule or regulation.

"Leased Premises" means the real property demised by the Real Property Leases including, without limitation, and along with, any buildings or other improvements located thereon or forming a part thereof (notwithstanding whether Sellers lease or own such buildings or other improvements).

"Legal Proceeding" means any judicial, administrative or arbitral actions, suits, alternative dispute resolution, proceedings (public or private) or claims or any proceedings by or before a Governmental Body or the Bankruptcy Case.

"Liability" means any claim, debt, liability or obligation (whether direct or indirect, known or unknown, absolute or contingent, accrued or unaccrued, liquidated or unliquidated, or due or to become due), and including all fines, penalties, costs and expenses relating thereto.

"Lien" means any lien, encumbrance, pledge, mortgage, deed of trust, security interest, claim, lease, charge, option, right of first refusal, easement, servitude, proxy, voting trust or agreement, adverse claim, and transfer restriction under any agreement, of any kind or nature, known or unknown.

"Local Bankruptcy Rules" means the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware applicable to all cases in such district governed by the Bankruptcy Code.

"Lockbox Account" as defined in Section 12.2 below.

"Marks" as defined in the "Intellectual Property" definition.

"Material Adverse Effect" means any fact, change, development, effect, event or occurrence or failure of any fact, change, development, effect, event or occurrence that, individually or in the aggregate, would reasonably be expected to have a material adverse effect on (a) the business, operations, results of operations, or financial position of the Business, (b) the value of any material Purchased Asset or (c) the ability of Purchaser to timely receive and retain the benefit of this Agreement and the transactions contemplated by this Agreement.

"Medicaid" means any state program for medical assistance administered under Title XIX of the Social Security Act.

"Medical Reimbursement Program" means Medicare, Medicaid, any other federal health care program (as defined in 42 U.S.C. § 1320a-7b(f)), and any other state sponsored reimbursement program.

-7-

"Medical Reimbursement Program Laws" means the Laws governing the Medical Reimbursement Programs, including: 42 U.S.C. §§ 1320a-7, 1320a-7a, 1320a-7b and 1395nn; the False Claims Act (31 U.S.C. § 3729 et seq.); the False Statements Act (18 U.S.C. § 1001 et seq.); the Program Fraud Civil Penalties Act (31 U.S.C. § 3801 et seq.); the anti-fraud and abuse provisions of the Health Insurance Portability and Accountability Act of 1996 (18 U.S.C. § 1347, 18 U.S.C. § 669, 18 U.S.C. § 1035, 18 U.S.C. § 1518); and the corresponding fraud and abuse, false claims and anti self-referral Laws of any other Governmental Body.

"Medicare" means the health insurance program administered under Title XVIII of the Social Security Act.

"Notice Parties" as defined in Section 7.7 below.

"Order" means the Bid Procedures Order and the Sale Order, and any other orders of the Bankruptcy Court and any, injunction, judgment, decree, ruling, consent, approval, writ, assessment or arbitration award of a Governmental Body.

"Ordinary Course of Business" means the ordinary and usual course of normal day to day operations of the Business consistent with past practice.

"Patents" as defined in the "Intellectual Property" definition.

"Patient" means any individual that is a customer of Sellers.

"Patient Notice Letter" as defined in Section 8.1 below.

"Patient Records" means any Documents containing information concerning the clinical, billing, or medical, health care or behavioral health services provided to, or the medical, health care or behavioral health of any individual, or that are otherwise subject to regulation under applicable Law, including the Health Insurance Portability and Accountability Act of 1996 ("HIPAA"), the Health Information Technology for Economic and Clinical Health Act ("HITECH Act") and all regulations promulgated pursuant thereto, including the Transaction Code Set Standards, the Privacy Rules and the Security Rules set forth at 45 C.F.R. Parts 160 and 164.

"Permits" means any approvals, authorizations, consents, licenses, permits, provider numbers, certificates of exemption, franchises, accreditations, registrations or certificates of a Governmental Body or other regulatory entity.

"Permitted Exceptions" means (i) statutory Liens for current Taxes, assessments or other governmental charges not yet due and payable or the amount or validity of which is being contested in good faith by appropriate proceedings; (ii) zoning, entitlement and other land use and environmental regulations or designations by any Governmental Body provided that such regulations or designations have not been violated, which, in each case, do not materially interfere with the operation of the Business as currently conducted at the applicable site; (iii) title of a lessor under a capital or operating lease; (iv) Liens set forth on Schedule 1.1; and (v) mortgages, security interests and Liens arising from and related to Assumed Liabilities.

01:14018665.1

"Person" means any individual, corporation, limited liability company, partnership, firm, joint venture, association, joint-stock company, trust, unincorporated organization, association, estate, Governmental Body or other entity.

"Personal Property Leases" means all leases of personal property used by the Sellers.

"Petition Date" as defined in the Recitals.

"Purchased Assets" as defined in Section 2.1 below.

"Purchased Intellectual Property" as defined in Section 2.1 below.

"Purchase Price" as defined in Section 3.1 below.

"Purchaser" as defined in the Recitals.

"Qualified Bid" means an alternate transaction for the Purchased Assets (a) the value of which is greater or otherwise better than the sum of (i) the value of Purchaser's offer as set forth in this Agreement plus (ii) the Initial Incremental Bid Amount, (b) that is accompanied by an executed copy of an alternative purchase agreement that reflects any substantive changes to this Agreement and satisfactory evidence of committed financing or other ability to perform; (c) that is accompanied by a cash deposit in the amount of ten percent (10%) of the purchase price offered in the proposal for the alternate transaction, which deposit shall be a non-exclusive remedy of the Sellers and the Sellers shall be entitled to any other rights or remedies available hereunder, at law, or in equity; provided, however, if the Sellers consummate a sale of the Purchased Assets with a back-up bidder other than the Qualified Bidder, then retention of the Deposit shall serve as liquidated damages and shall be the Sellers sole and exclusive remedy against the Qualified Bidder.

"Qualified Bidder" means a person who (a) has delivered to Sellers an executed confidentiality agreement in form and substance acceptable to the Sellers, (b) who has delivered to the Sellers a bid for all or substantially all of the Purchased Assets and the consideration to be paid for such assets, and (c) whom the Sellers in good faith determine will be able to consummate a transaction by the Closing Date, if selected as the Successful Bidder.  The Purchaser shall be deemed a Qualified Bidder.

"Real Property Leases" means the leases and other instruments and agreements for the Leased Premises together with (and as amended, modified, supplemented or restated by) all amendments, modifications, supplements and restatements thereto or thereof (if any), and all rights and interests of Sellers relating thereto, whether held directly by Sellers or indirectly through an agent or nominee (including but not limited to all security deposits, purchase options, renewal options, rights of first refusal, reconveyance rights and expansion rights, if any) but excluding rent credits, refunds and other monetary rights for the period prior to the Closing Date.

"Restricted Names" as defined in Section 12.1 below.

"Sale Motion" means the motion filed by Sellers seeking approval of this Agreement and entry of the Sale Order.

01:14018665.1

"Sale Order" shall be an order or orders of the Bankruptcy Court, in form and substance reasonably acceptable to Purchaser and Sellers, and substantially in the form attached hereto as **Exhibit A**, approving this Agreement, and all of the terms and conditions hereof, and approving and authorizing Sellers to consummate the transactions contemplated hereby.

"Sellers" as defined in the Recitals.

"Sellers' Representative" as defined in Section 3.2 below.

"Software" means, except to the extent generally available for purchase from a third Person, any and all (i) computer programs, including any and all software implementations of algorithms, models and methodologies, whether in source code or object code, (ii) databases and compilations, including any and all data and collections of data, whether machine readable or otherwise, (iii) descriptions, flow-charts and other work product used to design, plan, organize and develop any of the foregoing, screens, user interfaces, report formats, firmware, development tools, templates, menus, buttons and icons, and (iv) all documentation including user manuals and other training documentation related to any of the foregoing.

"Successful Bidder" means any party who acquires all or substantially all of the Purchased Assets or all or substantially all of the equity interests of Sellers or any of their successors by reason of having submitted the successful bid prior to or at the Auction in a manner consistent with and authorized by the Bid Procedures Order.

"Tax Authority" means any federal, state or local government, or agency, instrumentality or employee thereof, charged with the administration of any law or regulation relating to Taxes.

"Tax Return" means all returns, declarations, reports, estimates, information returns and statements required to be filed in respect of any Taxes.

"Taxes" means (i) all federal, state, local or foreign taxes, charges or other assessments, including all net income, gross receipts, capital, sales, use, ad valorem, value added, transfer, franchise, profits, inventory, capital stock, license, withholding, payroll, employment, social security, unemployment, excise, severance, stamp, occupation, property, excise taxes under Section 4358 of the Code, unrelated business income taxes, and estimated taxes, whether disputed or not, and (ii) all interest, penalties, fines, additions to tax or additional amounts imposed by any taxing authority in connection with any item described in clause (i).

"Technology" means, collectively, all designs, formulae, algorithms, procedures, methods, techniques, ideas, know-how, research and development, technical data, programs, subroutines, tools, materials, specifications, processes, inventions (whether patentable or unpatentable and whether or not reduced to practice), apparatus, creations, improvements, works of authorship and other similar materials, and all recordings, graphs, drawings, reports, analyses, and other writings, and other tangible embodiments of the foregoing, in any form whether or not specifically listed herein, and all related technology, that are used in, incorporated in, embodied in, displayed by or relate to, or are used or useful in the Business, other than any in the form of Software.

-10-

"Third Party" means any Person other than Sellers, Purchaser or any of their respective Affiliates.

"Transfer Taxes" as defined in Section 11.1 below.

"Transition Services Agreement" as defined in Section 8.6 below.

"Unassigned Account Receivable" as defined in Section 12.2 below.

"Unrestricted Cash" means Cash less (i) any checks or other drafts that have not cleared the bank as of the Closing Date, (ii) Cash required to collateralize any letters of credit, performance bonds or other similar instruments, and (iii) Cash that may not be distributed or used pursuant to any Contract or applicable Laws or otherwise considered to be "restricted" in the books and records of Sellers.

"WARN Act" as defined in Section 5.11 below.

1.2    Other Definitional and Interpretive Matters.Unless otherwise expressly provided, for purposes of this Agreement, the following rules of interpretation shall apply:

Calculation of Time Periods.  When calculating the period of time before which, within which or following which any act is to be done or step taken pursuant to this Agreement, the date that is the reference date in calculating such period shall be excluded. If the last day of such period is a non-Business Day, the period in question shall end on the next succeeding Business Day.

Dollars.  Any reference in this Agreement to $ shall mean U.S. dollars.

Exhibits/Schedules.  All Exhibits and Schedules annexed hereto or referred to herein are hereby incorporated in and made a part of this Agreement as if set forth in full herein. Any capitalized terms used in any Schedule or Exhibit but not otherwise defined therein shall be defined as set forth in this Agreement.  To the extent there is a conflict between the terms of this Agreement and a Schedule or Exhibit, the terms of this Agreement shall control.

Gender and Number.  Any reference in this Agreement to gender shall include all genders, and words imparting the singular number only shall include the plural and vice versa.

Headings.  The division of this Agreement into Articles, Sections and other subdivisions and the insertion of headings are for convenience of reference only and shall not affect or be utilized in construing or interpreting this Agreement. All references in this Agreement to any "Section" are to the corresponding Section of this Agreement unless otherwise specified.

Herein. The words such as "herein," "hereinafter," "hereof," and "hereunder" refer to this Agreement as a whole and not merely to a subdivision in which such words appear unless the context otherwise requires.

01:14018665.1

Including. The word "including" or any variation thereof means "including, without limitation" and shall not be construed to limit any general statement that it follows to the specific or similar items or matters immediately following it.

(b)     The Parties have been advised by experienced counsel, and have participated jointly in the negotiation and drafting of this Agreement and, in the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as jointly drafted in its entirety by the parties hereto and no presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of the authorship of any provision of this Agreement.

## ARTICLE II: PURCHASE AND SALE OF ASSETS; ASSUMPTION OF LIABILITIES

2.1     Purchase and Sale of Assets.  On the terms and subject to the conditions set forth in this Agreement, at the Closing, Purchaser shall purchase, acquire and accept from Sellers, and Sellers shall sell, transfer, assign, convey and deliver to Purchaser, all of Sellers' respective right, title and interest in, to and under the Purchased Assets, free and clear of any and all existing Liens, other than Permitted Exceptions.    "Purchased Assets" shall mean the following assets of Sellers (but excluding Excluded Assets) as of the Closing to the extent related to the Business, whether tangible or intangible, real or personal and wherever located and by whomever possessed:

(a)     all Inventory;

(b)     all Documents related to the Business, including all Patient Records; provided, however, Sellers may retain copies of all Documents, including Patient Records for the purpose of winding down their affairs and ensuring compliance with applicable laws;

(c)     the Contracts (and all rights of Sellers thereunder) set forth on Schedule (c) (the "Assigned Contracts");

(d)     the Real Property Leases  (and all rights of Sellers thereunder) set forth in Schedule (d) (the "Assigned Real Property Leases");

(e)     the Personal Property Leases  (and all rights of Sellers thereunder) set forth in Schedule (e) (the "Assigned Personal Property Leases");

(f)     (i) all Intellectual Property; and (ii) the rights of Sellers as licensees under the Intellectual Property Licenses identified in Schedule (f) (the "Assigned Intellectual Property Licenses," and (i) and (ii) together, the "Purchased Intellectual Property");

(g)     all rights of Sellers, including the right to any rental or other payments, arising out of equipment rental arrangements of Sellers with any Patients whether pursuant to a Contract or otherwise;

(h)     all Accounts Receivable;

-12-

01:14018665.1

(i)    all goodwill, telephone and facsimile numbers, websites, domain names, and other intangible assets owned by Sellers and associated with the Business;

(j)    all Furniture and Equipment;

(k)    any motor vehicles owned by Sellers;

(l)    all Permits used by Sellers in the Business, to the extent assignable; and

(m)    Sellers' rights of recovery, claims, and causes of action, if any, under Sections 544, 547, 548, 549 and 550 of the Bankruptcy Code, and any proceeds arising from any such action ("Avoidance Actions");

(n)    Sellers' rights, claims, or causes of action, except for rights, claims or causes of action against Passaic Healthcare Services LLC d/b/a Allcare ("Allcare Claims"); and

(o)    Two Hundred and Fifty Thousand Dollars (US) ($250,000.00) of Unrestricted Cash.

2.2    Excluded Assets. Nothing herein contained shall be deemed to sell, transfer, assign or convey the Excluded Assets to Purchaser, and Sellers shall retain all right, title and interest to, in and under the Excluded Assets. "Excluded Assets" shall mean the following assets, properties, interests and equities of Sellers:

(a)    all of Sellers' deposits or prepaid charges and expenses paid in connection with or relating to any Excluded Assets;

(b)    any Contract, Real Property Lease, Personal Property Lease, or Intellectual Property License not identified in Section 2.1 above;

(c)    any claim, right or interest of Sellers in or to any refund, rebate, abatement or other recovery for Taxes, together with any interest due thereon or penalty rebate arising therefrom, for any Tax period (or portion thereof) ending on or before the Closing Date;

(d)    all insurance policies or rights to proceeds thereof for periods prior to the Closing Date;

(e)    the Allcare Claims; and

(f)    any Unrestricted Cash in excess of the amount purchased by Purchaser pursuant to Section 2.1(o) above.

2.3    Assumption of Liabilities. On the terms and subject to the conditions set forth in this Agreement, at the Closing, Purchaser shall assume, effective as of the Closing, and shall timely pay, perform and discharge in accordance with their respective terms, only the Liabilities accruing from and after the Closing with respect to the Purchased Assets (the "Assumed Liabilities"), including without limitation:

01:14018665.1

(a)    all Liabilities of Sellers under the Assigned Contracts, Assigned Real Property Leases, Assigned Personal Property Leases, and Purchased Intellectual Property;

(b)    all Liabilities arising out of, relating to or with respect to Purchaser's employment of any Employee from and after the Closing Date;

(c)    all Liabilities arising from the rental or sale of Inventory in the Ordinary Course of Business from and after the Closing Date;

(d)    Purchaser's share of all Transfer Taxes applicable to the transfer of the Purchased Assets pursuant to this Agreement as determined pursuant to Section 11.1;

(e)    all other Liabilities with respect to the Business, the Purchased Assets or the Employees arising after the Closing; and

(f)    all Liabilities relating to amounts required to be paid by Purchaser hereunder.

2.4    <u>Excluded Liabilities</u>.  Except for the items expressly included in the Assumed Liabilities, Purchaser shall not assume or become liable for the payment or performance of any Liability of Sellers or otherwise related to the Business of any nature whatsoever, whether accrued or unaccrued, known or unknown, fixed or contingent, including, without limitation, any liability arising from or related to the Excluded Assets or any Taxes arising out of or resulting from Sellers' operation of the Business prior to the Closing Date ("<u>Excluded Liabilities</u>").

2.5    <u>Executory Contracts</u>.

(a)    At Closing and pursuant to Section 365 of the Bankruptcy Code, Sellers shall assume, assign and sell to Purchaser and Purchaser shall assume and purchase from Sellers, the Assigned Contracts, Assigned Real Property Leases, Assigned Personal Property Leases, and Assigned Intellectual Property Licenses.  Except as otherwise set forth in any Bankruptcy Court order approving this Agreement and authorizing the sale of the Purchased Assets, the amount, as determined by the Bankruptcy Court, if any, necessary to cure all defaults, if any, and to pay all actual or pecuniary losses that have resulted from such defaults thereunder on the part of the Sellers, if any (the "<u>Cure Amounts</u>") shall be paid by Sellers, on or before Closing, and not by Purchaser and Purchaser shall have no liability therefore; provided, however, Sellers shall not be obligated to cure any such default that is in dispute as of the Closing Date if an escrow or other commercially reasonable arrangement with respect thereto shall have been established and funded by the Sellers in an amount sufficient to satisfy the dispute in full at or following the Closing pursuant to an order of the Bankruptcy Court.

(b)    Notwithstanding Purchaser's initial designation of a Contract, Real Property Lease, Personal Property Lease, or Intellectual Property License to be assumed or assigned to it pursuant to this Agreement:

(i)    Purchaser shall have until the Closing Date to give written notice to the Sellers that it elects to remove any such previously designated Contract, Real Property Lease, Personal Property Lease, or Intellectual Property License from Schedule 2.1(c), 2.1(d),

-14-

2.1(e) or 2.1(f), and such contract, lease, or license so removed shall be deemed not assumed and assigned without the need for further order of the Bankruptcy Court.  If Purchaser elects to remove any such previously designated contract, lease, or license as provided for herein, there shall be no reduction in the Purchase Price;

(ii)    Purchaser shall have until September 10, 2013 to give written notice to the Sellers that it elects to add any Contract, Real Property Lease, Personal Property Lease, or Intellectual Property License not previously designated as a Purchased Asset to Schedule 2.1(c), 2.1(d), 2.1(e) or 2.1(f), and such contract, lease, or license so added shall be deemed assumed and assigned at Closing without the need for further order of the Bankruptcy Court.  If Purchaser timely elects to add any contract, lease or license, not previously designated in accordance with this Section 2.5, there shall be no increase in the Purchase Price;

(iii)    Between September 11, 2013 and Closing, Purchaser may give written notice to Sellers that it elects to add one or more Contracts, Real Property Leases, Personal Property Leases, or Intellectual Property Licenses not previously designated as a Purchased Asset to Schedule 2.1(c), 2.1(d), 2.1(e) or 2.1(f), and Sellers shall use good faith efforts to obtain a Bankruptcy Court order authorizing and approving the assumption and assignment of such contract, lease or license; provided, however, the Purchaser shall pay all Cure Amounts associated therewith; provided, further, if, notwithstanding Sellers' good faith efforts to assume and assign any such contract, lease, or license, Sellers are unable to obtain a Bankruptcy Court order authorizing and approving such assumption and assignment the Purchaser shall have no right to a purchase price adjustment or to terminate this Agreement.

(iv)    Within three (3) days after the Bid Procedures Order is entered by the Bankruptcy Court, the Sellers shall provide adequate notice, in accordance with the Bankruptcy Code, Bankruptcy Rules, Local Bankruptcy Rules and any orders of the Bankruptcy Court, to each non-Seller party (served Attn: Legal Department, Officer, Managing or General Agent or to the attention of any other agent authorized by appointment or by law to receive service of process) to any Contract, Real Property Lease, Personal Property Lease, or Intellectual Property License of (i) the possible assumption and assignment of such Contract, Real Property Lease, Personal Property Lease, or Intellectual Property License to the Purchaser by the Sellers, (ii) the proposed Cure Amount related thereto and (iii) the deadline for objections and responses to the potential assumption and assignment of the Contract, Real Property Lease, Personal Property Lease, or Intellectual Property License (including Cure Amount objections and objections regarding adequate assurance of future performance by the Purchaser) and that all responses or objections shall be served on, among others, counsel to Purchaser.

2.6    Further Conveyances and Assumptions.  From time to time following the Closing, each Party shall, and shall cause their respective Affiliates to, execute, acknowledge and deliver all such further conveyances, notices, assumptions, releases and other instruments, and shall take such further actions, as may be reasonably necessary or appropriate to assure fully to Purchaser and its respective successors or assigns, all of the properties, rights, titles, interests, estates, remedies, powers and privileges intended to be conveyed to Purchaser under this Agreement and to assure fully to Sellers and their Affiliates and their successors and assigns, the assumption of the liabilities and obligations intended to be assumed by Purchaser under this Agreement, and to otherwise make effective the sale contemplated hereby.

-15-

## ARTICLE III: PURCHASE PRICE

3.1      Purpose Price.

(a)      The purchase price for the Purchased Assets shall be Twenty-Two Million Dollars (US) ($22,000,000.00) subject to the terms and conditions of this Agreement and as adjusted pursuant to Section 3.1(b) below (the "Purchase Price").

(b)      No later than three (3) Business Days prior to the Closing Date, Sellers shall have delivered to Purchaser an updated version of Schedule 5.10, setting forth the Current Accounts Receivable of Sellers as of the date three (3) Business Days prior to the Closing Date, together with such schedule(s) and data with respect to the determination of the Current Accounts Receivable as may be appropriate (the "Closing Date Accounts Receivable Statement"). The Purchase Price shall be decreased to the extent that the amount of Current Accounts Receivable identified in the Closing Date Accounts Receivable Statement is less than the Current Accounts Receivable Target. If the amount of Current Accounts Receivable identified in the Closing Date Accounts Receivable Statement is greater than the Current Accounts Receivable Target, then no adjustment will be made.

(c)      Pursuant to the Deposit Escrow Agreement, Purchaser shall deposit with Wilmington Trust, within three (3) Business Days of execution of this Agreement, the Deposit. The Deposit shall be applied against the Purchase Price and paid to Sellers if the Closing occurs and as otherwise provided in the Sale Order and the Deposit Escrow Agreement and released to Purchaser if this Agreement is terminated pursuant to Section 4.4(a) or (c) below, within three (3) Business Days of termination and as otherwise provided in the Sale Order. If this Agreement is terminated pursuant to Section 4.4(b) below, Purchaser shall forfeit, and Sellers shall be entitled to retain, the Deposit and the receipt by the Sellers of the Deposit shall be a non-exclusive remedy of the Sellers and the Sellers shall be entitled to any other rights or remedies available hereunder, at law, or in equity; provided, however, if the Sellers consummate a sale of the Purchased Assets with a back-up bidder, then retention of the Deposit shall serve as liquidated damages and shall be the Sellers sole and exclusive remedy against the Purchaser.

(d)      The Purchase Price, less the Deposit, less the Escrow Amount and net of the adjustments, if any, set forth in Section 3.1(b), shall be paid by Purchaser to Sellers at the Closing in cash or by wire transfer of immediately available funds into an account designated by Sellers.

3.2      Accounts Receivable Escrow. At Closing, Purchaser shall deposit One Million Dollars (US) ($1,000,000) (the "Escrow Amount" and, together with all earnings thereon, the "Escrow Deposit") from the Purchase Price on behalf of the Sellers with an escrow agent selected by mutual agreement of the Parties (the "Escrow Agent") to be deposited into an account (the "Escrow Account"), by wire transfer of immediately available United States federal funds. The Escrow Deposit shall be held, invested and disbursed as specified in and pursuant to the terms and conditions of an Escrow Agreement, substantially in the form attached hereto as **Exhibit B** (the "Escrow Agreement"). Sellers designate Mike Flynn to serve as the Sellers' Representative (the "Sellers' Representative") for purposes of administrating disbursements of the Escrow Account.

01:14018665.1

## ARTICLE IV: CLOSING AND TERMINATION

4.1     <u>Closing Date</u>.  Subject to the satisfaction of the conditions set forth in Section 10 (or the waiver thereof by the Party entitled to waive that condition),  the closing of the purchase and sale of the Purchased Assets and the assumption of the Assumed Liabilities (the "<u>Closing</u>") shall take place at the offices of K&L Gates LLP, 599 Lexington Avenue, New York, NY 10022 (or at such other place as Sellers and Purchaser may designate in writing) at 10:00 a.m. (Eastern time) on a date that is no more than three (3) Business days following the satisfaction or waiver of the conditions set forth in <u>ARTICLE X</u> (other than conditions that by their nature are to be satisfied at the Closing, but subject to the satisfaction or waiver of such conditions), unless another time or date, or both, are agreed to in writing by Sellers and Purchaser. The date on which the Closing shall be held is referred to in this Agreement as the "<u>Closing Date</u>." Unless otherwise agreed by Sellers and Purchaser in writing, regardless of the time at which the Closing is completed, the Closing shall be deemed effective and all right, title and interest of Sellers in any asset to be acquired by Purchaser hereunder, and any Assumed Liability, shall be considered to have passed to Purchaser as of 12:01 a.m. (Eastern time) on the Closing Date.

4.2     <u>Deliveries by Sellers.</u>

(a)     No later than three (3) Business Days prior to the Closing Date, Sellers shall cause to be prepared and delivered to the Purchaser the Closing Date Accounts Receivable Statement.

(b)     At the Closing, Sellers shall deliver or cause to be delivered to Purchaser:

(i)     a certified copy of the Sale Order (as such order shall have become a Final Order) and the docket in the Bankruptcy Case;

(ii)     a duly executed bill of sale for all the Purchased Assets that are tangible personal property in a form reasonably acceptable to Purchaser and Sellers;

(iii)     a duly executed assignment and assumption agreement in a form reasonably acceptable to Purchaser and Sellers, and duly executed assignments of the U.S. trademark registrations and applications included in the Purchased Intellectual Property, in a form suitable for recording in the U.S. Patent and Trademark Office, and general assignments of all other Purchased Intellectual Property;

(iv)     duly executed assignment and assumption agreements in forms prepared by Purchaser's counsel at Purchaser's expense and reasonably acceptable to Sellers for all Assigned Contracts, Assigned Real Property Leases, Assigned Personal Property Leases, and Assigned Intellectual Property Licenses;

(v)     executed counterparts of the Escrow Agreement by each Seller and Sellers' Representative;

(vi)     certified resolutions of the governing body of each Seller approving and authorizing the sale of the Purchased Assets;

-17-

(vii)     officer's certificates, executed by a duly authorized officer of each Seller to the effect that all conditions to Closing have been satisfied;

(viii)    affidavits executed by each Seller stating that such Seller is not a "foreign person" within the meaning of Section 1445(f)(3) of the Code;

(ix)     executed counterparts of the Transition Services Agreement by each Seller;

(x)     all documents necessary to effectuate the name changes of Sellers pursuant to Section 12.1 in each case fully completed and executed by Sellers and in a form ready for filing in the appropriate jurisdictions immediately following the Closing;

(xi)     all other instruments of conveyance and transfer executed by Sellers, in form and substance reasonably acceptable to Purchaser, as may be necessary to convey the Purchased Assets to Purchaser free and clear of all Liens other than Permitted Exceptions; and

(xii)    such other documents, instruments and certificates as Purchaser may reasonably request and which are necessary to effect the Closing.

4.3     Deliveries by Purchaser.  At the Closing, Purchaser shall deliver or cause to be delivered to Sellers:

(a)     the Purchase Price, in immediately available funds, as set forth in Section 3.1 above;

(b)     executed counterparts of the assignment and assumption agreement in a form reasonable acceptable to Purchaser and Sellers, and duly executed assignments of the U.S. trademark registrations and applications included in the Purchased Intellectual Property, in a form suitable for recording in the U.S. Patent and Trademark Office, and general assignments of all other Purchased Intellectual Property;

(c)     executed counterparts of the assignment and assumption agreements in forms prepared by Purchaser's counsel at Purchaser's expense and reasonably acceptable to Sellers for all Assigned Contracts, Assigned Real Property Leases, Assigned Personal Property Leases, and Assigned Intellectual Property Licenses;

(d)     executed counterpart of the Escrow Agreement;

(e)     executed counterpart of the Transition Services Agreement by Purchaser;

(f)     all other instruments of conveyance and transfer executed by Sellers, in form and substance reasonably acceptable to Purchaser, as may be necessary to convey the Purchased Assets to Purchaser free and clear of all Liens other than Permitted Exceptions; and

(g)     such other documents, instruments and certificates as Sellers may reasonably request and which are necessary to effect the Closing.

-18-

4.4      Termination of Agreement.  This Agreement may be terminated prior to the Closing as follows:

(a)      Termination by Purchaser.  So long as Purchaser is not then in breach of its obligations under this Agreement in any material respect, Purchaser may terminate this Agreement upon the occurrence of any of the following:

(i)      if any of the conditions to the obligations of Purchaser to close that are set forth in Sections 10.1 and 10.3 shall have become incapable of fulfillment other than as a result of a breach of this Agreement by Purchaser, and such condition is not waived by Purchaser;

(ii)      if there shall be a material breach by Sellers of any representation, warranty, covenant or agreement contained in this Agreement which breach cannot be or has not been cured within ten (10) Business Days after the giving of written notice by Purchaser to Sellers of such breach;

(iii)      if the Petition Date does not occur by August 16, 2013;

(iv)      if the Bid Procedures Order approving the Purchaser's stalking horse bid has not been entered by August 30, 2013;

(v)      if the Bid Procedures Order does not provide for any of the followings: (a) approval of the Break-Up Fee and Expense Reimbursement; (b) that the Liens and claims of the Sellers' senior secured lenders shall be subject and subordinate to the Purchaser's right to receive payment of the Break-Up Fee and Expense Reimbursement; (c) that the Auction will be held no later than September 18, 2013 and (d) that the Sale Hearing shall be held no later than September 20, 2013;

(vi)      if the Purchaser is not selected as the Successful Bidder or designated as the back-up bidder by the Sellers at the Auction;

(vii)      if the Sale Order, has not been entered and become a Final Order by October 9, 2013;

(viii)      if the Closing has not occurred by October 14, 2013;

(ix)      if the Sellers' Bankruptcy Case shall be converted into a case under Chapter 7 of the Bankruptcy Code or dismissed, or if a trustee or examiner with expanded powers is appointed in the Sellers' Bankruptcy Case; or

(x)      if there shall be excluded from the Purchased Assets any Assigned Contracts, Assigned Real Property Leases, Assigned Personal Property Leases or Purchased Intellectual Property, that is not assignable or transferable pursuant to the Bankruptcy Code or otherwise without the consent of any Person other than Sellers, to the extent that such consent shall not have been given prior to the Closing and the absence of such Assigned Contracts, Assigned Real Property Leases, Assigned Personal Property Leases and Purchased Intellectual Property, would have a Material Adverse Effect on the Business.

-19-

(b)     Termination by Sellers. So long as Sellers are not then in breach of its obligations under this Agreement in any material respect, Sellers may terminate this Agreement upon the occurrence of any of the following:

(i)     if any of the conditions to the obligations of Sellers to close that are set forth in Sections 10.2 and 10.3 shall have become incapable of fulfillment other than as a result of a breach of this Agreement by Sellers, and such condition is not waived by Sellers; or

(ii)     if there shall be a material breach by Purchaser of any representation, warranty covenant or agreement contained in this Agreement, which breach cannot be or has not been cured within ten (10) Business Days after the giving of written notice by Sellers to Purchaser of such breach.

(c)     Termination by Purchaser and/or Sellers. Either Purchaser or Sellers may terminate this Agreement upon the occurrence of any of the following:

(i)     by mutual written consent of Sellers and Purchaser;

(ii)     if the Bankruptcy Court shall enter an Order approving a Competing Transaction with a Successful Bidder unless the Purchaser has been designated as the back-up bidder;

(iii)     by Sellers or Purchaser if there shall be in effect a Final Order of a Governmental Body of competent jurisdiction restraining, enjoining or otherwise prohibiting the consummation of the transactions contemplated hereby; it being agreed that the parties hereto shall promptly appeal any adverse determination which is not nonappealable (and pursue such appeal with reasonable diligence); or

(iv)     if the Parties have not executed the Transition Services Agreement by August 31, 2013; provided, however, in the event that Purchaser, in its sole discretion, has waived the requirement for the Transition Services Agreement, neither Party shall be permitted to terminate this Agreement pursuant to this Section 4.4(c)(iv).

4.5     Procedure For Termination. In the event of termination of this Agreement by Purchaser or Sellers, or both, pursuant to Section 4.4, written notice thereof shall forthwith be given to the other parties, and upon the giving of such notice (or at such time as specified in the particular termination right set forth in Section 4.4) the sale contemplated by this Agreement shall be abandoned, without further action by the parties.

4.6     Effect of Termination.

(a)     Subject to the Break-Up Fee and Expense Reimbursement obligations of the Sellers, in the event that this Agreement is validly terminated pursuant to Section 4.4(a) or (c) as provided herein, then (i) each of the parties shall be relieved of its duties and obligations arising under this Agreement after the date of such termination and such termination shall be without liability to Purchaser or Sellers and (ii) the Deposit, together with all interest accrued thereon shall be returned to Purchaser within three (3) business days after termination of this Agreement; and (iii) the Sellers shall not be entitled to any damages, losses, or payment from the

Purchaser, and the Purchaser shall have no further obligation or liability of any kind to the Sellers; provided, however, that the obligations of the parties set forth in ARTICLE XIII hereof shall survive any such termination and shall be enforceable hereunder.

(b)     If this Agreement is terminated pursuant to Section 4.4(b) above, Purchaser shall forfeit, and Sellers shall be entitled to retain, the Deposit and the receipt by the Sellers of the Deposit shall be a non-exclusive remedy of the Sellers and the Sellers shall be entitled to any other rights or remedies available hereunder, at law, or in equity; provided, however, if the Sellers consummate a sale of the Purchased Assets with a back-up bidder, then retention of the Deposit shall serve as liquidated damages and shall be the Sellers sole and exclusive remedy against the Purchaser.

## ARTICLE V: REPRESENTATIONS AND WARRANTIES OF SELLERS

Each Seller hereby represents and warrants to Purchaser that:

5.1     Authorization of Agreement. Except for such authorization as is required by the Bankruptcy Court (as hereinafter provided for), Seller has all requisite power, authority and legal capacity to execute and deliver this Agreement and Seller has all requisite power, authority and legal capacity to execute and deliver each other agreement, document, or instrument or certificate contemplated by this Agreement or to be executed by Seller in connection with the consummation of the transactions contemplated by this Agreement (the "Seller Documents"), to perform its respective obligations hereunder and thereunder and to consummate the transactions contemplated hereby and thereby.  The execution and delivery of this Agreement and the Seller Documents and the consummation of the transactions contemplated hereby and thereby have been duly authorized by all requisite corporate action on the part of Seller.  This Agreement has been, and each of the Seller Documents will be at or prior to the Closing, duly and validly executed and delivered by Seller and (assuming the due authorization, execution and delivery by the other parties hereto and thereto, the entry of the Sale Order) this Agreement constitutes, and each of the Seller Documents when so executed and delivered will constitute, legal, valid and binding obligations of Seller enforceable against Seller in accordance with their respective terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium and similar laws affecting creditors' rights and remedies generally, and subject, as to enforceability, to general principles of equity, including principles of commercial reasonableness, good faith and fair dealing (regardless of whether enforcement is sought in a proceeding at law or in equity).

5.2     Title to Purchased Assets. Subject to entry of the Sale Order, Purchaser will be vested with title to such Purchased Assets, free and clear of all Liens, other than Permitted Exceptions, to the fullest extent permissible under Section 363(f) of the Bankruptcy Code.  At and as of the Closing, Sellers will convey the Purchased Assets to Purchaser by the bill of sale and such other certificates of title and instruments of assignment and transfer sufficient to vest in Purchaser all of the Purchased Assets, free and clear of all Liens, other than the Permitted Exceptions.

5.3     No Conflict or Violation. The execution, delivery and performance by Seller of this Agreement and each Seller Document to which Seller is a party does not violate or

conflict with any provision of Seller's certificate of incorporation, bylaws, or similar organizational documents.

5.4      Consents and Approvals.  Other than such consents, waivers, authorizations or approvals that have been obtained, and subject to Purchaser's receipt of the Sale Order, no consent, waiver, authorization or approval of any Person or declaration, filing or registration with any Governmental Body is required in connection with the execution and delivery by Seller of this Agreement or the performance by Seller of its obligations hereunder.

5.5      Litigation.  Except as set forth on Schedule 5.5 and for the Bankruptcy Case and proceedings therein, there is no action, suit, or proceeding, in equity or at law, arbitration or administrative or other proceeding by or before any Person (including, without limitation, any Governmental Body), pending, or to Seller's knowledge, threatened in writing against Seller which, if adversely determined, would result in a Material Adverse Effect on the Business or the Purchased Assets at any time before or after the Closing Date, and Seller has not received written notice that any of the Purchased Assets are subject to any judgment, order or decree entered in any material lawsuit or proceeding that would continue to affect the Purchased Assets after Closing, nor be binding on Purchaser.

5.6      Contracts.  Seller has provided Purchaser access to a correct and complete copy of each Contract (and all amendments, modifications, and supplements thereto).  Subject to laws of general application relating to bankruptcy, insolvency and the relief of debtors, each of the Assigned Contracts is valid and in full force and effect in accordance with its terms, and no option to renew or extend such Assigned Contracts has been missed or will lapse before the Closing.

5.7      Real Property Leases.

(a)      Seller does not own any real property.  Seller has provided Purchaser with, or access to, true, correct, accurate and complete copies of all leases and other instruments and agreements (together with all amendments, modifications, supplements and restatements thereto, if any, in Seller's possession pertaining to the Real Property Leases).

(b)      After giving effect to the Sale Order, each Real Property Lease will be in full force and effect and comprise Seller's entire agreement with the counterparty concerning the leased premises.

(c)      To Seller's knowledge, after giving effect to the Sale Order:  (y) no landlord will be in material default under any Real Property Lease, and (z) no event has occurred which, with the giving of notice or the passage of time or both, would result in a material default by any landlord under any Real Property Lease.

(d)      To Seller's knowledge, after giving effect to the Sale Order: (y) no landlord presently asserts any matured right to terminate or to cancel any Real Property Lease, and (z) Seller knows of no fact which, with the giving of notice or the passage of time, or both, could give rise to any such right.

5.8      Personal Property Leases.

-22-

(a)    Seller has provided Purchaser with, or access to, true, correct, accurate and complete copies of all leases and other instruments and agreements (together with all amendments, modifications, supplements and restatements thereto, if any, in Seller's possession pertaining to the Personal Property Leases).

(b)    After giving effect to the Sale Order, each Personal Property Lease will be in full force and effect and comprise Seller's entire agreement with the counterparty concerning the leased property.

(c)    To Seller's knowledge, after giving effect to the Sale Order: (y) no lessor will be in material default under any Personal Property Lease, and (z) no event has occurred which, with the giving of notice or the passage of time or both, would result in a material default by any lessor under any Personal Property Lease.

(d)    To Seller's knowledge, after giving effect to the Sale Order: (y) no lessor presently asserts any matured right to terminate or to cancel any Personal Property Lease, and (z) Seller knows of no fact which, with the giving of notice or the passage of time, or both, could give rise to any such right.

5.9    Intellectual Property.

(a)    Schedule 5.9(a) sets forth a true, complete and correct list of all of the Intellectual Property.  Except for the Intellectual Property Licenses set forth on Schedule 5.9(a), Seller does not license any Intellectual Property to a Third Party.

(b)    Seller owns and possesses, free and clear of all Liens (other than Liens set forth on Schedule 1.1 or that will be discharged pursuant to the Sale Order), all right, title and interest in and to, or have a right to use pursuant to a written license agreement that is valid and enforceable, all of the Intellectual Property necessary for the conduct of the Business as presently conducted by Seller.  All of the Intellectual Property owned by Seller and set forth or required to be set forth on Schedule 5.9(a) is valid, subsisting and enforceable.  Seller has taken commercially reasonable actions to maintain and protect the Intellectual Property owned by Seller.

(c)    No Legal Proceedings are pending or, to Seller's knowledge, are threatened, contesting the validity, use, ownership or enforceability of any of the Intellectual Property owned by Seller.  To Seller's knowledge, Seller is not infringing, misappropriating or otherwise conflicting with, and the operation of the Business as presently conducted does not infringe, misappropriate or otherwise conflict with, any Intellectual Property of any Third Party.  To Seller's knowledge, there are no facts which indicate a likelihood of any of the foregoing.  Seller has not received any written notices regarding any of the foregoing (including any demands or offers to license any Intellectual Property from any Third Party in connection with a Legal Proceeding for infringement, misappropriation or conflict with such Intellectual Property).

(d)    To Seller's knowledge, no Third Party is infringing, misappropriating or otherwise conflicting with, and no Third Party has infringed, misappropriated or otherwise conflicted with, any of the Intellectual Property owned by Seller.

-23-

01:14018665.1

5.10      Accounts Receivable.  Schedule 5.10 sets forth a complete list of all Accounts Receivable, showing the amounts due and an aging analysis thereof as of the date hereof.  Except as disclosed on Schedule 5.10, and subject to reserves for doubtful accounts (including with respect to deductions, set-off or counterclaim by the account obligor) determined in accordance with GAAP, and subject to normal and customary trade discounts, each as described on Schedule 5.10, all Accounts Receivable are collectible.  All Accounts Receivable (i) represent bona fide claims against debtors for sales and other charges, (ii) arose in the Ordinary Course of Business, (iii) are obligations of the respective debtors enforceable in accordance with their terms, and (iv) are not in dispute with the respective debtor.  Sellers have not accelerated or requested early payment of any Accounts Receivable.

5.11      WARN Act.  Seller has not effectuated a "plant closing" or "mass layoff" as defined by the federal Worker Adjustment and Retraining Notification Act of 1988 (the "WARN Act") or any similar local, state or foreign Law requiring notice to employees, affecting any site of employment or facility of the Business, nor has the Business been affected by any transaction or engaged in layoffs or employment terminations sufficient to trigger application of any state, local or foreign Law or regulation similar to the federal WARN Act, including triggering application by a rolling "employment loss" (as defined in the WARN Act).  The Employees of the Business have not suffered an actual "employment loss" in the previous ninety (90) calendar days.

5.12      No Other Representations or Warranties; Schedules.  Except for the representations and warranties contained in this ARTICLE V, neither Sellers nor any other Person makes any other express or implied representation or warranty with respect to the Business, the Purchased Assets, the Assumed Liabilities, and Sellers disclaim any other representations or warranties, whether made by Sellers, Sellers' Affiliates (if any) or any of their respective officers, directors, Employees, agents or other Representatives.  Except for the representations and warranties contained in ARTICLE V hereof, Sellers (i) expressly disclaim and negate any representation or warranty, expressed or implied, at common law, by statute, or otherwise, relating to the condition of the Purchased Assets (including any implied or expressed warranty of merchantability or fitness for a particular purpose, or of conformity to models or samples of materials) and (ii) disclaim all liability and responsibility for any representation, warranty, projection, forecast, statement, or information made, communicated, or furnished (orally or in writing) to Purchaser or its Representatives (including any opinion, information, projection, or advice that may have been or may be provided to Purchaser or its Representatives by any director, officer, employee, agent, consultant, or other Representative of Sellers or any of Sellers' Affiliates (if any)).  Sellers make no representations or warranties to Purchaser regarding the probable success or profitability of the Business.

## ARTICLE VI: REPRESENTATIONS AND WARRANTIES OF PURCHASER

Purchaser hereby represents and warrants to Sellers that:

6.1      Authorization of Agreement.  Purchaser has full corporate power and authority to execute and deliver this Agreement and each other agreement, document, instrument or certificate contemplated by this Agreement or to be executed by it in connection with the consummation of the transactions contemplated hereby and thereby (the "Purchaser

-24-

Documents"), and to consummate the transactions contemplated hereby and thereby. The execution, delivery and performance by Purchaser of this Agreement and each Purchaser Document have been duly authorized by all necessary corporate action on behalf of Purchaser. This Agreement has been, and each Purchaser Document will be at or prior to the Closing, duly executed and delivered by Purchaser, and (assuming the due authorization, execution and delivery by the other parties hereto and thereto) this Agreement constitutes, and each Purchaser Document when so executed and delivered will constitute, the legal, valid and binding obligations of Purchaser, enforceable against Purchaser in accordance with their respective terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium and similar laws affecting creditors' rights and remedies generally, and subject, as to enforceability, to general principles of equity, including principles of commercial reasonableness, good faith and fair dealing (regardless of whether enforcement is sought in a proceeding at law or in equity).

6.2     Financial Capability.   Purchaser (i) has, and at the Closing will have, sufficient internal funds (without giving effect to any unfunded financing regardless of whether any such financing is committed) available to pay the Purchase Price and any expenses incurred by Purchaser in connection with the transactions contemplated by this Agreement, (ii) has, and at the Closing will have, the resources and capabilities (financial or otherwise) to perform its obligations hereunder, and (iii) has not incurred any obligation, commitment, restriction or Liability of any kind, which would impair or adversely affect such resources and capabilities.

6.3     Financial Advisors.   No Person has acted, directly or indirectly, as a broker, finder or financial advisor for Purchaser in connection with the transactions contemplated by this Agreement and no Person is entitled to any fee or commission or like payment in respect thereof.

6.4     Litigation.   There are no Legal Proceedings pending or, to the knowledge of Purchaser, threatened against Purchaser, or to which Purchaser is otherwise a party before any Governmental Body, which, if adversely determined, would reasonably be expected to have a material adverse effect on the ability of Purchaser to perform its obligations under this Agreement or to consummate the transactions hereby.   Purchaser is not subject to any Order of any Governmental Body except to the extent the same would not reasonably be expected to have a material adverse effect on the ability of Purchaser to perform its obligations under this Agreement or to consummate the transactions contemplated hereby.

## ARTICLE VII: BANKRUPTCY COURT MATTERS

7.1     Sale Motion, Bid Procedures Order, and Sale Order.   No later than August 16, 2013, the Sellers shall file the Sale Motion seeking entry of the Bid Procedures Order and Sale Order. Sellers shall provide Purchaser with drafts of the Bid Procedures Order and Sale Order prior to the filing thereof with the Bankruptcy Court in order for Purchaser to review and provide Sellers with comments thereon and to consent thereto.   Subject to the termination provisions of this Agreement, the purchase and sale of the Purchased Assets will be in accordance with (and only in accordance with) the Bid Procedures Order.   Sellers shall pursue diligently the entry of the Bid Procedures Order and the Sale Order.   Sellers shall use commercially reasonable efforts to comply (or obtain an order from the Bankruptcy Court waiving compliance) with all requirements under the applicable provisions of the Bankruptcy Code, the Bankruptcy Rules, and

01:14018665.1

the Local Bankruptcy Rules in connection with obtaining approval of the Bid Procedures Order and the Sale Order.

7.2     Competing Transaction.

(a)     This Agreement is subject to approval by the Bankruptcy Court and the consideration by Sellers of higher or otherwise better bids with respect to any transaction (or series of transactions) involving the direct or indirect sale, transfer, or other disposition of the Purchased Assets to a purchaser or purchasers other than Purchaser ("Competing Transaction").

(b)     From the Petition Date (and any prior time) and until the Auction, Sellers are permitted to cause its representatives and Affiliates to initiate contact with, solicit or encourage submission of any inquiries, proposals or offers by, any Person (in addition to Purchaser and its Affiliates, agents and representatives) in connection with any sale or other disposition of the Purchased Assets. In addition, prior to the Auction, Sellers shall have the responsibility and obligation to respond to any inquiries or offers to purchase all or any part of the Purchased Asset and perform any and all other acts related thereto which are required under the Bankruptcy Code or other applicable law, including, without limitation, supplying information relating to the Business and the assets of Sellers to prospective purchasers.

(c)     Following completion of the Auction, Sellers shall not cause its representatives or Affiliates to initiate contact with, solicit or encourage submission or any inquiries, proposals or offers by, any Person in connection with any sale or other disposition of the Purchased Assets. In addition, unless otherwise directed by the Bankruptcy Court, Sellers shall not after completion of the Auction, respond to any inquiries or offers to purchase all or part of the Purchased Assets or perform any other acts related thereto, including supplying information relating to the Business and assets of Sellers to prospective purchasers.

7.3     Bankruptcy Court Filings.

(a)     Sellers shall promptly provide Purchaser with the proposed final drafts of any and all motions, applications, pleadings, schedules, statements, reports and other papers (including exhibits and supporting documentation) filed by or on behalf of Sellers related to the Purchased Assets, the Assigned Contracts, Assigned Real Property Leases, Assigned Personal Property Leases and Purchased Intellectual Property, this Agreement or the consummation of the transactions or any provision thereof or herein, so as to provide Purchaser and its counsel with a reasonable opportunity to review and comment on such motions, applications, pleadings, schedules, statements, reports and other papers prior to filing with the Bankruptcy Court, and insomuch as is consistent with the Sellers' fiduciary duties, consider such comments in good faith. Purchaser may file a notice of appearance in the Bankruptcy Case and Sellers acknowledge and agree that Purchaser shall have standing to appear in connection with all proceedings regarding the sale of the Purchased Assets in the Bankruptcy Case.

(b)     Purchaser agrees that it will promptly take such actions as are reasonably requested by Sellers to assist in obtaining entry of the Sale Order and a finding of adequate assurance of future performance by Purchaser, including furnishing affidavits or other documents or information for filing with the Bankruptcy Court for the purposes, among others, of providing

01:14018665.1

necessary assurances of performance by Purchaser under this Agreement and demonstrating that Purchaser is a "good faith" purchaser under Section 363(m) of the Bankruptcy Code. Purchaser shall not, without the prior written consent of Sellers, file, join in, or otherwise support in any manner whatsoever any motion or other pleading relating to the sale of the Purchased Assets hereunder. In the event the entry of the Sale Order shall be appealed, Sellers and Purchaser shall use their respective reasonable efforts to defend such appeal.

7.4     Break-Up Fee and Expense Reimbursement.

(a)     Sellers acknowledge and agree that the Purchaser has expended considerable time and expense in connection with this Agreement, and the negotiation thereof, and the identification and quantification of assets to be included in the Purchased Assets, and that the entry into this Agreement provides value to the Sellers' chapter 11 estates by, among other things, inducing other parties to submit higher or better offers for the Purchased Assets. Therefore, if (a) a Competing Transaction with a Successful Bidder other than Purchaser occurs, or (b) all conditions to Closing set forth in ARTICLE X have been satisfied or waived by Purchaser before the Closing Date and Sellers refuse to effect the Closing after demand of Purchaser, the Sellers shall cause Purchaser to be paid a break-up fee equal to Four Hundred Forty Thousand Dollars (US) ($440,000.00) and an expense reimbursement in the amount of Two Hundred Thousand Dollars (US) ($200,000.00) (collectively, the "Break-Up Fee and Expense Reimbursement"), provided, however, the Expense Reimbursement payable to Purchaser shall not exceed Purchaser's reasonable and documented out-of-pocket expenses incurred by Purchaser in connection with the transaction contemplated hereby.

(b)     Sellers and Purchaser agree that the Break-Up Fee and Expense Reimbursement is a material and necessary inducement to the Purchaser to enter into this Agreement and to consummate the transactions contemplated in this Agreement.

(c)     Any Break-Up Fee and Expense Reimbursement payable pursuant to this Agreement shall be paid in full directly to Purchaser, out of the purchase price paid by the Successful Bidder in any Competing Transaction, at the time of and as a condition to the closing of any Competing Transaction. Sellers shall cause such payment to be included as a term of any Competing Transaction. Sellers shall cause the Break-Up Fee and Expense Reimbursement to be paid to Purchaser in immediately available funds and without need for further order of the Bankruptcy Court (other than the Bid Procedures Order).

(d)     Sellers hereby acknowledge that their obligation to pay the Break-Up Fee and Expense Reimbursement shall survive termination of this Agreement, and that Purchaser's claim for the Break-Up Fee and Expense Reimbursement shall have administrative superpriority status against the Sellers and their respective estates under Section 503(b) and 507(a) of the Bankruptcy Code and with priority over all other expenses of the kind specified in Sections 503(b) and 507(a) of the Bankruptcy Code.

(e)     Sellers hereby acknowledge and agree that no Person other than Purchaser shall be entitled to payment of a break-up fee or expense reimbursement in connection with a sale of the Purchased Assets.

01:14018665.1

7.5     Bid Procedures Order. The Bid Procedures Order shall, among other things, (i) set the Initial Incremental Bid Amount for any Qualified Bid; (ii) provide that any overbids at the Auction shall be in the amount of $100,000; (iii) approve the Break-Up Fee and Expense Reimbursement; (iv) provide that the Liens and claims of the Sellers' senior secured lenders shall be subject and subordinate to the Purchaser's right to receive payment of the Break-Up Fee and Expense Reimbursement; (v) acknowledge the Sellers' senior secured lenders' right, if any, to credit bid consistent with Section 363(k) of the Bankruptcy Code; (vi) deem the Purchaser a Qualified Bidder and (vii) provide that the Auction shall be held no later than September 18, 2013. The Sellers shall represent to the Bankruptcy Court that Sellers actively solicited this "stalking horse" bid from the Purchaser.

7.6     Sale Order. Among other provisions, the Sale Order shall contain the following provisions:

(a)     finding that notice of the hearing on the Sale Motion and the Auction was proper and sufficient under the Bankruptcy Code, the Bankruptcy Rules and the Local Bankruptcy Rules, that the Sellers and Purchaser entered into the Agreement in good faith, the Purchase Price and Assumed Liabilities constitute fair value in consideration for the Purchased Assets and the Assigned Contracts, Assigned Real Property Leases, Assigned Personal Property Leases and Purchased Intellectual Property and determining that the Purchaser is a "good faith" purchaser entitled to the protections afforded by Section 363(m) of the Bankruptcy Code with respect to the transactions, the Purchased Assets and the Assigned Contracts, Assigned Real Property Leases, Assigned Personal Property Leases and Purchased Intellectual Property;

(b)     authorizing the Sellers to transfer to Purchaser all rights, title, privileges and interests of the Sellers in and to the Purchased Assets, free and clear of any Liens, except for Permitted Exceptions, with all such Liens attaching to the net proceeds of sale, if any;

(c)     authorizing the Sellers to assume and sell and assign the Assigned Contracts, Assigned Real Property Leases, Assigned Personal Property Leases and Purchased Intellectual Property to Purchaser pursuant to Sections 363 and 365 of the Bankruptcy Code;

(d)     finding that Purchaser is a not a successor to the Sellers or their estates by reason of any theory of law or equity with respect to any Liens against the Sellers or the Purchased Assets; and

(e)     establishing the Cure Amounts, if any, which the Sellers must pay or escrow to cure any defaults or actual pecuniary losses under or with respect to the Assigned Contracts, Assigned Real Property Leases, Assigned Personal Property Leases and Purchased Intellectual Property.

7.7     Notice to the Notice Parties. Adequate notice of hearing on the Sale Motion, and request for entry of the Sale Order and the objection deadline shall be served by Sellers in accordance with the Bankruptcy Code and Bankruptcy Rules, including Bankruptcy Rules 2002, 6004, 6006 and 9014, any Local Bankruptcy Rules and any orders of the Bankruptcy Court on all Persons required to receive notice, including, but not limited to (i) the Office of the United States Trustee for the District of Delaware; (ii) counsel to the Official Committee of Unsecured

Creditors; (iii) all entities known to have expressed an interest in a transaction with respect to the Purchased Assets during the past nine (9) months; (iv) all counterparties to any Contract or leases, whether executory or not and whether unexpired or not; (v) all parties with Liens, claims, interests or encumbrances on or against any of the Purchased Assets; (vi) each affected Governmental Body, including the Internal Revenue Service; (vii) all known holders of claims against and equity interests in Sellers, (viii) all of Sellers' insurers; (vii) all parties that have filed and not withdrawn requests for notices pursuant to Bankruptcy Rule 2002 and (ix) to the extent not already included above, all parties in interest listed on Sellers' creditor matrix (collectively, the "Notice Parties").  To the extent not already included above, the Notice Parties shall also include the following Persons at the following addresses:

> DME MAC Region A
> NHIC, Corp. DME MAC Jurisdiction A
> DME – Written Inquiries
> Attn: Legal Department, Officer, Managing or General Agent
> P.O. Box 9146
> Hingman, MA 02043-9146
>
> National Supplier Clearinghouse
> Palmetto GBA
> Attn: Legal Department, Officer, Managing or General Agent
> AG-495
> 2300 Springdale Drive, Bldg. 1
> Camden, SC 29020
>
> CMS
> Region 2 – New York
> Office of the Regional Administrator
> Attn: Victoria Abril – Associate Regional Administrator
> Jacob K. Javits Federal Building
> 26 Federal Plaza, Room 3811
> New York, NY 10278-0063
>
> CMS
> Region 2 – New York
> Office of the Regional Administrator
> Attn: Legal Department, Officer, Managing or General Agent
> Jacob K. Javits Federal Building
> 26 Federal Plaza, Room 3811
> New York, NY 10278-0063

Sellers shall provide notice to the Notice Parties that all responses or objections to the Sale Motion shall be served on, among others, counsel to Purchaser.

## ARTICLE VIII: COVENANTS

01:14018665.1

8.1    Consents. Sellers shall, at their sole cost and expense, use reasonable best efforts (i) to obtain all consents and approvals of any Governmental Body or Third Party that are necessary, desirable or appropriate in connection with consummating the purchase and sale of the Purchased Assets and the assignment of the Assumed Liabilities, including obtaining entry of the Sale Order, in each case in form and substance reasonably satisfactory to Purchaser and Sellers, (ii) to make all filings, applications, statements and reports to all Governmental Bodies that are required to be made prior to the Closing Date by or on behalf of Sellers or any of their Affiliates pursuant to any applicable Law in connection with this Agreement and the transactions contemplated hereby, and (iii) to assist Purchaser in obtaining replacements for any of Sellers' permits, certificates, licenses, supplier numbers, provider numbers, accreditation and surety bonds. Not less than fifteen (15) days prior to Closing, Sellers shall sign and mail a letter, prepared by Purchaser and attached hereto as **Exhibit C** (the "Patient Notice Letter"), to the Patients. The letter shall state that (i) Sellers have made the decision to sell their business to Purchaser, (ii) the Patient has the right to choose his or her supplier, (iii) Sellers recommend that the Patient choose to be serviced by Purchaser, (iv) if the Patient does not, within fifteen (15) days from date of the letter, notify Sellers or Purchaser of the Patient's election to switch to a supplier other than Purchaser, then Sellers shall transfer Patient's file to Purchaser, and (v) if the Patient decides that his or her file shall be transferred to a supplier other than Purchaser, then Sellers shall honor the Patient's decision. Purchaser shall give any notices to, make any other filings with, and use reasonable best efforts to cooperate with Sellers to obtain, any authorizations, consents and approvals in connection with the matters contemplated by this Section 8.1.

8.2    Access to Information. Sellers agree that, prior to the Closing Date, Purchaser shall be entitled, through its officers, employees and representatives (including, without limitation, its legal advisors and accountants), to make such continuing investigation of the properties, businesses and operations of the Business and such examination of the books and records of the Business, the Purchased Assets and the Assumed Liabilities as it reasonably requests and to make extracts and copies of such books and records. Any such investigation and examination shall be conducted during regular business hours upon reasonable advance notice and under reasonable circumstances and shall be subject to restrictions under applicable Law. Sellers shall cause the officers, Employees, legal advisors, accountants and other representatives of Sellers to cooperate with Purchaser and Purchaser's representatives in connection with such investigation and examination, and Purchaser and its representatives shall cooperate with Sellers and their representatives and shall use their reasonable efforts to minimize any disruption to the Business. Notwithstanding anything herein to the contrary, no such investigation or examination shall be permitted to the extent that it would require to disclose information subject to attorney-client privilege or conflict with any confidentiality obligations to which Sellers are bound.

8.3    Further Assurances. Each Seller and Purchaser shall use commercially reasonable efforts to (i) take all actions necessary or appropriate to consummate the transactions contemplated by this Agreement and (ii) cause the fulfillment at the earliest practicable date of all of the conditions to their respective obligations to consummate the transactions contemplated by this Agreement.

8.4    Confidentiality. Purchaser acknowledges that the Confidential Information provided to it in connection with this Agreement, and the consummation of the transactions

-30-

contemplated hereby, is subject to the terms of the confidentiality agreement between Purchaser and Sellers dated July 16, 2012 (the "Confidentiality Agreement"), the terms of which are incorporated herein by reference.  Effective upon, and only upon, the Closing Date, the Confidentiality Agreement shall terminate with respect to information relating solely to the Business or otherwise included in the Purchased Assets; provided, however, that Purchaser acknowledges that any and all other Confidential Information provided to it by Sellers or their representatives concerning Sellers shall remain subject to the terms and conditions of the Confidentiality Agreement after the Closing Date.

     8.5     <u>Conduct of the Business Pending the Closing</u>.

     (a)     Except as otherwise expressly contemplated by this Agreement, from the date hereof until the Closing, Sellers shall (i) conduct the Business in the Ordinary Course of Business consistent with a cash collateral order and budget approved by the Bankruptcy Court (including timely payment of post-petition accounts payable, purchasing and maintaining appropriate levels of Inventory, performing all required maintenance and repairs, making capital expenditures and collecting Accounts Receivable), (ii) shall use commercially reasonable efforts to preserve intact the Business, to keep available the services of its current Employees and agents and to maintain its relations and goodwill with its suppliers, customers, and any others with whom or with which it has business relations, and (iii) maintain in full force and effect insurance policies covering Sellers and the Purchased Assets in a form and amount consistent with past practice.

     (b)     Without limiting the foregoing, except as expressly contemplated by this Agreement, from the date hereof until the Closing, Sellers shall not take (or permit to be taken) any of the following actions without the prior written consent of Buyer:

     (i)     sell, transfer, abandon, permit to lapse or otherwise dispose of any of the material assets of Sellers except in the Ordinary Course of Business;

     (ii)     (A) make, grant or announce any equity or incentive awards or the increase in the salaries, bonuses, wages or other compensation and benefits payable by Sellers to any director or officer or the Employees, independent contractors, consultants or other service providers of the Business except in the Ordinary Course of Business; (B) hire any new employees to the Business, (C) fire, terminate or discharge Employees other than in the Ordinary Course of Business; (D) pay or agree to pay any pension, retirement allowance, termination or severance pay, bonus or other employee benefit not required by any existing Employee Benefit Plan to any Employee or other service provider of the Business, whether past or present, (E) enter into or amend any Contract of employment or any consulting, bonus, severance, retention, retirement or similar agreement with any of Sellers' current or prospective directors, officers, Employees, independent contractors, consultants or equityholders; or (F) except as required to ensure that any Employee Benefit Plan is not then out of compliance with applicable Law, enter into or adopt any new, or materially increase benefits under or renew, amend or terminate any existing, Employee Benefit Plan;

01:14018665.1

(iii)    change in any material respects any financial accounting policies or procedures or any of its methods of reporting income, deductions or other material items for financial accounting purposes, except as required by GAAP or applicable Law;

(iv)    adopt any amendments to the organizational or charter documents of Sellers;

(v)    create any subsidiaries;

(vi)    modify, amend, cancel, terminate, relinquish, waive or release any Contract or any rights under any Contract, except in the Ordinary Course of Business;

(vii)    enter into, amend, waive or terminate (other than terminations in accordance with their terms) any transaction with any officer, director, governing body member, equityholder, partner or Affiliate, as applicable, of Sellers, other than transactions for reimbursement of reasonable expenses;

(viii)    settle, pay or discharge, any Legal Proceeding, except to the extent they may be paid under existing insurance policies;

(ix)    take, or fail to take, any action that could reasonably be expected to result in any loss, lapse, abandonment, expiration, invalidity or unenforceability of any Intellectual Property that constitutes a Purchased Asset;

(x)    purchase or lease, or commit to purchase or lease, any asset of Sellers, including, without limitation, any of the Purchased Assets, for an amount in excess of Ten Thousand Dollars (US) ($10,000) alone or in the aggregate, except purchases of inventory and supplies in the Ordinary Course of Business;

(xi)    make or authorize any capital expenditures or commitment for capital expenditures in an amount more than Ten Thousand Dollars (US) ($10,000) individually or Five Hundred Thousand Dollars (US) ($500,000) in the aggregate, other than those capital expenditures or commitments heretofore made or authorized in the Ordinary Course of Business;

(xii)    revalue any asset of Sellers, including, without limitation, any of the Purchased Assets, including writing off accounts receivable or revaluing inventory except in the Ordinary Course of Business;

(xiii)    accelerate in any material respect the collection of any Accounts Receivable or any other amounts owed to Sellers before their due date, or (ii) delay payments in any material respect of any accounts payable or other debts, obligations or liabilities;

(xiv)    transfer patients to any Third Party durable medical supplier, except for patients transferred to the Purchaser or its Affiliates; or

(xv)    enter into any Contract to take any of the foregoing actions that is binding upon the Sellers or otherwise commit to a course of action which if undone or not undertaken would create a Liability on the part of the Sellers.

01:14018665.1

8.6    Transition Services Agreement. Each Seller and Purchaser agree to negotiate in good faith and otherwise use their commercial best efforts to prepare and agree to a transition services agreement by and among Sellers and Purchaser (the "Transition Services Agreement"), which shall, among other things, provide (i) the terms by which the Purchaser shall manage the Business following Closing to the extent necessary to complete the orderly transfer of Patients required by the Centers for Medicare and Medicaid Services to have a face-to-face examination with the Patients' physicians prior to the physicians providing a new written order to the Purchaser and (ii) amendments necessary to this Agreement in order to effectuate the purpose set forth in (i).

## ARTICLE IX:  EMPLOYEES AND EMPLOYEE BENEFITS

9.1    Employment Terms; Employee Benefits. As between Purchaser and Sellers, with respect to the Employees whom Purchaser hires, Sellers shall be responsible for all Liabilities attributable to the period prior to the Closing Date (and Purchaser shall not be responsible for such Liabilities), including with respect to their accrued and unused vacation, sick days, personal days and other paid time off credit, and Sellers also shall be responsible for all Liabilities with respect to the Employees whom Purchaser does not hire.

## ARTICLE X: CONDITIONS TO CLOSING

10.1    Conditions Precedent to Obligations of Purchaser.  The obligations of Purchaser to consummate the sale contemplated by this Agreement is subject to the fulfillment, on or prior to the Closing Date, of each of the following conditions (any or all of which may be waived by Purchaser in whole or in part to the extent permitted by applicable Law):

(a)    the representations and warranties of Sellers set forth in this Agreement shall be true and correct at and as of the Closing, except to the extent such representations and warranties expressly relate to an earlier date (in which case such representations and warranties shall be true and correct on and as of such earlier date);

(b)    Sellers shall have performed and complied in all material respects with all obligations and agreements required in this Agreement to be performed or complied with by them prior to the Closing Date;

(c)    Sellers shall have delivered, or caused to be delivered, to Purchaser all of the items set forth in Section 4.2;

(d)    the Sale Order shall have been entered by the Bankruptcy Court and shall have become a Final Order; and

(e)    Sellers shall have available at least Two Hundred Fifty Thousand Dollars (US) ($250,000.00) of Unrestricted Cash available for sale to Purchaser pursuant to Section 2.1(o).

10.2    Conditions Precedent to Obligations of Sellers.  The obligation of Sellers to consummate the sale contemplated by this Agreement are subject to the fulfillment, prior to or on the Closing Date, of each of the following conditions (any or all of which may be waived by

-33-

Sellers in whole or in part to the extent permitted by applicable Law):The representations and warranties of Purchaser set forth in this Agreement shall be true and correct at and as of the Closing, except to the extent such representations and warranties expressly relate to an earlier date (in which case such representations and warranties shall be true and correct on and as of such earlier date);

(b)     Purchaser shall have performed and complied with all obligations and agreements required in this Agreement to be performed or complied with by them prior to the Closing Date;

(c)     Purchaser shall have delivered, or caused to be delivered, to Sellers all of the items set forth in Section 4.3; and

(d)     the Orders shall have been entered and shall have become Final Orders.

10.3     Conditions Precedent to Obligations of Purchaser and Sellers. The respective obligations of the parties to consummate the sale provided by this Agreement are subject to the fulfillment, on or prior to the Closing Date, of each of the following conditions (any or all of which may be waived by Purchaser and Sellers, jointly, in whole or in part to the extent permitted by applicable Law):

(a)     all authorizations, consents, filings and approvals necessary to permit the Parties to consummate the transactions contemplated hereby shall have been duly obtained, made or given, shall be in form and substance reasonably satisfactory to the Parties, shall not be subject to the satisfaction of any condition that has not been satisfied or waived and shall be in full force and effect. All terminations or expirations of waiting periods imposed (and any extension thereof) by any Governmental Body necessary for the transactions contemplated under this Agreement, if any, shall have occurred;

(b)     there shall not be in effect any Order by a Governmental Body of competent jurisdiction restraining, enjoining or otherwise prohibiting the consummation of the sale or which would make the consummation of such transactions unlawful and no action or proceeding shall have been instituted and remain pending before a Governmental Body to restrain or prohibit the sale and no adverse decision shall have been made by any such Governmental Body which could materially adversely affect the Business. No federal, state or local statute, rule or regulation shall have been enacted the effect of which would be to prohibit, restrict, impair or delay the consummation of the transactions contemplated by this Agreement or restrict or impair the ability of the Purchaser to conduct the Business; and

(c)     the Bankruptcy Court shall have entered the Orders and the Orders shall have become Final Orders.

10.4     Frustration of Closing Conditions. Neither Sellers nor Purchaser may rely on the failure of any condition set forth in Section 10.1, 10.2 or 10.3, as the case may be, if such failure was caused by such Party's failure to comply with any provision of this Agreement.

01:14018665.1

## ARTICLE XI: TAXES

11.1     Transfer Taxes.  Unless the disposition Purchased Assets contemplated by this Agreement is found to be exempt under § 1146(a) of the Bankruptcy Code, any sales, use, stamp, documentary stamp, filing, recording, transfer or similar fees or taxes or governmental charges (including any interest and penalty thereon) payable in connection with the transactions contemplated by this Agreement ("Transfer Taxes") shall be borne equally among Purchaser on the one hand, and Sellers on the other hand.  To the extent that any Transfer Taxes are required to be paid by Purchaser or Sellers, as applicable, (or such Transfer Taxes are assessed against Purchaser or Sellers, as applicable), the other Party shall promptly reimburse such Party, as applicable, for its proportionate share of such Transfer Taxes as determined pursuant to this Section 11.1.  Sellers and Purchaser shall cooperate and consult with each other prior to filing any Tax Returns in respect of Transfer Taxes; provided, however, Sellers may initially pay any Transfer Taxes (for which Purchaser shall promptly reimburse Sellers for its proportionate share as determined pursuant to this Section 11.1).   Sellers and Purchaser shall cooperate and otherwise take commercially reasonable efforts to obtain any available refunds for Transfer Taxes.

11.2     Prorations.  All real and personal property Taxes or similar ad valorem obligations levied with respect to the Purchased Assets for any taxable period that includes the Closing Date and ends after the Closing Date, whether imposed or assessed before or after the Closing Date, shall be prorated between Sellers and Purchaser as of 12:01 a.m. (Eastern time) on the Closing Date.  If any Taxes subject to proration are paid by Purchaser, on the one hand, and Sellers, on the other hand, the proportionate amount of such Taxes paid (or in the event of a refund of any portion of such Taxes previously paid is received, such refund) shall be paid promptly by (or to) the other after the payment of such Taxes (or promptly following the receipt of any such refund).

11.3     Purchase Price Allocation.  Sellers and Purchaser shall allocate the Purchase Price (including the Assumed Liabilities) among the Purchased Assets and, in accordance with such allocation, Purchaser shall prepare and deliver to Sellers copies of Form 8594 and any required exhibits thereto (the "Asset Acquisition Statement").  Purchaser shall prepare and deliver to Sellers from time to time revised copies of the Asset Acquisition Statement (the "Revised Statements") so as to report any matters on the Asset Acquisition Statement that need updating (including purchase price adjustments, if any) consistent with the agreed upon allocation. The Purchase Price for the Purchased Assets shall be allocated in accordance with the Asset Acquisition Statement or, if applicable, the last Revised Statements, provided by Purchaser to Sellers, and all income Tax Returns and reports filed by Purchaser and Sellers shall be prepared consistently with such allocation.

## ARTICLE XII: POST-CLOSING COVENANTS

12.1     Name Change.  Within five (5) days following the Closing, Sellers shall take all necessary action to change Sellers' names (including making all such filings as are necessary to effect, evidence, or record such name change in each applicable jurisdiction) to one that does not include the phrase "Landauer-Metropolitan" or any other name or mark included in the Purchased Intellectual Property (including any name set forth on the signature pages to this

01:14018665.1

Agreement) or any translations, adaptations, derivations or combinations of any of the foregoing or any name or mark confusingly similar thereto (collectively, the "Restricted Names"), and Sellers shall promptly notify Purchaser of the new name(s) chosen by Sellers and provide evidence to Purchaser of such name change; and Purchaser agrees and acknowledges that it shall not change its name to the name of Sellers prior to the Closing. From and after Closing, Sellers and all Affiliates of Sellers shall cease all use of any Restricted Name, including by removing all Restricted Names from all letterhead, stationary, signage and tangible assets included in the Excluded Assets; provided, however, notwithstanding any other provision of this Agreement, to the extent Sellers desire to use the Restricted Names in connection with the wind-down and liquidation of their bankruptcy estates in any publicly filed document or in communication with former customers, suppliers or vendors of Sellers, Sellers (and each of their respective successors in interest, including any chapter 7 trustee) shall not use such Restricted Names in the caption, title or header of such documentation or communication and shall only be permitted to use the Restricted Names to clarify that it is the successor in interest to the debtor in the Bankruptcy Case and that it no longer uses the name "Landauer-Metropolitan."

12.2     Unassigned Accounts Receivable. Prior to Closing, Sellers shall identify any Account Receivable that is not assignable pursuant to applicable Law (each so identified account shall be an "Unassigned Account Receivable") and shall establish a "lockbox" account at a bank identified by Purchaser for the receipt of payment on each Unassigned Account Receivable (the "Lockbox Account"). Upon the Closing, and on a daily basis thereafter, any funds in the Lockbox Account shall be automatically transferred into an account designated by the Purchaser. Without the prior written consent of the Purchaser, after the Closing, no changes shall be made to any instructions regarding the Lockbox Account and the Lockbox Account shall not be closed. Within two (2) Business Days following the Closing, Sellers shall inform Patients and any other relevant Persons that payments on any Unassigned Account Receivable are to be made into the Lockbox Account.

12.3     Mail and Other Notices Related to the Business. Within two (2) Business Days following the Closing, Sellers shall inform all relevant Persons that any mail, payments (other than payments related to Unassigned Accounts Receivable which shall be handled in accordance with Section 12.2) or other notices related to the Business shall be directed to such address, bank accounts or other place identified by Purchaser. To the extent Sellers receive any mail, payments (other than payments related to Unassigned Accounts Receivable which shall be handled in accordance with Section 12.2) or other notices related to the Business, Sellers shall forward same to Purchaser in such a manner so as to ensure Purchaser receives such mail, payment or notice within three (3) Business Days after the receipt of same by Sellers.

## ARTICLE XIII: MISCELLANEOUS

13.1     Expenses. Except as otherwise provided in this Agreement, each Party shall bear its own expenses incurred in connection with the negotiation and execution of this Agreement and each other agreement, document and instrument contemplated by this Agreement and the consummation of the transactions contemplated hereby and thereby.

13.2     No Survival of Representations and Warranties. The parties hereto agree that the representations and warranties contained in this Agreement shall not survive the Closing

-36-

01:14018665.1

hereunder, and none of the parties shall have any liability to each other after the Closing for any breach thereof.

13.3     Injunctive Relief.  Damages at law may be an inadequate remedy for the breach of any of the covenants, promises and agreements contained in this Agreement, and, accordingly, any Party shall be entitled to injunctive relief with respect to any such breach, including without limitation specific performance of such covenants, promises or agreements or an order enjoining a party from any threatened, or from the continuation of any actual, breach of the covenants, promises or agreements contained in this Agreement.  The rights set forth in this Section 13.3 shall be in addition to any other rights which a Party may have at law or in equity pursuant to this Agreement.

13.4     Submission to Jurisdiction; Consent to Service of Process.  Without limiting any Party's right to appeal any order of the Bankruptcy Court, (i) the Bankruptcy Court shall retain exclusive jurisdiction to enforce the terms of this Agreement and to decide any claims or disputes which may arise or result from, or be connected with, this Agreement, any breach or default hereunder, or the transactions contemplated hereby, and (ii) any and all proceedings related to the foregoing shall be filed and maintained only in the Bankruptcy Court, and the parties hereby consent to and submit to the jurisdiction and venue of the Bankruptcy Court and shall receive notices at such locations as indicated herein; provided, however, that if the Bankruptcy Case has closed, the parties agree to unconditionally and irrevocably submit to the exclusive jurisdiction of the United States District Court for the District of Delaware.  The parties hereby irrevocably waive, to the fullest extent permitted by applicable law, any objection which they may now or hereafter have to the laying of venue of any such dispute brought in such court or any defense of inconvenient forum for the maintenance of such dispute.  Each of the parties hereto agrees that a judgment in any such dispute may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.

13.5     Waiver of Right to Trial by Jury.  Each Party waives any right to trial by jury in any action, matter or proceeding regarding this Agreement or any provision hereof.

13.6     Entire Agreement; Amendments and Waivers.  This Agreement (including the schedules and exhibits hereto) represent the entire understanding and agreement between the parties hereto with respect to the subject matter hereof.  This Agreement can be amended, supplemented or changed, and any provision hereof can be waived, only by written instrument making specific reference to this Agreement signed by the Party against whom enforcement of any such amendment, supplement, modification or waiver is sought.  No action taken pursuant to this Agreement, including any investigation by or on behalf of any Party, shall be deemed to constitute a waiver by the Party taking such action of compliance with any representation, warranty, covenant or agreement contained herein.  The waiver by any Party of a breach of any provision of this Agreement shall not operate or be construed as a further or continuing waiver of such breach or as a waiver of any other or subsequent breach.  No failure on the part of any Party to exercise, and no delay in exercising, any right, power or remedy hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of such right, power or remedy by such Party preclude any other or further exercise thereof or the exercise of any other right, power or remedy.  All remedies hereunder are cumulative and are not exclusive of any other remedies provided by law.

-37-

13.7    Governing Law.  This Agreement shall be governed by and construed in accordance with the laws of the State of New York applicable to contracts made and performed in such State.

13.8    Notices.  All notices and other communications under this Agreement shall be in writing and shall be deemed given (i) when delivered personally by hand (with written confirmation of receipt), or (ii) one business day following the day sent by overnight courier (with written confirmation of receipt), in each case at the following addresses (or to such other address as a Party may have specified by notice given to the other Party pursuant to this provision):

If to Purchaser to:

    Luke McGee
    LMI DME Holdings LLC
    40 West 57th Street
    20th Floor
    New York, NY  10019

with a copy to:

    David B. Stratton, Esq.
    Evelyn J. Meltzer, Esq.
    Pepper Hamilton LLP
    Hercules Plaza, Suite 5100
    1313 Market Street
    Wilmington, DE  19801

If to Sellers:

    Alan Landauer
    Landauer Metropolitan, Inc.
    One Bradford Road
    Mount Vernon, NY 10553

with a copy to:

    John A. Bicks, Esq.
    K&L Gates LLP
    599 Lexington Avenue
    New York, NY 10022

    Charles A. Dale, III, Esq.
    Mackenzie L. Shea, Esq.
    K&L Gates LLP
    State Street Financial Center
    One Lincoln Street
    Boston, MA 02111

13.9    Severability.  If any term or other provision of this Agreement is invalid, illegal, or incapable of being enforced by any law or public policy, all other terms or provisions of this Agreement shall nevertheless remain in full force and effect so long as the economic or legal substance of the sale is not affected in any manner materially adverse to any Party.  Upon such determination that any term or other provision is invalid, illegal, or incapable of being enforced, the parties hereto shall negotiate in good faith to modify this Agreement so as to effect

01:14018665.1

the original intent of the parties as closely as possible in an acceptable manner in order that the sale is consummated as originally contemplated to the greatest extent possible.

13.10    Binding Effect; Assignment.    This Agreement shall be binding upon and inure to the benefit of the parties and their respective successors and permitted assigns. A successor to either Seller shall include such Seller as a reorganized debtor. Nothing in this Agreement shall create or be deemed to create any third party beneficiary rights in any Person or entity not a party to this Agreement except as provided below. No assignment of this Agreement or of any rights or obligations hereunder may be made by any party (by operation of law or otherwise) without the prior written consent of Purchaser and Sellers and any attempted assignment without the required consents shall be void; provided, however, that Purchaser may assign its right to acquire any or all of the Purchased Assets and its other rights hereunder to an entity wholly owned by it that also assumes all of Purchaser's obligations hereunder (but such assumption shall not relieve Purchaser of its obligations hereunder) with the consent of Sellers, which shall not be unreasonably withheld; and provided further, Purchaser may assign its right to acquire any or all of the Purchased Assets to a third Person at Closing; provided that Purchaser's assignment to a third Person of any executory contracts or unexpired leases shall require Sellers' consent, which shall not be unreasonably withheld. Upon any such permitted assignment, the references in this Agreement to Purchaser shall also apply to any such assignee unless the context otherwise requires. No permitted assignment of any rights hereunder and/or assumption of obligations hereunder shall relieve the parties hereto of any of their obligations.

13.11    No Personal Liability.    In entering into this Agreement, the parties understand, agree and acknowledge that no director, trustee, officer, manager, member, employee, shareholder, attorney, accountant, advisor or agent of any Party shall be personally liable or responsible to any other Party or its Affiliates, directors, trustees, officers, managers, members, employees, shareholders, attorneys, accountants, advisors or agents for the performance of any obligation under this Agreement of any Party or the truth, completeness or accuracy of any representation or warranty contained in, or statement made in, this Agreement or any document prepared pursuant hereto and that all obligations hereunder are those of the named parties only (but nothing contained herein shall limit the liability of any person for his or her fraudulent acts).

13.12    Counterparts.    This Agreement may be executed in one or more counterparts, each of which will be deemed to be an original copy of this Agreement and all of which, when taken together, will be deemed to constitute one and the same agreement.

[SIGNATURES APPEAR ON FOLLOWING PAGE]

-39-

IN WITNESS WHEREOF, the Parties have caused this Agreement to be executed by their respective officers thereunto duly authorized, as of the date first written above.

**SELLERS:**

**LANDAUER-METROPOLITAN, INC.**

By: _____

Alan J. Landauer
Its Executive Chairman


**LANDAUER HEALTHCARE HOLDINGS, INC.**

By: _____

Alan J. Landauer
Its Executive Chairman


**MILLER MEDICAL & RESPIRATORY, INC.**

By: _____

Alan J. Landauer
Its Executive Chairman


**C.O.P.D. SERVICES, INC.**

By: _____

Alan J. Landauer
Its Executive Chairman

**AMERICAN HOMECARE SUPPLY NEW YORK, LLC**

By:    LANDAUER HEALTHCARE
       HOLDINGS, INC., its sole member

       By:    _____
              **Alan J. Landauer**
              Its Exeuctive Chairman

**AMERICAN HOMECARE SUPPLY MID-ATLANTIC, LLC**

By:    LANDAUER HEALTHCARE
       HOLDINGS, INC., its sole member

       By:    _____
              **Alan J. Landauer**
              Its Exeuctive Chairman

**DENMARK'S, LLC**

By:    LANDAUER HEALTHCARE
       HOLDINGS, INC., its sole member

       By:    _____
              **Alan J. Landauer**
              Its Exeuctive Chairman

**GENOX HOMECARE, LLC**

By:    LANDAUER HEALTHCARE
       HOLDINGS, INC., its sole member

       By:    _____
              **Alan J. Landauer**
              Its Exeuctive Chairman

**PURCHASER:**

**LMI DME Holdings LLC**

By: QMES LLC, its sole member

By: _____

    Luke McGee
    Its Manager

## SCHEDULE 1.1
### Permitted Encumbrances

01:14018665.1

## SCHEDULE 2.1(c)
## Assigned Contracts

## SCHEDULE 2.1(d)
## Assigned Real Property Leases

01:14018665.1

**<u>SCHEDULE 2.1(e)</u>**
**<u>Assigned Personal Property Leases</u>**

01:14018665.1

**SCHEDULE 2.1(f)**
**Assigned Intellectual Property Licenses**

## SCHEDULE 5.5
### Litigation

01:14018665.1

**SCHEDULE 5.9(a)**
**Intellectual Property**

01:14018665.1

**<u>SCHEDULE 5.10</u>**
**<u>Accounts Receivable</u>**

## AMENDMENT NO. 1 TO ASSET PURCHASE AGREEMENT

This Amendment No. 1 to Asset Purchase Agreement, dated as of January [6], 2014 (this "Amendment"), amends the Asset Purchase Agreement (the "Purchase Agreement") dated as of August 16, 2013, by and among Landauer-Metropolitan, Inc., a New York corporation; Landauer Healthcare Holdings, Inc., a Delaware corporation; Miller Medical & Respiratory, Inc., a Pennsylvania corporation; C.O.P.D. Services, Inc., a New Jersey corporation; American Homecare Supply New York, LLC, a Delaware limited liability company; American Homecare Supply Mid-Atlantic LLC, a Delaware limited liability company; Denmark's, LLC, a Delaware limited liability company; and Genox Homecare, LLC, a Delaware limited liability company (referred to individually herein as "Seller," and collectively as "Sellers") and LMI DME Holdings LLC, a Delaware limited liability company ("Purchaser" and together with Sellers, the "Parties"). Capitalized terms used but not otherwise defined in this Amendment shall have the meanings ascribed to them in the Purchase Agreement or as incorporated therein by this Amendment.

## BACKGROUND

A.   **WHEREAS**, the Parties desire to amend the Purchase Agreement in a manner consistent with the terms of the Settlement Agreement, by and between, the Creditors' Committee, Purchaser, and Quadrant Management, Inc., and/or its assigns, dated September 25, 2013 and approved by Bankruptcy Court on October 22, 2013 [Docket No. 282]; and

B.   **WHEREAS**, the Purchase Agreement by its terms may be modified or amended from time to time by the written consent of the Parties;

**NOW, THEREFORE**, the Parties, intending to be legally bound, hereby agree as follows and agree to amend the Purchase Agreement in the manner hereinafter provided:

1.   Incorporation of Recitals. Each of the foregoing recitals is incorporated by reference in this Amendment as if fully set forth in the body of this Amendment.

2.   Amendment of Section 1.1.

a.   Section 1.1 of the Purchase Agreement shall be amended to add the following definitions:

"Approved Budget" means the Approved Budget referenced in Paragraph 3(a) of the Cash Collateral Order.

"Burdi Employment Agreements" means the Employment Agreement and Non-Competition Agreement, by and between Saverio D. Burdi and Landauer-Metropolitan Inc., both dated May 10, 1997, as amended, modified and/or restated including on April 1, 1999, January 1, 2001, December 13, 2002, February 17, 2006, July 1, 2007 and June 16, 2009.

"Cash Collateral Order" means that Final Order (I) Authorizing Debtors to Use Cash Collateral and (II) Granting Adequate Protection [Docket No. 140], as extended, amended or modified.

"Cash Portion of Purchase Price" as defined in Section 3.1 below.

"Causes of Action" means any action, Claim, cause of action, controversy, demand, right, action, Lien, indemnity, guaranty, suit, obligation, liability, damage, judgment, account, defense, offset, power, privilege, license and franchise of any kind or character whatsoever, known, unknown, contingent or non-contingent, matured or unmatured, suspected or unsuspected, liquidated or unliquidated, disputed or undisputed, secured or unsecured, assertable directly or derivatively, whether arising before, on or after the Petition Date, in contract or in tort, in law or in equity, or pursuant to any other theory of law, including, but not limited to, those causes of action listed on the Causes of Action List. Causes of Action also include: (a) any right of setoff, counterclaim or recoupment and any claim for breaches of duties imposed by law or in equity; (b) the Avoidance Actions; (c) any Claim or defense including fraud, mistake, duress and usury and any other defenses set forth in section 558 of the Bankruptcy Code; and (d) any state law fraudulent transfer claim.

"Causes of Action List" means the non-exclusive list of Causes of Action attached hereto as **Exhibit A**.

"Claim" means any claim, as such term is defined in section 101(5) of the Bankruptcy Code.

"Credit Bid Portion of Purchase Price" as defined in Section 3.1 below.

"Creditors' Committee" means the statutory committee of unsecured creditors appointed on August 26, 2013 by the U.S. Trustee in the Bankruptcy Case pursuant to section 1102 of the Bankruptcy Code, as may be reconstituted from time to time.

"Entity" means an entity as such term is defined in section 101(15) of the Bankruptcy Code.

"GUC Funds Carveout" shall have the same meaning as set forth in the Settlement Agreement.

"GUC Note" shall have the same meaning as set forth in the Settlement Agreement.

"GUC Trust" means that trust formed pursuant to the Settlement Agreement, as approved by Order of the Bankruptcy Court dated October 22, 2013.

"GUC Trust Assets" means the (a) GUC Funds Carveout; (b) GUC Trust Causes of Action; (c) GUC Trust Insurance Proceeds and (d) the Promissory Notes, and all of the proceeds of the foregoing, which assets are held in trust for the benefit of holders of allowed general unsecured claims in accordance with the Settlement Agreement.

"GUC Trust Causes of Action" means any and all Claims or Causes of Action of the Sellers that are not (i) against any Entity that is a vendor, supplier, lessor, employee, contract counterparty or other Entity with whom Purchaser is doing business on or after the Closing Date; (ii) related to any physical or intangible Purchased Asset acquired by Purchaser pursuant to this Agreement that is used or to be used in Purchaser's operations following the Closing Date; (iii) related to any property damage or business interruption claim other than solely with respect to a property damage or business interruption claim related to Hurricane Sandy; (iv) related to deposits or accounts receivable (v) against any or all of Purchaser, the Pre-Petition Lender, and/or the Pre-Petition Agent and such entity's successors and assigns, subsidiaries, Affiliates, managed accounts or funds, current directors and officers, principals, shareholders, members, partners, employees, agents, advisory board members, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, management companies, fund advisors and other professionals, each in its respective capacity as such or (vi) the Non-Compete Litigation.

"GUC Trust Insurance Proceeds" means 100% of the proceeds of the Sellers' Insurance Policies relating to (i) an allowed general unsecured claim asserted against the Sellers or their estates covered by an Insurance Policy; provided, however, that the insurance proceeds shall be for the sole benefit of the holder of such allowed general unsecured claim, (ii) GUC Trust Causes of Action and (iii) property damage or business interruption Claims solely relating to Hurricane Sandy.

"Insurance Policies" means all insurance policies maintained by the Sellers as of the Petition Date, including, without limitation, the D&O Policy, any general liability policies, and any errors and omissions policies.

"Non-Compete Litigation" as defined in section 2.1(q) below.

"Pre-Petition Lenders" means TD Securities (USA) LLC and RBS Citizens N.A. who were joint lead arrangers and those certain other lenders who were party to the Pre-Petition Credit Facility.

"Pre-Petition Agent" means TD Bank, N.A., as former administrative agent, under the Pre-Petition Credit Facility.

"Pre-Petition Credit Facility" means that certain Credit Agreement, dated February 9, 2011, and related loan documents, as amended or modified, entered into by and among the Sellers, the Pre-Petition Lenders and the Pre-Petition Agent for (i) a term loan of $35 million with a maturity date of February 9, 2016; (ii) a revolving line of credit in the maximum amount of $10 million with a maturity date of February 9, 2016 and (iii) certain other loans in the amount of $5 million for acquisition and capital expenditure.

"Promissory Notes" means any promissory note issued by (i) Louis Rocco, (ii) Salverio Burdi, (iii) Joe Luceri and/or (iv) Scott Summers and payable to the Sellers.

"Restrictive Covenant Rights" as defined in Section 2.1(q) below.

-3-

"Rocco Employment Agreements" means the Employment Agreement and Non-Competition Agreement, by and between Louis Rocco and Landauer-Metropolitan Inc., both dated May 10, 1997, as amended, modified and/or restated including on April 1, 1999, January 1, 2001, December 13, ~~2003,~~ February 17, 2006, July 1, 2007 and June 16, 2009.

"Secured Lender" means Herbard Ltd. and shall include any assignee or designee of Herbard Ltd.

"Settlement Agreement" means that Settlement Agreement, by and between, the Creditors' Committee, LMI DME Holdings LLC and Quadrant Management, Inc., and/or its assigns, dated September 25, 2013 and approved by Bankruptcy Court on October 22, 2013 [Docket No. 282].

"Trade Payables" means any post-petition accounts payable owed to trade vendors through the Closing Date, as determined in accordance with GAAP, that are (i) included in line items marked with an asterisk on the Approved Budget, (ii) not yet due in the Ordinary Course of Business as of the Closing; and (iii) listed on an accounts payable schedule agreed upon by Seller and Purchaser at the Closing.

"Unassigned Governmental Accounts" as defined in the Transition Services Agreement.

"Wage Obligations" as defined in Section 2.3(g) below.

      b.      Section 1.1 of the Purchase Agreement shall be amended to delete the following definitions:

Allcare Claims as defined in Section 2.1(n) below.

Closing Date Accounts Receivable Statement as defined in Section 3.1(b).

Current Accounts Receivable means, as of the Closing Date, all billed Accounts Receivable that have been outstanding for ninety (90) days or less determined in accordance with GAAP.

Current Accounts Receivable Target" means Thirteen Million Dollars (US) ($13,000,000).

Escrow Account as defined Section 3.2 below.

Escrow Agent as defined in Section 3.2 below.

Escrow Agreement as defined in Section 3.2 below.

Escrow Amount as defined in Section 3.2 below.

Escrow Deposit as defined in Section 3.2 below.

Sellers' Representative as defined in Section 3.2 below.

c.    Section 1.1 of the Purchase Agreement shall be amended to replace the following definitions:

"Avoidance Action" means any and all Causes of Action to avoid or recover a transfer of property, or avoid an obligation incurred by the Seller pursuant to any applicable section of the Bankruptcy Code, including sections 544, 545, 547, 548, 549, 550, 551, 553(b), and 724(a) of the Bankruptcy Code and any other applicable non-bankruptcy law, whether or not litigation has been commenced with respect to such Causes of Action as of the Closing Date.

"Permitted Exceptions" means (i) statutory Liens for current Taxes, assessments or other governmental charges not yet due and payable or the amount or validity of which is being contested in good faith by appropriate proceedings; (ii) zoning, entitlement and other land use and environmental regulations or designations by any Governmental Body provided that such regulations or designations have not been violated, which, in each case, do not materially interfere with the operation of the Business as currently conducted at the applicable site; (iii) title of a lessor under a capital or operating lease; (iv) Liens set forth on Schedule 1.1; (v) mortgages, security interests and Liens arising from and related to Assumed Liabilities and (vi) the GUC Note.

3.    Amendment of Section 2.1(m). Section 2.1(m) of the Purchase Agreement is hereby deleted in its entirety and replaced with the following: "all Causes of Action;".

4.    Amendment of Section 2.1(n). Section 2.1(n) of the Purchase Agreement is hereby deleted in its entirety and replaced with the following: "the Promissory Notes; and".

5.    Amendment of Section 2.1. Section 2.1 of the Purchase Agreement shall be amended to include a new sub-section (p) which provides: "all Insurance Policy proceeds related to, or associated with, the Purchased Assets and all proceeds that constitute GUC Trust Insurance Proceeds; and".

6.    Amendment of Section 2.1. Section 2.1 of the Purchase Agreement shall be amended to include a new sub-section (q) which provides: "all of Sellers' rights under the Burdi Employment Agreements and Rocco Employment Agreements including the right to enforce the restrictive covenants contained therein (collectively, the "Restrictive Covenant Rights") and all of Sellers' Restrictive Covenant Rights in the litigation pending in Supreme Court of the State of New York, County of Nassau styled as *Saverio D. Burdi and Louis P. Rocco v. Landauer-Metropolitan, Inc. and Clairvest Group Inc., and John Does 1-10, being individuals who improperly acted to the detriment of plaintiff and other minority shareholders of Landauer-Metropolitan, Inc.,* Index No. 008622-13, including the right to enforce the Order to Show Cause with Temporary Restraining Order entered by the Hon. Vito M. DeStefano, J.C.S. on November 8, 2013, ordering that pending the hearing and determination, the Executives (as defined in the Order to Show Cause with Temporary Restraining Order) shall be restrained from: (i) entering, directly or indirectly, into the employment of or render, directly or indirectly, any services to any person, firm or corporation engaged in any business competitive with the Sellers in the States of New York, New Jersey or Connecticut; (ii) contact or solicit, or attempt to contact or solicit, directly or through agents, any entity for whom Sellers performed services or

#23086359 v5

actively marketed for the purpose of performing services, or with whom Executive had any dealings from July 10, 2012 to July 10, 2013; (iii) hire, subcontract, employ or engage, or contract or solicit, for the purpose of hiring, subcontracting, employing or engaging, any entity who was an employee of Sellers as of any time from July 10, 2012 through July 10, 2013; and (iv) providing any services to Allcare (as defined in the Order to Show Cause with Temporary Restraining Order), and any proceeds related to such litigation or the settlement of such litigation (the "Non-Compete Litigation")."

7.    Amendment of Section 2.2(d).  Section 2.2(d) of the Purchase Agreement is hereby deleted in its entirety and replaced with the following" "the Insurance Policies;"

8.    Amendment of Section 2.2(e).  Section 2.2(e) of the Purchase Agreement is hereby deleted in its entirety and replaced with the following: "Reserved; and".

9.    Amendment of Section 2.3(d).  Section 2.3(d) of the Purchase Agreement is hereby deleted in its entirety and replaced with the following: "the Transfer Taxes applicable to the transfer of the Purchased Assets pursuant to this Agreement; provided, however, the total aggregate sum of any Cure Amounts and/or Transfer Taxes paid by Purchaser pursuant to the terms hereunder shall not exceed $750,000.00 in the aggregate;"

10.    Amendment of Section 2.3   Section 2.3 of the Purchase Agreement shall be amended to include a new sub-section (g) which provides: "Trade Payables and accrued but unpaid wages and benefits (including accrued and unused paid time off) for employees of Sellers through their final day of employment ("Wage Obligations") in an aggregate amount not to exceed $1,400,000 and any such Wage Obligations shall be paid when due by Purchaser's delivery to Sellers of cash necessary to satisfy any such obligations and thereafter paid directly by Sellers to such applicable recipient (less any applicable withholding and less Sellers' share of any Taxes to be withheld) through the payroll system of Sellers."

11.    Amendment of Section 2.4.  Section 2.4 of the Purchase Agreement is hereby deleted in its entirety and replaced with the following:

"2.4    Excluded Liabilities.  Except for the items expressly included in the Assumed Liabilities, Purchaser shall not assume or become liable for the payment or performance of any Liability of Sellers or otherwise related to the Business of any nature whatsoever, whether accrued or unaccrued, known or unknown, fixed or contingent, including, without limitation, (i) any Liability arising from or related to the Excluded Assets, (ii) any Taxes arising out of or resulting from Sellers' operation of the Business prior to the Closing Date and (iii) any Liabilities of Sellers arising from or related to (a) the Non-Compete Litigation or (b) Liabilities for any salary, allowance, bonus, vacation pay or other employment benefits, insurance coverage, indemnification, or advancement or reimbursement of expenses ("Excluded Liabilities")."

12.    Amendment of Section 2.5(a).  The second sentence of Section 2.5(a) of the Purchase Agreement is hereby deleted in its entirety and replaced with the following: "Except as otherwise set forth in any Bankruptcy Court order approving this Agreement and authorizing the sale of the Purchased Assets, the amount, as determined by the Bankruptcy

Court, necessary to cure all defaults, and to pay all actual pecuniary losses that have resulted from such defaults thereunder on the part of the Sellers (the "Cure Amounts") shall be paid by Purchaser on or before Closing; provided, however, the total aggregate sum of any Cure Amounts and/or Transfer Taxes paid by Purchaser pursuant to the terms hereunder shall not exceed $750,000.00 in the aggregate; provided, further, however, that Purchaser shall not be obligated to cure any such default that is in dispute as of the Closing Date if an escrow or other commercially reasonable arrangement with respect thereto shall have been established and funded by Purchaser in an amount sufficient to satisfy the dispute in full at or following the Closing pursuant to an order of the Bankruptcy Court.".

13.   Amendment to Article III.   Article III of the Purchase Agreement is hereby deleted in its entirety and replaced with the following:

"Article III: Consideration

3.1   Consideration.   The aggregate consideration to be paid for the Purchased Assets by the Purchaser (the "Purchase Price") shall be: (a) the assumption of the Assumed Liabilities; and (b) Twenty-Two Million Dollars (US) ($22,000,000.00) payable as follows:

(i) cash equal to the sum of the following amounts, but only to the extent Sellers' Unrestricted Cash as of the Closing is insufficient to satisfy such items in full: (1) Cure Amounts in an amount not to exceed $750,000 in the aggregate as provided in Section 2.5(a) of this Agreement; (2) accrued but unpaid fees of the Clerk of the Bankruptcy Court and the U.S. Trustee pursuant to 28 U.S.C. § 1930(a)(6) (and any applicable interest relating thereto); (3) accrued but unpaid post-petition operating expenses set forth on the Approved Budget through the Closing Date that are not Trade Payables or Wage Obligations; (4) accrued but unpaid fees and expenses incurred by professionals retained by the Sellers and Creditors' Committee in accordance with the Approved Budget through the Closing Date; and (5) $700,000 for the costs and expenses associated with the wind-down of the Sellers' estates from and after the Closing (collectively, the "Cash Portion of Purchase Price"); and

(ii) satisfaction of indebtedness owed by the Sellers to the Secured Lender under the Prepetition Credit Facility in an amount equal to $22 million less the aggregate amount of (a) Cash required by subsection (i) of this section; (b) Trade Payables; and (c) Wage Obligations (such difference, the "Credit Bid Portion of Purchase Price").

3.2   Payment of Cash Portion of Purchase Price.   The Cash Portion of Purchase Price shall be made by Purchaser to the Sellers at Closing. If, after Closing, any amount of the Cash Portion of Purchase Price paid on account of the items specified in Sections 3.1(b)(i)(1), (2), or (3) is not needed to satisfy such obligations, then such excess shall be paid to the Secured Lender in accordance with the Cash Collateral Order. If the Cash Portion of Purchase Price is zero because the amount of Sellers' Unrestricted Cash as of the Closing is sufficient to satisfy the items specified in Section 3.1(b)(i) in full, then

-7-

such excess cash shall be paid to the Secured Lender in accordance with the Cash Collateral Order.

3.3     Credit Bid Portion of Purchase Price. Purchaser shall cause the Secured Lender to contribute the Credit Bid Portion of Purchase Price by delivery at Closing of the instruments and documents contemplated by Section 4.3(d) of this Agreement."

14.     Amendment to Section 4.2(b)(v). Section 4.2(b)(v) of the Purchase Agreement is hereby deleted in its entirety and replaced with the following: "(i) instruments and documents reasonably acceptable to the Sellers, Purchaser and the Secured Lender evidencing satisfaction of indebtedness under the Prepetition Credit Facility for the Credit Bid Portion of the Purchase Price as contemplated by Section 3.1 and (ii) complete agreements or any other necessary authorizations, fully executed by the applicable bank(s), Sellers and Purchaser, necessary to effectuate the transfer of funds pursuant to Section 12.2 hereto and any Unassigned Governmental Accounts as provided for in the Transition Services Agreement;"

15.     Amendment to Section 4.3(d). Section 4.3(d) of the Purchase Agreement is hereby deleted in its entirety and replaced with the following: "(i) instruments and documents reasonably acceptable to the Sellers, Purchaser and the Secured Lender evidencing satisfaction of indebtedness under the Prepetition Credit Facility for the Credit Bid Portion of the Purchase Price as contemplated by Section 3.1 and (ii) complete agreements or any other necessary authorizations, fully executed by the applicable bank(s), Sellers and Purchaser, necessary to effectuate the transfer of funds pursuant to Section 12.2 hereto and any Unassigned Governmental Accounts as provided for in the Transition Services Agreement;"

16.     Amendment of Section 4.4(a)(vii). The date set forth in sub-section (vii) of Section 4.4(a) of the Purchase Agreement is hereby deleted in its entirety and replaced with January 20, 2014.

17.     Amendment of Section 4.4(a)(viii). The date set forth in sub-section (viii) of Section 4.4(a) of the Purchase Agreement is hereby deleted in its entirety and replaced with January 31, 2014.

18.     Amendment to Section 7.6(d). Section 7.6(d) of the Purchase Agreement is hereby deleted in its entirety and replaced with the following: "finding that Purchaser is a not a successor to the Sellers or their estates by reason of any theory of law or equity with respect to any Liens against the Sellers or the Purchased Assets, including, without limitation and for the avoidance of doubt, any liabilities related to or arising under the False Claims Act; and".

19.     Amendment of Section 7.6(e). Section 7.6(e) of the Purchase Agreement is hereby deleted in its entirety and replaced with the following: "establishing the Cure Amounts, if any, which Purchaser must pay or escrow to cure any defaults or actual pecuniary losses under or with respect to the Assigned Contracts, Assigned Real Property Leases, Assigned Personal Property Leases and Purchased Intellectual Property;".

20.     Amendment to Article VIII. Article VIII of the Purchase Agreement shall be amended to include a new Section 8.7 which shall provide:

#23086359 v5

"8.7     Casualty Prior to Closing.  In the event that, prior to the Closing, any Purchased Asset shall be damaged by fire, casualty or any other cause resulting in a loss, solely to the extent that the Closing Date occurs, all insurance proceeds arising with respect to such damage shall, at the option of Purchaser, be (a) transferred to Purchaser upon receipt, (b) used as directed in writing by Purchaser to Sellers to repair, restore or replace such damaged assets or (c) deducted from the Purchase Price to be delivered by Purchaser at Closing (this clause (c) shall automatically apply to any insurance proceeds expected to be received after the Closing Date)."

21.    Amendment to Section 10.1.  Section 10.1 of the Purchase Agreement shall be amended to include a new sub-section (f) which provides:

"(f)     the total aggregate sum of any Cure Amounts and/or Transfer Taxes paid by Purchaser pursuant to the terms hereunder shall not have exceeded $750,000.00 in the aggregate."

22.    Amendment of Section 11.1.  Section 11.1 of the Purchase Agreement is hereby deleted in its entirety and replaced with the following:

"11.1     Transfer Taxes.  Unless the disposition Purchased Assets contemplated by this Agreement is found to be exempt under § 1146(a) of the Bankruptcy Code, any sales, use, stamp, documentary stamp, filing, recording, transfer or similar fees or taxes or governmental charges (including any interest and penalty thereon) payable in connection with the transactions contemplated by this Agreement ("Transfer Taxes") shall be paid by Purchaser; provided, however, the total aggregate sum of any Cure Amounts and/or Transfer Taxes paid by Purchaser pursuant to the terms hereunder shall not exceed $750,000.00 in the aggregate.  So long as the total aggregate sum of any Cure Amounts and/or Transfer Taxes paid by Purchaser pursuant to the terms hereunder shall not exceed $750,000.00 in the aggregate, then (i) to the extent that any Transfer Taxes are required to be paid by Sellers, or such Transfer Taxes are assessed against Sellers, Purchaser shall promptly reimburse Sellers for such Transfer Taxes and (ii) Sellers may initially pay any Transfer Taxes for which Purchaser shall promptly reimburse Sellers.  Sellers and Purchaser shall cooperate and consult with each other prior to filing any Tax Returns in respect of Transfer Taxes.  Sellers and Purchaser shall cooperate and otherwise take commercially reasonable efforts to obtain any available refunds for Transfer Taxes."

23.    Amendment to Article XII.  Article XII of the Purchase Agreement shall be amended to include the addition of the following sections:

"12.4     Reasonable Access.  After the Closing Date, Purchaser shall provide the Sellers, the Creditors' Committee, the GUC Trust and their representatives with access, at reasonable times and in a manner as to not unreasonably interfere with Purchaser's normal business, to the Documents and personnel in connection with such parties (i) investigation and pursuit of Claims and Causes of Action that constitute GUC Trust Assets, (ii) analysis and reconciliation of Claims filed against the Sellers' estates and/or (iii) wind-down of the Sellers' estates.  Nothing herein shall require Purchaser to incur any out of pocket expense that is not reimbursed by the Sellers, their estates, the

-9-

#23086359 v5

Creditors' Committee or the GUC Trust, as applicable.  Purchaser shall not dispose of any Documents relating to the GUC Trust Assets until the closing of the Bankruptcy Case or Order of the Bankruptcy Court.".

"12.5        Post-Closing Cure Amounts and Transfer Taxes.  To the extent that any Cure Amounts and/or Transfer Taxes are required to be paid subsequent to the Closing Date, Purchaser shall only be responsible for such Cure Amounts and/or Transfer Taxes to the extent such Cure Amount and/or Transfer Taxes plus any Cure Amounts and/or Transfer Taxes previously paid for by Purchaser pursuant to the terms provided hereunder do not exceed $750,000.00 in the aggregate."

"12.6        Transfer of GUC Trust Causes of Action, GUC Trust Insurance Proceeds and Promissory Notes.  On the Closing Date (i) the Purchased Assets shall vest in Purchaser, free and clear of all Liens, other than Permitted Exceptions, (ii) all Causes of Action shall vest in Purchaser, free and clear of all Liens, other than Permitted Exceptions and (iii) all GUC Trust Causes of Action, GUC Trust Insurance Proceeds and the Promissory Notes shall be deemed automatically transferred by Purchaser to the GUC Trust, free and clear of all Liens, other than Permitted Exceptions."

"12.7.        Notice to Purchaser Regarding Causes of Action.  Prior to initiating, prosecuting or pursuing in any manner any Cause of Action, the GUC Trust will provide thirty (30) days written notice to Purchaser and their counsel of the GUC Trust's intent to treat such Cause of Action as a GUC Trust Cause of Action.  If the GUC Trust does not receive a written objection from Purchaser to the treatment of such Cause of Action as a GUC Trust Cause of Action within thirty (30) days of receiving written notice from the GUC Trust, then the Cause of Action shall be deemed a GUC Trust Cause of Action.  If Purchaser objects to treatment of the Cause of Action as a GUC Trust Cause of Action within thirty (30) days of receiving written notice from the GUC Trust, Purchaser shall provide an explanation regarding the reasons why such Cause of Action is not a GUC Trust Cause of Action.  The parties shall thereafter work in good faith to resolve any dispute regarding the treatment of such Cause of Action, including the reasonable production of documents in support of their position.  Any dispute that cannot be resolved between Purchaser and the GUC Trust regarding whether a Cause of Action constitutes a GUC Trust Cause of Action shall be adjudicated by the Bankruptcy Court.  Notwithstanding the foregoing, no later than sixty (60) days after the Closing Date, the Purchaser shall provide written notice to the GUC Trust whether an Avoidance Action against any Entity listed on Exhibit A to the Causes of Action List is a not a GUC Trust Cause of Action."

        24.    No Further Amendment.  Except as otherwise amended by this Amendment, all provisions of the Purchase Agreement, including, without limitation, provisions relating to governing law, shall remain in full force and effect and shall apply to this Amendment (unless this Amendment specifically amends a particular provision of the Purchase Agreement) and the Purchase Agreement and this Amendment shall be construed together and considered one and the same agreement.

#23086359 v5

25. <u>Bring Down of Representations and Warranties</u>.  Upon its execution of this Amendment, Sellers hereby certify that the representations, warranties, and covenants of Sellers set forth in the Purchase Agreement (including without limitation in Article 5 and Section 8.5 thereof) are true and correct at and as of the date hereof, except to the extent such representations, warranties, or covenants (i) expressly relate to an earlier date (in which case such representations and warranties were true and correct on and as of such earlier date); or (ii) are in conflict with actions taken by the Sellers during the Bankruptcy Case that Purchaser had notice of and/or consented to prior to Closing.  <u>Schedule 5.5 Litigation</u> and <u>Schedule 5.10 Accounts Receivable</u> are hereby amended and replaced by the versions attached to this Amendment.

26. <u>Counterparts</u>.  This Amendment may be executed in any number of counterparts and when so executed, all of such counterparts shall constitute a single instrument binding upon all Parties notwithstanding the fact that all parties are not signatory to the original or to the same counterpart.  Any and all counterparts may be executed by facsimile.

27. <u>Governing Law; Waiver of Jury Trial</u>.  This Amendment shall be governed by and construed in accordance with the laws of the State of New York applicable to contracts made and performed in such State.

*[signatures appear on following page]*

IN WITNESS WHEREOF, the Parties have caused this Amendment to be executed by their respective officers thereunto duly authorized, as of the date first written above.

**SELLERS:**

**LANDAUER-METROPOLITAN, INC.**

By: _____
   Alan J. Landauer
   Its Executive Chairman

**LANDAUER HEALTHCARE HOLDINGS, INC.**

By: _____
   Alan J. Landauer
   Its Executive Chairman

**MILLER MEDICAL & RESPIRATORY, INC.**

By: _____
   Alan J. Landauer
   Its Executive Chairman

**C.O.P.D. SERVICES, INC.**

By: _____
   Alan J. Landauer
   Its Executive Chairman

**AMERICAN HOMECARE SUPPLY NEW YORK, LLC**

By: _____
     Alan J. Landauer
     Its Executive Chairman

**AMERICAN HOMECARE SUPPLY MID-ATLANTIC, LLC**

By: _____
     Alan J. Landauer
     Its Executive Chairman

**DENMARK'S, LLC**

By: _____
     Alan J. Landauer
     Its Executive Chairman

**GENOX HOMECARE, LLC**

By: _____
     Alan J. Landauer
     Its Executive Chairman

BOS-3375122 v2

**PURCHASER:**

**LMI DME Holdings LLC**

By: QMES LLC, its sole member

By: _____
              Luke McGee
              Its Manager