## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -  x
                                                                   :
In re:                                                             :     Chapter 11
                                                                   :
LMI LEGACY HOLDINGS INC., *et al.*,[1]                             :     Case No. 13-12098 (CSS)
                                                                   :
                                    Debtors.                       :     (Jointly Administered)
                                                                   :
                                                                   :
                                                                   :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -  x


## DISCLOSURE STATEMENT FOR THE JOINT PLAN OF LIQUIDATION OF LMI LEGACY HOLDINGS INC. AND ITS DEBTOR AFFILIATES PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE

**K&L GATES LLP**
John A. Bicks
599 Lexington Avenue
New York, New York  10022-6030
Telephone:  (212) 536-3900
Facsimile:  (212) 536-3901

and

Charles A. Dale III
Mackenzie L. Shea
One Lincoln Street
Boston, Massachusetts 02111
Telephone:  (617) 261-3100
Facsimile:  (617) 261-3175

**YOUNG CONAWAY STARGATT & TAYLOR, LLP**
Michael R. Nestor (No. 3526)
Matthew B. Lunn (No. 4119)
Justin H. Rucki (No. 5304)
Rodney Square
1000 North King Street
Wilmington, Delaware  19801
Telephone:  (302) 571-6600
Facsimile:  (302) 571-1253

*Co-Counsel to the Debtors and Debtors in Possession*

Dated: March 12, 2014

---

[1]     The Debtors in these Chapter 11 Cases along with the last four digits of each Debtor's federal tax identification number, are as follows: LMI Legacy Holdings Inc. (9115); LMI Legacy Holdings II Inc. (9291); LMI Legacy Holdings III Inc. (3261); LMI Legacy Holdings IV Inc. (0336); LMI Legacy Holdings I LLC (7937); LMI Legacy Holdings II LLC (0026); LMI Legacy Holdings III LLC (4588); and LMI Legacy Holdings IV LLC (7361). Following the sale of substantially all of the Debtors' assets, the Debtors assumed these new names and filed a motion seeking to change the case caption as set forth above, which motion was approved by an order of the Bankruptcy Court dated February 27, 2014 [Docket 604].

**THIS IS NOT A SOLICITATION OF AN ACCEPTANCE OR REJECTION OF THE PLAN. ACCEPTANCES OR REJECTIONS MAY NOT BE SOLICITED UNTIL THE BANKRUPTCY COURT AUTHORIZES THE DEBTORS TO TRANSMIT THIS DISCLOSURE STATEMENT TO PARTIES ENTITLED TO VOTE ON THE PLAN. THIS DISCLOSURE STATEMENT IS BEING SUBMITTED FOR APPROVAL FOR USE IN SOLICITATION ON THE PLAN BUT HAS NOT BEEN APPROVED BY THE BANKRUPTCY COURT. THE INFORMATION IN THIS DISCLOSURE STATEMENT IS SUBJECT TO CHANGE. THIS DISCLOSURE STATEMENT IS NOT AN OFFER TO SELL ANY SECURITIES NOR IS IT SOLICITING AN OFFER TO BUY ANY SECURITIES.**

01:15144890.2

## DISCLAIMER

THE DEBTORS ARE PROVIDING THE INFORMATION IN THIS DISCLOSURE STATEMENT FOR PURPOSES OF SOLICITING VOTES TO ACCEPT OR REJECT THE PLAN OF LIQUIDATION OF LMI LEGACY HOLDINGS INC., AND ITS AFFILIATED DEBTORS TO HOLDERS OF CLAIMS AND INTERESTS.  YOU SHOULD NOT RELY UPON OR USE THE INFORMATION IN THIS DISCLOSURE STATEMENT FOR ANY OTHER PURPOSE.

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED PURSUANT TO SECTION 1125 OF THE BANKRUPTCY CODE AND BANKRUPTCY RULE 3016(b) AND IS NOT NECESSARILY IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER SIMILAR LAWS.  THIS DISCLOSURE STATEMENT WAS NOT FILED WITH THE SECURITIES AND EXCHANGE COMMISSION OR ANY STATE AUTHORITY AND NEITHER THE SECURITIES AND EXCHANGE COMMISSION NOR ANY STATE AUTHORITY HAS PASSED UPON THE ACCURACY OR ADEQUACY OF THIS DISCLOSURE STATEMENT OR UPON THE MERITS OF THE PLAN.

THIS DISCLOSURE STATEMENT MAY CONTAIN "FORWARD LOOKING STATEMENTS" WITHIN THE MEANING OF THE PRIVATE SECURITIES LITIGATION REFORM ACT OF 1995.  SUCH STATEMENTS CONSIST OF ANY STATEMENT OTHER THAN A RECITATION OF HISTORICAL FACT AND CAN BE IDENTIFIED BY THE USE OF FORWARD LOOKING TERMINOLOGY SUCH AS "MAY," "EXPECT," "ANTICIPATE," "ESTIMATE" OR "CONTINUE" OR THE NEGATIVE THEREOF OR OTHER VARIATIONS THEREON OR COMPARABLE TERMINOLOGY.  THE READER IS CAUTIONED THAT ALL FORWARD-LOOKING STATEMENTS ARE NECESSARILY SPECULATIVE AND THERE ARE CERTAIN RISKS AND UNCERTAINTIES THAT COULD CAUSE ACTUAL EVENTS OR RESULTS TO DIFFER MATERIALLY FROM THOSE REFERRED TO IN SUCH FORWARD-LOOKING STATEMENTS.  THE LIQUIDATION ANALYSIS, DISTRIBUTION PROJECTIONS AND OTHER INFORMATION CONTAINED HEREIN AND ATTACHED HERETO ARE ESTIMATES ONLY, AND THE TIMING AND AMOUNT OF ACTUAL DISTRIBUTIONS TO HOLDERS OF ALLOWED CLAIMS MAY BE AFFECTED BY MANY FACTORS THAT CANNOT BE PREDICTED.  THEREFORE, ANY ANALYSES, ESTIMATES OR RECOVERY PROJECTIONS MAY OR MAY NOT TURN OUT TO BE ACCURATE.

NO LEGAL OR TAX ADVICE IS PROVIDED TO YOU BY THIS DISCLOSURE STATEMENT.  THE DEBTORS URGE EACH HOLDER OF A CLAIM OR AN INTEREST TO CONSULT WITH ITS OWN ADVISORS WITH RESPECT TO ANY LEGAL, FINANCIAL, SECURITIES, TAX OR BUSINESS ADVICE IN REVIEWING THIS DISCLOSURE STATEMENT AND THE PLAN.  FURTHERMORE, THE BANKRUPTCY COURT'S APPROVAL OF THE ADEQUACY OF DISCLOSURE CONTAINED IN THIS DISCLOSURE STATEMENT, IF AND WHEN SUCH APPROVAL IS OBTAINED, DOES NOT CONSTITUTE THE BANKRUPTCY COURT'S APPROVAL OF THE MERITS OF THE PLAN.

01:15144890.2

THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE, AND MAY NOT BE CONSTRUED AS, AN ADMISSION OF FACT, LIABILITY, STIPULATION OR WAIVER. RATHER, HOLDERS OF CLAIMS AND INTERESTS AND OTHER ENTITIES SHOULD CONSTRUE THIS DISCLOSURE STATEMENT AS A STATEMENT MADE IN SETTLEMENT NEGOTIATIONS RELATED TO CONTESTED MATTERS, ADVERSARY PROCEEDINGS AND OTHER PENDING OR THREATENED LITIGATION OR ACTIONS.

NO RELIANCE SHOULD BE PLACED ON THE FACT THAT A PARTICULAR LITIGATION CLAIM OR PROJECTED OBJECTION TO A PARTICULAR CLAIM IS, OR IS NOT, IDENTIFIED IN THE DISCLOSURE STATEMENT.  THE DEBTORS AND/OR THE GUC TRUST MAY SEEK TO INVESTIGATE, FILE AND PROSECUTE CLAIMS AND MAY OBJECT TO CLAIMS AFTER THE CONFIRMATION OR EFFECTIVE DATE OF THE PLAN IRRESPECTIVE OF WHETHER THE DISCLOSURE STATEMENT IDENTIFIES ANY SUCH CLAIMS OR OBJECTIONS TO CLAIMS.  THE PLAN RESERVES FOR THE DEBTORS AND/OR THE GUC TRUST THE RIGHT TO BRING CAUSES OF ACTION (DEFINED IN THE PLAN) AGAINST ANY ENTITY OR PARTY IN INTEREST EXCEPT THOSE SPECIFICALLY RELEASED HEREIN OR BY SEPARATE ORDER OF THE BANKRUPTCY COURT.

THIS DISCLOSURE STATEMENT CONTAINS, AMONG OTHER THINGS, SUMMARIES OF THE PLAN, CERTAIN STATUTORY PROVISIONS, CERTAIN EVENTS IN THE DEBTORS' CHAPTER 11 CASES AND CERTAIN DOCUMENTS RELATED TO THE PLAN THAT ARE ATTACHED HERETO AND INCORPORATED HEREIN BY REFERENCE.  ALTHOUGH THE DEBTORS BELIEVE THAT THESE SUMMARIES ARE FAIR AND ACCURATE, THESE SUMMARIES ARE QUALIFIED IN THEIR ENTIRETY TO THE EXTENT THAT THE SUMMARIES DO NOT SET FORTH THE ENTIRE TEXT OF SUCH DOCUMENTS OR STATUTORY PROVISIONS OR EVERY DETAIL OF SUCH EVENTS.  IN THE EVENT OF ANY INCONSISTENCY OR DISCREPANCY BETWEEN A DESCRIPTION IN THIS DISCLOSURE STATEMENT AND THE TERMS AND PROVISIONS OF THE PLAN OR ANY OTHER DOCUMENTS INCORPORATED HEREIN BY REFERENCE, THE PLAN OR SUCH OTHER DOCUMENTS WILL GOVERN FOR ALL PURPOSES.  THE DEBTORS DO NOT REPRESENT OR WARRANT THAT THE INFORMATION CONTAINED HEREIN OR ATTACHED HERETO IS WITHOUT ANY MATERIAL INACCURACY OR OMISSION.

THE DEBTORS AND THEIR ADVISORS HAVE REVIEWED THE FINANCIAL INFORMATION PROVIDED IN THIS DISCLOSURE STATEMENT.  ALTHOUGH THE DEBTORS HAVE USED THEIR REASONABLE BUSINESS JUDGMENT TO ENSURE THE ACCURACY OF THIS FINANCIAL INFORMATION, NO ENTITY HAS AUDITED THE FINANCIAL INFORMATION CONTAINED IN, OR INCORPORATED BY REFERENCE INTO, THIS DISCLOSURE STATEMENT.

01:15144890.2

THE DEBTORS ARE MAKING THE STATEMENTS AND PROVIDING THE FINANCIAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT AS OF THE DATE HEREOF, UNLESS OTHERWISE SPECIFICALLY NOTED.  ALTHOUGH THE DEBTORS MAY SUBSEQUENTLY UPDATE THE INFORMATION IN THIS DISCLOSURE STATEMENT, THE DEBTORS HAVE NO AFFIRMATIVE DUTY TO DO SO.  HOLDERS OF CLAIMS AND INTERESTS REVIEWING THIS DISCLOSURE STATEMENT SHOULD NOT INFER THAT, AT THE TIME OF THEIR REVIEW, THE FACTS SET FORTH HEREIN HAVE NOT CHANGED SINCE THE FILING OF THIS DISCLOSURE STATEMENT.  HOLDERS OF CLAIMS ENTITLED TO VOTE TO ACCEPT OR REJECT THE PLAN MUST RELY ON THEIR OWN EVALUATION OF THE DEBTORS AND THEIR OWN ANALYSIS OF THE TERMS OF THE PLAN, INCLUDING, WITHOUT LIMITATION, ANY RISK FACTORS CITED HEREIN, IN DECIDING WHETHER TO VOTE TO ACCEPT OR REJECT THE PLAN.

THE DEBTORS HAVE NOT AUTHORIZED ANY ENTITY TO GIVE ANY INFORMATION ABOUT OR CONCERNING THE PLAN OTHER THAN THAT WHICH IS CONTAINED IN THIS DISCLOSURE STATEMENT.  THE DEBTORS HAVE NOT AUTHORIZED ANY REPRESENTATIONS CONCERNING THE DEBTORS OR THE VALUE OF THEIR PROPERTY OTHER THAN AS SET FORTH IN THIS DISCLOSURE STATEMENT.

PRIOR TO DECIDING WHETHER AND HOW TO VOTE ON THE PLAN, EACH HOLDER OF A CLAIM IN A VOTING CLASS SHOULD CONSIDER CAREFULLY ALL OF THE INFORMATION IN THIS DISCLOSURE STATEMENT, INCLUDING THE RISK FACTORS DESCRIBED IN GREATER DETAIL HEREIN.

THE DEBTORS URGE ALL HOLDERS OF CLAIMS ENTITLED TO VOTE ON THE PLAN TO VOTE TO ACCEPT THE PLAN.

## <u>TABLE OF CONTENTS</u>

**Page**

I. INTRODUCTION .................................................................................................... 1

II. OVERVIEW OF PLAN ......................................................................................... 1

III. IMPORTANT INFORMATION ABOUT THIS DISCLOSURE STATEMENT ................... 5

    A.    Key Terms Used in this Disclosure Statement ........................................5

    B.    Additional Important Information.............................................................7

    C.    What is Chapter 11?.................................................................................8

    D.    Why are the Debtors sending me this Disclosure Statement? .................9

    E.    Am I entitled to vote on the Plan? ...........................................................9

    F.    What will I receive from the Debtors if the Plan is consummated? .........9

    G.    What will I receive from the Debtors if I hold an Administrative Claim or a Priority Tax Claim?.............................................................................10

    H.    How will the Plan be implemented and what is the function of the Liquidating Supervisor?.........................................................................10

    I.    What is the GUC Trust and how will it be administered? .....................11

    J.    What is a Convenience Claim?...............................................................11

    K.    What happens to my recovery if the Plan is not confirmed or does not go effective?................................................................................................12

    L.    If the Plan provides that I get a distribution, do I get it upon Confirmation or when the Plan goes effective, and what is meant by "Confirmation," "Effective Date" and "Consummation?" ...............................................12

    M.    What are the sources of cash and other consideration required to fund the Plan?.......................................................................................................12

    N.    What will happen to my stock in LMI? ..................................................13

    O.    Will the final amount of Allowed General Unsecured Claims affect my recovery under the Plan?.......................................................................13

    P.    Will there be releases and exculpation granted to parties in interest as part of the Plan?..............................................................................................13

    Q.    What is the deadline to vote on the Plan?..............................................14

    R.    How do I vote for or against the Plan? ..................................................14

    S.    Why is the Bankruptcy Court holding a Consolidated Hearing related to the Disclosure Statement and confirmation, and when is the Consolidated Hearing set to occur? ...........................................................................15

    T.    What is the purpose of the Confirmation Hearing? ...............................15

    U.    Will the Debtors have any ongoing operations?....................................15

    V.    Who do I contact if I have additional questions with respect to this Disclosure Statement or the Plan? ........................................................16

    W.    Do the Debtors recommend voting in favor of the Plan? ......................16

IV. THE DEBTORS' CORPORATE HISTORY, STRUCTURE AND BUSINESS OVERVIEW ...................................................................................................... 16

    A.    Corporate Structure................................................................................17

    B.    Services and Products .............................................................................17

i

C. Revenue Sources ...................................................................................................18
D. Company History ...................................................................................................18
E. Capital Structure ...................................................................................................19

V. EVENTS LEADING TO THE CHAPTER 11 FILINGS ........................................................ 21

VI. EVENTS OF THE CHAPTER 11 CASES ......................................................................... 24
A. Overview of Chapter 11 .........................................................................................24
B. Section 363 Sale of Debtors' Assets .....................................................................27
C. Settlement Agreement -- Creation of the GUC Trust ...........................................28
D. Abandoned Reorganization Plan Process ..............................................................29
E. Sale of the Debtors' Assets and Name Changes ...................................................29
F. Insurance Claims ...................................................................................................30
G. Status of the Allcare Litigation ............................................................................30
H. Causes of Action ...................................................................................................31
I. Claims Bar Dates ..................................................................................................32

VII. RISK FACTORS ............................................................................................................ 32
A. The Debtors May Not Be Able To Obtain Confirmation of the Plan ...................32
B. Debtors Cannot State with any Degree of Certainty What Recovery Will Be
   Available to Holders of Allowed Claims in Voting Classes .................................33
C. Actual Amounts of Allowed Claims May Differ from the Estimated Claims
   and Adversely Affect the Percentage Recovery on Unsecured Claims ................33

VIII. VOTING PROCEDURES .............................................................................................. 33
A. Holders of Claims Entitled to Vote on the Plan ...................................................33
B. Voting Record Date ..............................................................................................34
C. Voting on the Plan ................................................................................................34
D. Ballots Not Counted .............................................................................................35

IX. TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES .............. 35
A. Assumption of Executory Contracts and Unexpired Leases .................................35
B. Claims Based on Rejection of Executory Contracts or Unexpired Leases ...........36
C. Indemnification Obligations Regarding Prepetition Acts or Omissions ...............36

X. CONFIRMATION OF THE PLAN ..................................................................................... 36
A. Requirements for Confirmation of the Plan ..........................................................36
B. Best Interests of Creditors/ Liquidation Analysis ................................................37
C. Feasibility ..............................................................................................................38
D. Acceptance by Impaired Classes ..........................................................................38
E. Confirmation without Acceptance by All Impaired Classes .................................38

XI. CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES OF THE
   PLAN ............................................................................................................................ 39

XII. CONCLUSION AND RECOMMENDATION .................................................................. 41

**EXHIBITS**

EXHIBIT A            Plan of Liquidation

EXHIBIT B            Settlement Agreement between LMI DME Holdings LLC, Quadrant
                     Management LLC, and the Creditors' Committee and Order approving
                     same

EXHIBIT C            Tax Summary

## I. INTRODUCTION

LMI Legacy Holdings Inc., formerly known as Landauer Healthcare Holdings, Inc., ("LHH") and its debtor affiliates, including LMI Legacy Holdings II Inc., formerly known as Landauer Metropolitan, Inc., ("LMI"), as debtors and debtors in possession (each, a "Debtor" and, collectively, the "Debtors"), submit this disclosure statement (the "Disclosure Statement")[2] pursuant to section 1125 of the Bankruptcy Code to holders of Claims against and Interests in the Debtors in connection with the solicitation of acceptances with respect to the *Joint Plan of Liquidation of LMI Legacy Holdings Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* (the "Plan"), dated February 28, 2014. A copy of the Plan is attached hereto as Exhibit A and incorporated herein by reference. The Plan constitutes a separate chapter 11 plan for each Debtor and, unless otherwise provided for in the Plan, the classification and treatment of Claims and Interests apply to each individual Debtor.

THE DEBTORS BELIEVE THAT THE PLAN IS FAIR AND EQUITABLE, MAXIMIZES THE VALUE OF THE DEBTORS' ESTATES AND PROVIDES THE BEST RECOVERY TO HOLDERS OF ALLOWED CLAIMS. AT THIS TIME, THE DEBTORS BELIEVE THIS IS THE BEST AVAILABLE ALTERNATIVE FOR CONCLUDING THESE CHAPTER 11 CASES AND STRONGLY RECOMMEND THAT YOU VOTE TO ACCEPT THE PLAN.

## II. OVERVIEW OF PLAN

The following summary is qualified in its entirety by, and should be read in conjunction with, the more detailed information appearing elsewhere in this Disclosure Statement and in the Plan. Unless otherwise stated herein, section ("Section" or "§") references are to the United States Bankruptcy Code, 11 U.S.C. §§ *et seq.* (the "Bankruptcy Code").

On February 7, 2014, the Debtors sold substantially all of their assets to LMI DME Holdings, LLC ("LMI DME" or the "Purchaser"). In connection with the sale, the Debtors' Estates received $700,000 in cash to wind-down these Chapter 11 Cases. The Debtors thereafter engaged in good faith negotiations with the Official Committee of Unsecured Creditors (the "Creditors' Committee") on the best method to conduct such wind-down and as a result of those negotiations, the Debtors believe they have proposed a liquidating plan that is fair and equitable, conserves the Debtors' cash on hand to the greatest extent possible, and as such, provides a greater recovery to holders of Allowed Claims than such holders would receive if these Chapter 11 Cases were converted to Chapter 7. The Debtors and the Creditors Committee recommend that you vote to accept the plan.

Pursuant to the Plan, a Liquidating Supervisor will be appointed and will become the exclusive representative for each of the Debtors. The Liquidating Supervisor will use the Debtors' cash on hand to satisfy Allowed Administrative and Priority Claims and to wind-down the Debtors' operations. Once those tasks have been completed, the Liquidating Supervisor will turn over any remaining cash to the GUC Trustee, as discussed further below.

---

[2] Capitalized terms used in this Disclosure Statement and not otherwise defined shall have the meanings ascribed to them in Article I.A of the Plan.

The GUC Trustee will be responsible for, among other things, (i) liquidating any GUC Trust Assets, including pursuing any of the GUC Trust Causes of Action and (ii) disbursing the GUC Trust Assets to holders of Allowed General Unsecured Claims, and if the Plan is confirmed, to holders of Allowed Convenience Class Claims.  Because the Plan provides a mechanism for the GUC Trustee to receive, on behalf of beneficiaries of the GUC Trust, any remaining cash not needed to wind-down the Debtors' estates, and because such expenses will be less than if these Chapter 11 Cases were converted to Chapter 7, the Debtors believe that the Plan is in the best interests of all stakeholders.

The following table provides a summary of the classification and treatment of Claims and Interests and the potential distributions to holders of Allowed Claims under the Plan.

THE PROJECTED RECOVERIES SET FORTH IN THE TABLE BELOW ARE ESTIMATES ONLY AND THEREFORE ARE SUBJECT TO CHANGE.  FOR A COMPLETE DESCRIPTION OF THE DEBTORS' CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS, REFERENCE SHOULD BE MADE TO THE PLAN.[3]

| Class | Claim/Interest | Treatment of Claim/ Interest | Projected Amount of Claims | Projected Recovery Under the Plan |
|---|---|---|---|---|
| Unclassified | Administrative Claims | Except with respect to Administrative Claims that are Fee Claims and except to the extent that a holder of an Allowed Administrative Claim and the applicable Debtor(s) agree to less favorable treatment with respect to such holder, each holder of an Allowed Administrative Claim shall be paid in full in Cash.  Such Claims shall be paid | [approximately $283,000][4] | 100% |

---

[3]  The recoveries set forth below may change based upon changes in the amount of Claims that are "Allowed." "Allowed" means with respect to any Claim against any Debtor or its Estate (including any Administrative Claim) or portion thereof: (a) a Claim that is listed on the Debtors' Schedules, as such Schedule may be amended from time to time in accordance with Bankruptcy Rule 1009 prior to the closing of the Chapter 11 Cases, as neither disputed, contingent nor unliquidated and for which no contrary Proof of Claim has been Filed and as to which no objection to allowance thereof, or action to reclassify, subordinate or otherwise limit recovery with respect thereto, shall have been interposed within such period of limitation fixed by the Plan, the Bankruptcy Code, the Bankruptcy Rules or Final Order of the Bankruptcy Court; (b) a Claim that is not a Disputed Claim or has been allowed by a Final Order; (c) a Claim that is allowed (i) pursuant to the terms of the Plan or (ii) in any stipulation that is approved by the Bankruptcy Court; and (d) a Claim as to which a Proof of Claim has been timely Filed and as to which no objection has been Filed by the Claims Objection Deadline or action to reclassify, subordinate or otherwise limit recovery with respect thereto has been interposed within such time period of limitation fixed by the Plan, the Bankruptcy Code, the Bankruptcy Rules or a Final Order.  Except for any Claim that is expressly Allowed in the Plan, any Claim that has been or is hereafter listed in the Schedules as contingent, unliquidated or disputed and for which no Proof of Claim has been Filed is not considered Allowed and shall be deemed expunged upon entry of the Confirmation Order.

[4]  This estimate includes the aggregate amount of Administrative Claims filed as of February 13, 2014, but does not take into account any such claims that the Purchaser has assumed as part of the Sale.

01:15144890.2

| | | | | |
|---|---|---|---|---|
| | | on the earlier of (a) on or as soon as reasonably practicable after the Effective Date if such Administrative Claim is Allowed as of the Effective Date or (b) on or as soon as reasonably practicable after the date such Administrative Claim is Allowed, if such Administrative Claim is not Allowed as of the Effective Date.  Notwithstanding the foregoing, no request for payment of an Administrative Claim need be Filed with respect to an Administrative Claim previously Allowed by Final Order. | | |
| Unclassified | Priority Tax Claims | Except to the extent that a holder of an Allowed Priority Tax Claim agrees to a less favorable treatment, in exchange for full and final satisfaction, settlement, release and discharge of each Allowed Priority Tax Claim, each holder of an  Allowed Priority Tax Claim due and payable on or before the Effective Date shall receive, on the Distribution Date, at the option of the Debtors, one of the following treatments: (i) Cash in an amount equal to the amount of such Allowed Priority Tax Claim, plus interest at the rate determined under applicable non-bankruptcy law and to the extent provided for by section 511 of the Bankruptcy Code; (ii) Cash in an aggregate amount of such Allowed Priority Tax Claim payable in installment payments over a period of time not to exceed five years after the Petition Date, pursuant to section 1129(a)(9)(C) of the Bankruptcy Code, plus interest at the rate determined under applicable non-bankruptcy law and to the extent provided for by section 511 of the Bankruptcy Code; or (iii) such other treatment as may be | [approximately $275,000.00][5] | 100% |

---

[5] This estimate includes the aggregate amount of Priority Tax Claims filed as of February 13, 2014, but notably, excludes a PriorityTax Claim in the amount of $206,921.00 filed by the City of New York, for which the Debtors do not believe they have any liability.

01:15144890.2

| | | | | |
|---|---|---|---|---|
| | | agreed upon by such holder and the Debtors or otherwise determined upon an order of the Bankruptcy Court. | | |
| 1 | Priority Non-Tax Claims | Unimpaired, Deemed to Accept. Except to the extent that a holder of an Allowed Priority Non-Tax Claim agrees to a less favorable treatment, in exchange for full and final satisfaction, settlement, release and discharge of each Allowed Priority Non-Tax Claim, each holder of such Allowed Priority Non-Tax Claim shall be paid in full in Cash. Allowed Priority Non-Tax Claims shall be paid on or as reasonably practicable after (i) the Effective Date, (ii) the date on which such Priority Non-Tax Claim against the Debtors becomes an Allowed Priority Non-Tax Claim or (iii) such other date as may be ordered by the Bankruptcy Court. | [approximately $72,000][6] | 100% |
| 2 | Convenience Class Claims | Impaired, Entitled to Vote. Except to the extent that a holder of an Allowed Convenience Class Claim agrees to less favorable treatment, in exchange for full and final satisfaction, settlement, release and discharge of each Allowed Convenience Class Claim, each holder of Allowed Convenience Class Claim shall receive Cash from the GUC Trust in the amount equal to 10% of such Allowed Convenience Class Claim on the later of the Effective Date or the date such Claim becomes an Allowed Claim. | [approximately $388,000][7] | [10%] |
| 3 | General Unsecured Claims | Impaired, Entitled to Vote. Except to the extent that a holder of an Allowed General Unsecured Claim agrees to a | [approximately $16 million-$184.5 million][8] | [1.01%-15.4%][9] |

---

[6] This estimate includes the aggregate amount of Priority Non-Tax Claims filed as of February 13, 2014, but excludes certain such claims that the Debtors believe will be reclassified as General Unsecured Claims, including notably, a claim in the amount of $126,087.27 filed by Premier Courier Services, Inc.

[7] This estimate includes the aggregate amount of General Unsecured Claims under $10,000 filed as of February 13, 2014. These claims will be satisfied from the GUC Trust Assets.

[8] This estimate includes the aggregate amount of General Unsecured Claim filed as of February 13, 2014, which notably on the high end of this range, includes approximately $160 million in claims filed by the federal and certain state governments related to the Debtors' alleged liability under the False Claims Act. The Debtors do not believe

| | | less favorable treatment, in exchange for full and final satisfaction, settlement, release and discharge of each Allowed General Unsecured Claim, each holder of such Allowed General Unsecured Claim shall receive its Pro Rata distribution of the GUC Trust Assets. | | |
|---|---|---|---|---|
| 4 | Intercompany Claims | Impaired, Deemed to Reject. On the Effective Date, Class 4 Intercompany Claims shall not be entitled to receive or retain any property or interest on account of such claims. | [$38,541,097.17] | 0.00% |
| 5 | Intercompany Interests | Impaired, Deemed to Reject. On the Effective Date, Intercompany Interests will be cancelled and discharged. Holders of Class 5 Intercompany Interests shall not receive any distribution on account of such Interests. | N/A | 0.00% |
| 6 | Subordinated Claims | Impaired, Deemed to Reject. On the Effective Date, Class 6 Subordinated Claims shall not be entitled to receive or retain any property or interest on account of such claims. | Unknown | 0.00% |
| 7 | Equity Interests | Impaired, Deemed to Reject. On the Effective Date, Class 7 Equity Interests will be cancelled and discharged. Holders of Class 7 Equity Interests in the Debtors shall not receive any distribution on account of such Interests. | N/A | 0.00% |

## III. IMPORTANT INFORMATION ABOUT THIS DISCLOSURE STATEMENT

### A.    Key Terms Used in this Disclosure Statement

The following are some of the defined terms used in this Disclosure Statement. This is not an exhaustive list of defined terms in the Plan or this Disclosure Statement, but is provided for ease of reference only. Please refer to the Plan for the exact, as well as, additional defined terms.

---

they have any such liability so the low end of this range excludes those claims, as well certain other claims to which the Debtors believe substantive and/or procedural objections may be appropriate.

[9]  The projected recovery to holders of General Unsecured Claims does not account for such contingencies, *inter alia*, as (1) any increases achieved from prosecution and collection of GUC Trust Causes of Action and (2) any decreases attributable to Filed and Allowed General Unsecured Claims exceeding the estimates contained herein. Notably, if the claims of the federal and certain state governments referenced in footnote 8 are allowed in the amounts requested of approximately $160 million, the projected recovery for General Unsecured Creditors will drop to approximately 1.36%.

01:15144890.2

References to the "<u>Asset Purchase Agreement</u>" means that certain Asset Purchase Agreement, dated as of August 16, 2013, as amended by Amendment No. 1 to Asset Purchase Agreement, dated January 6, 2014, by and among the Debtors and LMI DME, and approved by the Sale Order.

References to the "<u>Bankruptcy Court</u>" are to the United States Bankruptcy Court for the District of Delaware having jurisdiction over the Chapter 11 Cases or any other court having jurisdiction over the Chapter 11 Cases, including, to the extent of the withdrawal of the reference under 28 U.S.C. § 157, the United States District Court for the District of Delaware.

References to the "<u>Bankruptcy Rules</u>" mean the Federal Rules of Bankruptcy Procedure promulgated under section 2075 of the Judicial Code and the general, local and chambers rules of the Bankruptcy Court.

References to the "<u>Chapter 11 Cases</u>" means (a) when used with reference to a particular Debtor, the case pending for that Debtor under chapter 11 of the Bankruptcy Code and (b) when used with reference to all Debtors, the procedurally consolidated chapter 11 cases pending for the Debtors in the Bankruptcy Court under case number 13-12098 (CSS).

References to a "<u>Claim</u>" are to any claim, as such term is defined in section 101(5) of the Bankruptcy Code.

References to the "<u>Confirmation Hearing</u>" are to the hearing to be held by the Bankruptcy Court on confirmation of the Plan pursuant to section 1129 of the Bankruptcy Code, as such hearing may be continued from time to time.

References to the "<u>Confirmation Date</u>" are to the date upon which the Bankruptcy Court enters the Confirmation Order on the Docket of the Chapter 11 Cases, within the meaning of Bankruptcy Rules 5003 and 9021.

Reference to the "<u>Dissolution Date</u>" means the date upon which the Debtors are dissolved in accordance with the Plan.

References to "<u>GUC Trust</u>" means that trust formed pursuant to the Settlement Agreement.

References to "<u>Interests</u>" means any equity security in a Debtor as defined in section 101(16) of the Bankruptcy Code, including all issued, unissued, authorized or outstanding shares of capital stock of the Debtors together with any warrants, options or contractual rights to purchase or acquire such equity securities at any time and all rights arising with respect thereto.

References to "<u>Liquidating Supervisor</u>" mean the Person or Persons selected by the Debtors to manage and oversee the winding up and dissolution of the Debtors.  The Liquidating Supervisor shall also serve as the Disbursing Agent for the Debtors.

References to "<u>Person</u>" mean to a person, as the term is defined in section 101(41) of the Bankruptcy Code.

References to "<u>Plan</u>" means the Joint Plan of Liquidation of LMI Legacy Holdings Inc. and its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code, as modified, amended or supplemented from time to time.

References to the "Plan Supplement" mean the compilation of documents and forms of documents, schedules, and exhibits to the Plan, including such document whereby the Debtors will disclose the identity and affiliations of the Liquidating Supervisor.

References to the "Pre-Petition Credit Facility Claim" means the Allowed Claim of the Pre-Petition Lenders and the Pre-Petition Agent under the Pre-Petition Credit Facility, which claim and all rights, title and interests related thereto, were acquired by the Secured Lender on September 23, 2013.

References to "Sale" mean the sale of substantially all of the Debtors' assets to LMI DME pursuant to the Asset Purchase Agreement and the Sale Order, which sale was consummated on or about February 7, 2014.

References to the "Sale Order" mean that certain order dated January 6, 2014 [Docket No. 477].

References to the "Secured Lender" mean Herbard Ltd., including any assignee or designee thereof.

References to the "Settlement Agreement" mean the Settlement Agreement by and between the Creditors' Committee, LMI DME and Quadrant Management Inc. and/or its assigns, dated September 25, 2013, and approved by the Bankruptcy Court by order dated October 22, 2013.

References to the "TSA" mean the Amended and Restated Transition Services Agreement, dated as of February 7, 2014, by and among the Debtors and LMI DME.

References to the "TSA Order" means the Order entered by the Bankruptcy Court on January 8, 2014 [Docket No. 481] approving the TSA.

References to "Wind Down Funds" mean the cash on hand in the Debtors' operating accounts from and after the Effective Date; provided, however, Wind Down Funds shall not include the proceeds of accounts collected by one or more of the Debtors, which were included in the Sale.

## B.    Additional Important Information

The confirmation and effectiveness of the Plan are subject to certain material conditions precedent described herein and set forth in Article IX of the Plan. There is no assurance that the Plan will be confirmed, or if confirmed, that the conditions required for the Plan to go effective will be satisfied (or waived).

You are encouraged to read in entirety this Disclosure Statement, the Plan and the section entitled "Risk Factors" before submitting your ballot to vote on the Plan.

**The Bankruptcy Court's approval of this Disclosure Statement, which approval is being sought at a consolidated hearing in conjunction with confirmation of the Plan, does not constitute a guarantee by the Bankruptcy Court of the accuracy or completeness of the information contained herein or an endorsement by the Bankruptcy Court of the merits of the Plan.**

01:15144890.2

Summaries of the Plan and statements made in this Disclosure Statement are qualified in their entirety by reference to the Plan. The summaries of the financial information and the documents annexed to this Disclosure Statement or otherwise incorporated herein by reference are qualified in their entirety by reference to the Plan.

Statements are made only as of the date of this Disclosure Statement (or earlier where noted), and there is no assurance that the statements contained herein will be correct at any time after such date. Except as otherwise provided in the Plan or in accordance with applicable law, the Debtors are under no duty to update or supplement this Disclosure Statement.

The information contained in this Disclosure Statement is included for purposes of soliciting acceptances to, and Confirmation of, the Plan and may not be relied on for any other purpose. In the event of any inconsistency between the Disclosure Statement and the Plan, the relevant provisions of the Plan will govern.

This Disclosure Statement has not been approved or disapproved by the United States Securities and Exchange Commission (the "SEC") or any similar federal, state, local or foreign regulatory agency, nor has the SEC or any other agency passed upon the accuracy or adequacy of the statements contained in this Disclosure Statement.

The Debtors have sought to ensure the accuracy of the financial information provided in this Disclosure Statement; however, the financial information contained in this Disclosure Statement or incorporated herein by reference have not been, and will not be, audited or reviewed by the Debtors' independent auditors unless explicitly provided otherwise.

The Debtors make statements in this Disclosure Statement that are considered forward-looking statements under federal securities laws. The Debtors consider all statements regarding anticipated or future matters, including but not necessarily limited to the following, to be forward-looking statements: projected value from liquidation of GUC Trust Assets; estimations of Claims in each Class; projected recovery for each Class under the Plan; assessments of certain procedural and substantive objections to particular Claims; and the likelihood of prosecution and collection of GUC Trust Causes of Action.

Statements concerning these and other matters are not guarantees of the future events. There are risks, uncertainties and other important factors that could cause the actual results to be different from those estimated herein.

QUESTIONS AND ANSWERS REGARDING THIS DISCLOSURE STATEMENT AND THE PLAN

### C.    What is Chapter 11?

Chapter 11 promotes equality of treatment for creditors and similarly situated interest holders, subject to the priority of distributions prescribed by the Bankruptcy Code.

The commencement of a chapter 11 case creates an estate that comprises all of the legal and equitable interests of the debtor as of the date the chapter 11 case is commenced. The

Bankruptcy Code provides that the debtor may continue to operate its business and remain in possession of its property as a "debtor in possession."

Consummating a plan is a principal objective of a chapter 11 case. A bankruptcy court's confirmation of a plan binds the debtor, any person acquiring property under the plan, any creditor or interest holder of the debtor and any other entity as may be ordered by the bankruptcy court. Subject to certain limited exceptions, the order issued by a bankruptcy court confirming a plan provides for the treatment of the debtor's liabilities in accordance with the terms of the confirmed plan.

**D.      Why are the Debtors sending me this Disclosure Statement?**

The Debtors are seeking to obtain Bankruptcy Court approval of this Disclosure Statement and confirmation of the Plan. Before soliciting acceptances of the Plan, section 1125 of the Bankruptcy Code requires the Debtors to prepare a disclosure statement containing adequate information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment regarding acceptance of the Plan. This Disclosure Statement is being submitted in accordance with these requirements, but has not yet been approved by the Bankruptcy Court.  Such approval is being sought at a consolidated hearing currently scheduled to be held on April 28, 2014.

**E.      Am I entitled to vote on the Plan?**

Your ability to vote on and your distribution under the Plan, if any, depend on what type of Claim you hold. Each category of holders of Claims or Interests, as set forth in Article III of the Plan pursuant to section 1122(a) of the Bankruptcy Code, is referred to as a "Class." Each Class's respective voting status is set forth below.

| Class | Claim/ Interest | Status | Voting Rights |
|---|---|---|---|
| 1 | Priority Non-Tax Claims | Unimpaired | Deemed to Accept |
| 2 | Convenience Class Claims | Impaired | Entitled to Vote |
| 3 | General Unsecured Claims | Impaired | Entitled to Vote |
| 4 | Intercompany Claims | Impaired | Deemed to Reject |
| 5 | Intercompany Interests | Impaired | Deemed to Reject |
| 6 | Subordinated Claims | Impaired | Deemed to Reject |
| 7 | Equity Interests | Impaired | Deemed to Reject |

**F.      What will I receive from the Debtors if the Plan is consummated?**

The following chart provides a summary of the anticipated recovery to holders of Claims under the Plan.  Any estimates of Claims in this Disclosure Statement may vary from the final amounts allowed by the Bankruptcy Court.  Your ability to receive distributions under the Plan

- 9 -

depends upon the ability of the Debtors to obtain Confirmation and meet the conditions necessary to consummate the Plan.

| Class | Claim/Interest | Anticipated Recovery |
|-------|----------------|----------------------|
| 1 | Priority Non-Tax Claims | 100% |
| 2 | Convenience Class Claims | [10]% |
| 3 | General Unsecured Claims | [1.01-15.4]% |
| 4 | Intercompany Claims | 0% |
| 5 | Intercompany Interests | 0% |
| 6 | Subordinated Claims | 0% |
| 7 | Equity Interests | 0% |

**G.     What will I receive from the Debtors if I hold an Administrative Claim or a Priority Tax Claim?**

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims and Priority Tax Claims have not been classified and, thus, are excluded from the Classes of Claims and Interests set forth in Article III of the Plan.  Administrative Claims will be satisfied as set forth in Article II.A of the Plan, and Priority Tax Claims will be satisfied as set forth in Article II.B of the Plan.

**H.     How will the Plan be implemented and what is the function of the Liquidating Supervisor?**

On the Effective Date, the Debtors' Wind Down Funds will be used to fund any obligations required to consummate the Plan (including the satisfaction of Allowed Administrative and Priority Claims under the Plan and the Fee Claims necessary to achieve Plan confirmation) and to pay the expenses necessary to wind-down the Debtors' Estates.

On the Effective Date, the Liquidating Supervisor shall become the exclusive representative for each Debtor and their respective Estate.  The Liquidating Supervisor shall, as promptly as is practicable, take all such actions as are necessary to wind down the affairs, and cause the dissolution, of each Debtor.  Through and including the Dissolution Date, the Liquidating Supervisor shall have all requisite corporate authority and all of the rights and powers of a trustee under the Bankruptcy Code, including, but not limited to, the right to retain other professionals, including attorneys, without further order of the Court.

From and after the Effective Date, the Debtors shall continue to perform transition services for LMI DME in accordance with the TSA as authorized by the TSA Order.  As soon as

practicable after the TSA expires or is terminated, the Debtors' remaining affairs shall be concluded by the Liquidating Supervisor and each Debtor shall thereafter be dissolved. The Liquidating Supervisor shall use the Wind Down Funds to finish the wind-down of the Debtors' affairs. After the Dissolution Date, (after which point the Debtors will cease to exist) and following satisfaction of all Plan obligations and debts incurred in winding down the Debtors' affairs, the Liquidating Supervisor shall turn over to the GUC Trustee any remaining Wind Down Funds. The GUC Trust (discussed below) shall make distributions required hereunder to creditors holding Allowed Claims in Class 2 and Class 3.

### I.    What is the GUC Trust and how will it be administered?

The GUC Trust, which was formed pursuant to the terms of the Settlement Agreement, will be used to make distributions to Holders of Allowed General Unsecured Claims and if the Plan is confirmed, Allowed Convenience Class Claims. The GUC Trust holds the GUC Trust Assets, which include: (a) GUC Trust Funds Carveout; (b) the GUC Trust Causes of Action; (c) GUC Trust Insurance Proceeds; and (d) the Promissory Notes, and all of the proceeds of the foregoing, which assets are held in trust for the benefit of holders of Allowed General Unsecured Claims in accordance with the Settlement Agreement and the Sale Order.

The GUC Trust Assets are held in trust for the benefit of holders of Allowed General Unsecured Claims, and if the plan is confirmed, Allowed Convenience Class Claims, and will be distributed in accordance with the Settlement Agreement and the Plan. The failure of the Plan to be approved or confirmed will not affect the GUC Trust or the GUC Trust Assets.

In accordance with section 1123(b)(3) of the Bankruptcy Code, the GUC Trustee, on behalf of the GUC Trust may exclusively enforce any and all GUC Trust Causes of Action. The GUC Trustee shall have the exclusive right, authority and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw or litigate to judgment any GUC Trust Causes of Action and to decline to do any of the foregoing without further notice to or action, order or approval of the Bankruptcy Court.

The Debtors shall not bear any costs of administering or distributing the GUC Trust Assets to holders of Allowed Convenience Claims or Allowed General Unsecured Claims, including, for the avoidance of doubt, the costs of objecting to and/or resolving Convenience Class Claims or General Unsecured Claims, the post-Effective Date fees and expenses, if any, of the Notice, Claims and Balloting Agent related to Convenience Class Claims or General Unsecured Claims or any pleadings Filed by or served by the GUC Trust, and any such costs shall be incurred by the GUC Trust and reimbursed from the GUC Trust Assets.

### J.    What is a Convenience Claim?

A Convenience Claim is (i) any General Unsecured Claim in the amount of $10,000 or less that the holder of such Claim has not affirmatively elected to be treated as a Class 3 Claim or (ii) any General Unsecured Claim in an amount greater than $10,000 that the holder of such Claim has affirmatively elected to reduce to the amount of $10,000 and have treated as a Class 2 Claim. There is no cap on the number, or amount, of Claims that may elect convenience class treatment.

**K.     What happens to my recovery if the Plan is not confirmed or does not go effective?**

In this case, the Debtors have already sold substantially all of their assets pursuant to section 363 of the Bankruptcy Code. Accordingly, in the event that the Plan is not confirmed or does not go effective, these Chapter 11 Cases will be converted to chapter 7 of the Bankruptcy Code and the Debtors believe holders of Claims will receive less than they would have received pursuant to the Plan. For a more detailed description of the consequences of a liquidation under chapter 7 of the Bankruptcy Code see "Confirmation of the Plan - Best Interests of Creditors/Liquidation Analysis" of this Disclosure Statement.

**L.     If the Plan provides that I get a distribution, do I get it upon Confirmation or when the Plan goes effective, and what is meant by "Confirmation," "Effective Date" and "Consummation?"**

"Confirmation" of the Plan refers to approval of the Plan by the Bankruptcy Court. Confirmation of the Plan does not guarantee that you will receive the distribution indicated under the Plan. After Confirmation of the Plan by the Bankruptcy Court, there are conditions that need to be satisfied or waived so that the Plan can go effective. "Consummation" means the occurrence of the Effective Date, which is the date selected by the Debtors and the Creditors' Committee that is a Business Day after the Confirmation Date on which (a) the conditions to the occurrence of the Effective Date have been met or waived pursuant to Article IX.B and Article IX.C of the Plan and (b) no stay of the Confirmation Order is in effect.

Unless otherwise provided in the Plan, on the Effective Date (or if a Claim is not an Allowed Claim on the Effective Date, on the date that such Claim becomes an Allowed Claim, or as soon as reasonably practicable thereafter), each holder of an Allowed Claim, other than a Convenience Class Claim or General Unsecured Claim, shall receive the full amount of the distributions that the Plan provides for Allowed Claims in each applicable Class. Each holder of a Convenience Class Claim shall receive 10% of such Allowed Convenience Class Claim. See "Article VI - Provisions Governing Distributions," of the Plan for more detail. See also "Article IX - Conditions Precedent to Confirmation and Consummation of the Plan" of the Plan, and "Confirmation of the Plan," of this Disclosure Statement, for a discussion of the conditions to consummation of the Plan.

**M.     What are the sources of cash and other consideration required to fund the Plan?**

As set forth in Article IX of the Plan, it is a condition precedent to Confirmation that the Debtor shall have on hand Cash sufficient to satisfy the reasonably estimated, (i) Allowed Administrative Expense Claims, (ii) Allowed Fee Claims, (iii) Allowed Priority Tax Claims; and (iv) Allowed Priority Non-Tax Claims, in an aggregate amount determined by the Debtors or set forth in the Confirmation Order.

Each holder of an Allowed Class 2 Convenience Class Claim shall receive Cash from the GUC Trust in the amount equal to 10% of such Allowed Convenience Class Claim on the later of the Effective Date or the date such Claim becomes an Allowed Claim. Each holder of such

- 12 -

Allowed Class 3 General Unsecured Claim shall receive its Pro Rata distribution of the GUC Trust Assets.

**N.      What will happen to my stock in LMI?**

On the Effective Date, all existing Interests in LMI (including common stock, preferred stock, and any options, warrants or rights to acquire any interests) will be cancelled.

**O.      Will the final amount of Allowed General Unsecured Claims affect my recovery under the Plan?**

The General Unsecured Claims as Filed total approximately $180 million.[10]  Although the Debtors' estimate of General Unsecured Claims is the result of the Debtors' and their advisors' analysis of available information at the time of filing this Disclosure Statement, General Unsecured Claims actually asserted and allowed against the Debtors may be higher or lower than the Debtors' estimate provided herein, which difference could be material. Moreover, the Debtors have rejected, or will reject, all of their Executory Contracts and Unexpired Leases that were not assumed in the Sale, which may result in additional rejection damages claims not accounted for in this estimate. Further, the Debtors, or GUC Trust may object to certain proofs of claim, and any such objections could ultimately cause the total amount of General Unsecured Claims to change.  These changes could affect recoveries for holders of Claims in Class 3, and such changes could be material.

**P.      Will there be releases and exculpation granted to parties in interest as part of the Plan?**

The Plan proposes to exculpate each of: (a) the Debtors; a n d  (b) the members of the Creditors' Committee in their respective capacities as such; and (c) with respect to the entities in clauses (a) through (b), such entity's predecessors, successors and assigns, subsidiaries, Affiliates, managed accounts or funds, current directors, officers, principals, shareholders, members, partners, employees, agents, advisory board members, financial advisors, attorneys, accounts, investment bankers, consultants, representatives, management companies, fund advisors and other Professionals solely in their respective capacities as such.

The Plan proposes to release, on the Effective Date and to the fullest extent authorized by applicable law, the Secured Lender and LMI DME and such entities' successors and assigns, subsidiaries, Affiliates, managed accounts or funds, current directors, officers, principals, shareholders, members, partners, employees, agents, advisory board members, financial advisors, attorneys, accounts, investment bankers, consultants, representatives, management companies, fund advisors and other Professionals solely in their respective capacities as such, from any and all actions, claims, obligations, rights, suits, damages, causes of action, remedies and liabilities whatsoever, including any derivative claims asserted or that could be asserted on behalf of the Debtors or the Debtors' Estates, whether known or unknown, foreseen or unforeseen, matured or unmatured, existing or hereinafter arising, in law, equity, contract, tort or otherwise, by statute or

---

[10]  Of this estimate, approximately $160 million constitute claims filed by the United States of America and certain state governments based on the Debtors' alleged liability under the False Claims Act, 31 U.S.C. §§ 3729 et seq.. The Debtors do not believe they have any such liability.

otherwise, that the Debtors, the Liquidating Supervisor or the Debtors' Estates, whether individually or collectively, or on behalf of the holder of any Claim or Interest or other Entity, ever had, now has or hereafter can, shall or may have, based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Chapter 11 Cases, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between the Debtors and any Released Party, the treatment of Claims and Interests before or during the Chapter 11 Cases, the negotiation, formulation or preparation of the Plan, the Plan Supplement, any disclosure statement or related agreements, instruments or other documents or any other act or omission, transaction, agreement, event or other occurrence relating to the Debtors taking place on or before the Confirmation Date of the Plan, except for (1) any claims and causes of action for actual fraud, gross negligence or willful misconduct as determined by final order of a court of competent jurisdiction and (2) any claims arising under the Controlling Documents.

Based on the foregoing, the Debtors believe that the exculpation and releases in the Plan are necessary and appropriate and meet the requisite legal standard in the Third Circuit. Moreover, the Debtors will present evidence at the Confirmation Hearing to demonstrate the basis for and propriety of the exculpation and release provisions. For more detail see "Article VIII - Settlement, Release, Injunction and Related Provisions," of the Plan, which is incorporated herein by reference.

**Q.      What is the deadline to vote on the Plan?**

4:00 p.m. (prevailing Eastern Time) on April 15, 2014.

**R.      How do I vote for or against the Plan?**

Detailed instructions regarding how to vote on the Plan are contained on the ballots distributed to holders of Claims that are entitled to vote on the Plan. For your vote to be counted, your ballot must be completed and signed so that it is **actually received** by 4:00 p.m. (prevailing Eastern Time) on [**April 15, 2014**] at on the following addresses (depending on method of service):

<u>**Via First Class Mail:**</u>

Landauer Ballot Processing
c/o Epiq Bankruptcy Solutions, LLC
FDR Station, PO Box 5014
New York, NY 10150-5014

OR

<u>**Via Hand Delivery or Overnight Courier:**</u>

Epiq Bankruptcy Solutions, LLC
757 Third Avenue, 3rd Floor
New York, NY 10017

- 14 -

Attn: Landauer Ballot Processing

<u>See</u> Article X of this Disclosure Statement.

**S.    Why is the Bankruptcy Court holding a Consolidated Hearing related to the Disclosure Statement and confirmation, and when is the Consolidated Hearing set to occur?**

In order to minimize administrative costs, the Debtors have requested that the Bankruptcy Court schedule a Consolidated Hearing for **April 28, 2014 at 11:00 a.m.** to consider approval of this Disclosure Statement as containing "adequate information" and confirmation of the Plan, and the Bankruptcy Court has approved this request. The Consolidated Hearing may be adjourned from time to time without further notice.

Objections to Confirmation of the Plan, and the adequacy of the information set forth herein, must be filed and served on the Debtors, and certain other parties, by no later than **April 15, 2014 at 4:00 p.m.** (prevailing Eastern Time) in accordance with the notice of the Consolidated Hearing that accompanies this Disclosure Statement and is incorporated herein by reference.

**T.    What is the purpose of the Confirmation Hearing?**

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court to hold a hearing on confirmation of the Plan and recognizes that any party in interest may object to confirmation of the Plan.  The purpose of a Confirmation Hearing is to confirm a plan of reorganization or liquidation, as applicable.  The confirmation of a plan by a bankruptcy court binds the debtor, any creditor or interest holder of a debtor, and any other person or entity as may be ordered by the bankruptcy court in accordance with the applicable provisions of the Bankruptcy Code. Subject to certain limited exceptions, the order issued by the bankruptcy court confirming a plan of liquidation bars any person from attempting to enforce any claims against the Debtors that arose before the confirmation of the plan of liquidation except in accordance with the terms of the confirmed plan of liquidation.

**U.    Will the Debtors have any ongoing operations?**

No, following the Sale of substantially all of the Debtors' assets in early February, the Debtors no longer have any ongoing operations.  As a result, Confirmation means that the Wind Down Funds will be used to satisfy their obligations under the Plan and to wind-down their operations.  Following Confirmation, the Plan will be consummated on the Effective Date, which is a date selected by the Debtors and the Creditors' Committee that is the first Business Day after which all conditions to Consummation have been satisfied or waived and no stay of the Confirmation Order is in effect.  <u>See</u> Article IX of the Plan.  Additionally, upon the Effective Date, all actions contemplated by the Plan will be deemed authorized and approved.

Following the Effective Date, a Liquidating Supervisor will be appointed and the Debtors will ultimately be dissolved by the Liquidating Supervisor in accordance with the Plan.

- 15 -

On the Effective Date, the Liquidating Supervisor shall become the exclusive representative for each Debtor and their respective Estate.  The Liquidating Supervisor shall, as promptly as is practicable, take all such actions as are necessary to wind up the affairs, and cause the dissolution, of each Debtor.  Through and including the Dissolution Date, the Liquidating Supervisor shall have all requisite corporate authority and all of the rights and powers of a trustee under the Bankruptcy Code, including, but not limited to, the right to retain other professionals, including attorneys, without further order of the Court.

**V.      Who do I contact if I have additional questions with respect to this Disclosure Statement or the Plan?**

If you have any questions regarding this Disclosure Statement or the Plan, please contact the Debtors' Notice, Claims and Balloting Agent, Epiq Bankruptcy Solutions, LLC:

**Phone:** (646) 282-2500

**Email:** TABULATION@EPIQSYSTEMS.COM.

**Via First Class Mail:**

Landauer Ballot Processing
c/o Epiq Bankruptcy Solutions, LLC
FDR Station, PO Box 5014
New York, NY 10150-5014

**Via Hand Delivery or Overnight Courier:**

Epiq Bankruptcy Solutions, LLC
757 Third Avenue, 3rd Floor
New York, NY 10017
Attn: Landauer Ballot Processing

Copies of the Plan, this Disclosure Statement and any other publicly filed documents in these Chapter 11 Cases are available upon written request to the Debtors' counsel at the address above or by downloading the exhibits and documents from the website of the Debtors' Notice, Claims and Balloting Agent at http://dm.epiq11.com/LMI/Document] or the Bankruptcy Court's website at www.deb.uscourts.gov (for a fee).

**W.      Do the Debtors recommend voting in favor of the Plan?**

Yes. The Debtors believe the Plan provides for a larger distribution to holders of Allowed Claims against the Debtors than would otherwise result from conversion of these Chapter 11 Cases to liquidation under Chapter 7 of the Bankruptcy Code. The Debtors believe the Plan is in the best interest of all holders of Claims, and that other alternatives, such as conversion, fail to maximize the recovery for said holders.

**IV. THE DEBTORS' CORPORATE HISTORY, STRUCTURE AND BUSINESS OVERVIEW**

## A.    Corporate Structure

Prior to the Sale, the Debtors were providers of home medical equipment and related products and services to customers located in the northeast United States.  The Debtors provided respiratory durable medical equipment ("DME"), enteral and mobility products and services to over 240,000 patients in eight states (Connecticut, Maryland, Massachusetts, New Jersey, New York, Pennsylvania, Rhode Island and Virginia) and the District of Columbia.  While the Debtors' operations extended throughout the northeast, they were heavily concentrated in New York and Pennsylvania.  The Debtors' headquarters were located in Mount Vernon, New York.

LMI is the ultimate parent of all the other Debtors.  It owns 100% of LHH; LMI Legacy Holdings III Inc., formerly Miller Medical & Respiratory, Inc.; and LMI Legacy Holdings IV Inc., formerly C.O.P.D. Services, Inc.  LHH is the sole member of the remaining four Debtors, LMI Legacy Holdings I LLC, formerly American Homecare Supply New York, LLC;  LMI Legacy Holdings II LLC, formerly American Homecare Supply Mid-Atlantic, LLC; LMI Legacy Holdings III LLC, formerly Denmark's LLC; and LMI Legacy Holdings IV LLC, formerly Genox Homecare LLC.  In addition to LMI, the Debtors previously operated under the trade names Young's Medical in Pennsylvania and New Jersey; Denmark's in Massachusetts; Vanguard in Rhode Island; American Homecare Supply in western New York; and Genox in Connecticut, among others.

As of the Petition Date, the Debtors employed approximately 650 employees at approximately 32 operating locations.  The Debtors maintained inventory in all of these locations, although approximately 50% of the Debtors' inventory was concentrated in just four locations: Mount Vernon, New York; Great Neck, New York; Warwick, Rhode Island; and Philadelphia, Pennsylvania.  The Debtors had centralized billing and collection functions in 6 locations and customer service personnel at 20 locations.  The Debtors also offered a 24-hour emergency call center, which was reflective of the personalized customer and referral relationships characteristic of the home health care business.

The Debtors provided a full range of respiratory products and services from the simplest nebulizer or oxygen concentrators to the most complex ventilators and combination therapy equipment.  The Debtors offered over 4,000 types of medical equipment and supplies.  The Debtors' product selection included, among other things, hospital beds, wheelchairs, scooters, walkers, seat lifts, oxygen tanks, ventilators, monitors, tracheotomy tubes, CPM machines, nebulizers, urological supplies, and enteral feeding products.

## B.    Services and Products

The Debtors' business was evenly split between the rental and sale of product with each accounting for approximately 50% of the Debtors' net revenues.  In terms of product type or category, the Debtors' revenues were derived primarily from: (i) the rental or sale of respiratory equipment (58%); (ii) sale of enteral products (13%); (iii) the sale of other consumable supplies (12%); (iv) the rental or sale of DME (12%); and (v) the rental or sale of rehabilitation products (5%).

## C.    Revenue Sources

LMI derived its revenues principally by reimbursement from third-party payors, including private insurers, Medicare, and Medicaid.  LMI accepted assignment of insurance benefits from patients and, in most instances, invoiced and collected payments directly from private insurers, Medicare, or Medicaid, as well as directly from patients under co-insurance provisions.  For the fiscal years ended March 31, 2011, 2012, and 2013,[11] the Debtors reported revenues of $139,656,000, $137,160,000, and $128,500,000, respectively.  For those same years, the Debtors reported EBITDA of $12,034,000, $18,524,000, and $13,200,000, respectively.  The decrease in revenues and EBITDA between 2012 and 2013 was attributable mainly to (i) the loss of a large managed care contract which entered into an exclusive relationship with a competitor; (ii) a reduction in reimbursement rates from managed care organizations; and (iii) the impact of Hurricane Sandy which occurred in the fall of 2012.

Historically, approximately 35% of the Debtors' revenues were derived from the Medicare and Medicaid programs.  As discussed further below, however, the Debtors learned in the first calendar quarter of 2013 that they did not win any contracts in a competitive bidding process conducted by the Center for Medicare Services ("CMS")—the agency responsible for administering the Medicare program—and therefore, would not be an approved supplier for new Medicare patients subsequent to July 1, 2013.  As a result, the Debtors' revenues from this decreased substantially —which was one of the primary factors in their need to seek bankruptcy protection.

## D.    Company History

LMI was founded in 1999 when Alan J. Landauer acquired a small publicly held company, Community Care Services, Inc. ("Community Care"), in a leveraged buy-out and then merged that company into his then-existing business operations to form the entity that is now LMI.  In acquiring Community Care, LMI became a privately held company with approximately $50 million in annual revenues and operations in New York.  Since that time, LMI grew organically and through acquisitions.  Beginning in 2003, LMI expanded its business geographically by embarking on a series of acquisitions, including the acquisitions of (i) All Island Medical in 2003; (ii) Low Surgical & Medical Supply in 2005; (iii) Miller Medical & Respiratory and Home Care Services, Inc. in 2007; (iv) Atlas Respiratory, A&J, and C.O.P.D. in 2008; and (v) Genox, Mid-Atlantic Healthcare (including d/b/a Young's Medical), American Homecare Supply, and Denmark's (including d/b/a as Vanguard), all in 2009.  By 2011, LMI had become the largest independent regional home medical equipment supplier in the northeastern United States with over $137 million in annual revenues.

The capital to fund these acquisitions was obtained primarily from (i) CIT Healthcare LLC, which provided a series of loans totaling $40 million from 2005 through 2009 that were later refinanced into the Debtors' existing senior secured debt owed to the Pre-Petition Lenders; (ii) Clairvest Equity Partners Limited Partnership, Clairvest Group, Inc., and Clairvest Acquisition LLC (the "Clairvest Entities"), which provided debt and equity financing of

---

[11] LMI's 2011 and 2012 financial statements have been audited.

approximately $15.3 million between 2002 and 2013, as discussed further below; and (iii) other shareholders, including Mr. Landauer.

Two years after the Clairvest Entities' initial investment, Mr. Landauer left his position as Chief Executive Officer, although he continued to serve as a board member and remained a significant shareholder of LMI. He was succeeded as Chief Executive Officer by Louis Rocco until his departure (along with virtually every other member of the senior management team) shortly before the Petition Date. Upon Mr. Rocco's departure, Mr. Landauer returned to manage the Debtors' day-to-day operations.

### E.    Capital Structure

On February 9, 2011, LMI and each of its subsidiaries entered into that certain Credit Agreement by and among LMI, the Pre-Petition Lenders and the Pre-Petition Agent pursuant to which the Pre-Petition Lenders provided the Debtors with (i) a term loan of $35 million with a maturity date of February 9, 2016; (ii) a revolving line of credit in the maximum amount of $10 million with a maturity date of February 9, 2016; and (iii) certain other loans in the amount of $5 million for acquisition and capital expenditures (the "Pre-Petition Credit Facility"). A substantial portion of the proceeds of the Pre-Petition Credit Facility were used to refinance the Debtors' existing senior secured debt with CIT Healthcare LLC. No amounts were drawn on the acquisition and capital expenditure facility and the draw period was closed as of March 31, 2013. As of the Petition Date, $29,982,261.70 was owed on account of the Pre-Petition Credit Facility. The Debtors' obligations to the Pre-Petition Lenders were secured by first priority liens on substantially all of the Debtors' assets. On September 23, 2013, the Secured Lender acquired all right, title, and interest of the Pre-Petition Lenders related to the Pre-Petition Credit Facility, and thereafter credit bid a portion of the amount outstanding thereunder as partial consideration for the Sale.

Also on February 9, 2011, LMI entered into an agreement with certain participating shareholders—the Clairvest Entities, Thomas Blum, Louis Rocco, Saverio Burdi, and Mr. Landauer—pursuant to which they collectively loaned the company $3 million (the "Subordinated Secured Shareholder Loan").[12] The Subordinated Secured Shareholder Loan is expressly subordinated to the Pre-Petition Credit Facility loan. As of the Petition Date, $3,754,658.00 was owed on account of the Subordinated Secured Shareholder Loan.

On February 9, 2011, LMI and each of the other Debtors entered into a Security Agreement granting the Clairvest Entities a junior security interest in all of the Debtors' assets, which was intended to secure three separate loans to LMI including: (i) the Subordinated Secured Shareholder Loan, dated February 9, 2011, in the amount of $3 million; (ii) a prior loan by Clairvest Group, Inc. and Clairvest Equity Partners Limited Partnership, dated March 23, 2010, in the amount of $750,000;[13] and (iii) a prior loan by Clairvest Group, Inc. and Clairvest

---

[12] The participating shareholders' respective portions of the $3 million loan were: Clairvest Equity Partners Limited Partnership ($1,899,000); Clairvest Acquisition LLC ($633,000); Thomas Blum ($116,000); Louis Rocco ($126,000); Saverio Burdi ($126,000); and Mr. Landauer ($100,000).

[13] The principal balance of the $750,000 loan (together with accrued interest) was $1,734,531 as of the Petition Date.

- 19 -

Equity Partners Limited Partnership, dated September 24, 2010, in the amount of $300,000.[14]  In total, between their portion of the Subordinated Shareholder Loan and their prior loans, the debt owed to the Clairvest Entities totaled $5,122,455.02 as of the Petition Date.  The balance of the Subordinated Shareholder Loan (held by others) totaled $585,727 as of the Petition Date.  The Subordinated Shareholder Loan, along with prior loans of the Clairvest Entities, was expressly subordinated to the Pre-Petition Credit Facility.[15]  The Debtors' obligations to the Clairvest Entities were secured by second priority liens on substantially all of the Debtors' assets, although not on the identical same collateral package as the Pre-Petition Credit Facility.  Unlike the Pre-Petition Lenders, the Clairvest Entities did not perfect a lien on the Debtors' commercial tort claim against Allcare, which is discussed elsewhere in this Disclosure Statement.  For purposes of this Disclosure Statement, the Subordinated Shareholder Loan is included in the Class of "General Unsecured Claims."  The Subordinated Shareholder Loan was subordinated to the lien held by the Pre-Petition Lenders and is wholly unsecured based on the prior Sale of the Debtors' assets.

The Debtors also leased or financed certain equipment and inventory from various third-parties, some of which filed UCC financing statements purporting to perfect liens in certain property.  As a result of the Sale, the claims of Wells Fargo Bank, N.A., Philips Medical Capital, AirSep Corporation, and Medela Inc. are included in the Class of "General Unsecured Claims."  Any lien, even if valid, was extinguished by virtue of the Sale and is wholly unsecured.  The agreements with Cannon Financial Services, and Gelco a/k/a ARI have been rejected and any claim for any damages associated therewith will be classified as a General Unsecured Claim.

LMI has common, Series A preferred, and Series B preferred stock, with the last of these ranking senior to all other classes.  As of the Petition Date, there were 11 shareholders.[16]  The Clairvest Entities own a majority of LMI with 61.5% of its stock on a fully diluted basis.  Mr. Landauer owns 22.2%.  Most of the other shareholders are board members or former executives and none of them own more than 5% of LMI's stock.

Following its appointment, the Creditors' Committee immediately commenced investigations of, among other things, the amount, validity and priority of the debt and equity in the Debtors' capital structure.  As to the Secured Lender, the Creditors' Committee previously completed its investigation, reached a settlement of any disputes related thereto, and pursuant to that settlement, waived and released all prepetition Claims and Defenses (as defined in the

---

[14] The principal balance of the $300,000 loan (together with accrued interest) was $420,409 as of the Petition Date. Although the Security Agreement references the September 24, 2010 loan as being for $2.1 million, the Clairvest Entities only advanced $300,000.

[15] In making their first loan to LMI, Clairvest Group, Inc. and Clairvest Equity Partners Limited Partnership executed an Intercreditor and Subordination Agreement dated March 26, 2010 with the Debtors' senior secured lender at the time, CIT Healthcare LLC, agreeing to subordinate any loans, whether then existing or thereafter arising, that they made to LMI.  Upon the refinancing of the Debtors' senior secured debt, this Intercreditor and Subordination Agreement was assigned by CIT Healthcare LLC to the Pre-Petition Lenders, and later to the Secured Lender upon its acquisition of the debt.

[16] In decreasing order in terms of their respective holdings, LMI's shareholders include: Clairvest Equity Partners Limited Partnership, Clairvest Acquisition LLC, Alan Landauer, Thomas Blum (director), Thomas Blum IRA, Louis Rocco (former President and Chief Executive Officer), Saverio Burdi (former Executive Vice President), Joe Luceri (former Chief Financial Officer), Scott Sommer (former employee), Mona Zeliger (former employee), and Bill Simonds (deceased former employee).

- 20 -

Settlement Agreement) against the Secured Lender as of the Effective Date thereof.  The Creditors' Committee has advised the Debtors that it continues to investigate any other debt asserted against or equity interests in the Debtors, and that pending the completion of its investigation and the litigation and/or settlement of disputes, if any, in connection therewith, the Creditors' Committee, on behalf of the GUC Trust, reserves all of its rights to challenge on any grounds the validity, priority and/or amount of any such other debt or equity interests.  The GUC Trust Causes of Action include any potential claims relating to the Subordinated Secured Shareholder Loan and Debtors' alleged obligations to the Clairvest Entities.

## V. EVENTS LEADING TO THE CHAPTER 11 FILINGS

A number of factors contributed to the Debtors' decision to commence these Chapter 11 Cases.  In 2013, and particularly in the last 60 days leading up to the Petition Date, the Debtors encountered several financial and operational issues, which collectively caused a rapid and significant deterioration of the Debtors' business operations and financial condition.

In January 2013, the Debtors learned that they would no longer be eligible to provide equipment and services to Medicare patients after July 1, 2013, which had an immediate and drastic impact on their business.  CMS, the agency responsible for administering the Medicare program, issued the results for "Round 2" of its competitive bidding process– a process which was intended to result in a financial savings to both the Medicare Part B Trust Fund and its beneficiaries. According to CMS's website:

> suppliers compete to become Medicare contract suppliers by submitting bids to furnish certain items in competitive bidding areas, and [CMS] awards contracts to enough suppliers to meet beneficiary demand for the bid items.  The new, lower payment amounts resulting from the competition replace the Medicare [DME] fee schedule amounts for the bid items in these areas . . . .  The program sets more appropriate payment amounts for [DME] items while ensuring continued access to quality items and services, which will result in reduced beneficiary out-of-pocket expenses and savings to taxpayers and the Medicare program.

See http://www.cms.gov/Medicare/Medicare-Fee-for-Service-Payment/DMEPOSCompetitiveBid/index.html

Through the competitive bidding process, CMS selects the suppliers who are eligible to supply Medicare patients with oxygen, CPAP devices, DME, prosthetics, orthotics, and supplies.  Such suppliers agree to receive as payment, the "single payment amount" calculated by CMS after bids are submitted.  LMI competed with many other companies for the right to provide items to patients in defined geographic regions.  When CMS announced the results for "Round 2" competitive bidding, however, LMI unfortunately lost all of the competitive bidding areas in which it sought to be selected as a supplier.  Although LMI's pricing was competitive in some areas, CMS apparently disqualified the Debtors for other reasons.  The Debtors sought to appeal CMS's determination, but the decision was final and no appellate process was available, leaving the Debtors with the only option of reapplying in the next competitive bidding process two-three years from now.  The overall impact of the outcome of this competitive bidding process on the

Debtors' business was substantial and was expected to result in a decrease in annual revenues of approximately $26 million.

Almost immediately after it took effect on July 1, 2013, the Debtors' ineligibility to serve Medicare patients began to impact the Debtors' ability to attract new customers. When a patient is discharged from a hospital and is in need of certain medical equipment or supplies, the hospital discharge coordinator refers those patients to CMS's list of preferred providers. Not being on the list of preferred providers means the Debtors were unable to share in that business. Further, while the Debtors could continue to service their existing Medicare/Medicaid customers who receive refills of supplies (such as oxygen), the ongoing rental of equipment to those patients was terminated, thereby eliminating another source of revenue.

Without the designation of preferred provider status and facing rapid decline in their business, the Debtors began, once again, to explore a sale transaction during the spring of 2013. The Debtors had previously sought a buyer for their business during 2012 and had enlisted the services of the investment banking arm of the Royal Bank of Canada, RBC Capital Markets, to lead that process. Unfortunately, that process resulted in no viable bids for LMI.

On April 29, 2013, the Debtors entered into a letter of intent to sell substantially all of their assets to a competitor, Passaic Healthcare Services, LLC, d/b/a Allcare Medical ("Allcare") but the transaction failed to close and in fact, resulted in contentious litigation between the parties, which is currently pending in the state courts of New York. As part of that litigation, the Debtors have alleged that Allcare lured away a significant portion of the Debtors' senior management team, including its former Chief Executive Officer and Executive Vice President, Messrs. Rocco and Burdi (who remain shareholders of LMI) in violation of an agreement between the Debtors and Allcare entered into while they were in the process of negotiating the ultimately failed transaction. Between June 2013 (when the proposed Allcare transaction fell apart) and the Petition Date, more than 75 of the Debtors' employees, including a substantial portion of the Debtors' upper and middle management resigned. The Debtors believe that many of those former employees were actively solicited, and are now employed, by Allcare. On August 1, 2013, a temporary restraining order was issued in the state court litigation between the Debtors and Allcare, *inter alia*, barring Allcare from soliciting any current employees of the Debtors. Despite the existence of that injunction, the Debtors believe that Allcare continued to actively solicit and hire employees of the Debtors through the Petition Date (which Allcare disputes). In a subsequent written decision in the state court litigation (dated August 13, 2013), the court ruled (i) that the temporary restraining order would remain in effect, (ii) that the Debtors had demonstrated a likelihood of success on the merits with respect to their claims against Allcare, and (iii) that Allcare had failed to demonstrate a likelihood of success on the merits with respect to its various claims against the Debtors. The failed Allcare transaction, and the events that followed—including Allcare's alleged improper solicitation and hiring away of the Debtors' senior employees—irreparably harmed the Debtors' business and were a primary cause of the Debtors' need to seek bankruptcy protection. The current status of the Allcare litigation is discussed in further detail in Section VI.G of this Disclosure Statement.

Immediately following the Allcare transaction, the Debtors entered into a proposed stock merger agreement with Rite Surgical Supplies, Inc. and Med Star Surgical & Breathing

- 22 -

Equipment, Inc.  Given the uncertainty surrounding the mass exodus of the Debtors' employees, however, that deal also failed to close.

Around the same time, in May 2013, LMI received a civil investigative demand from the New York City office of the U.S. Attorney's Office for the Southern District of New York seeking records related to DME billing and collection.  As of the Petition Date, the precise nature of this inquiry was unclear.  Since then, and as discussed further below, both the federal government and certain states have filed proofs of claim indicating that such investigation relates to potential liability under the "False Claims Act" 31 U.S.C. §§ 3729 *et seq.*  For various reasons, the Debtors do not believe they have any liability under the False Claims Act.[17]

In July 2013, the Pre-Petition Lenders advised the Debtors of their belief that an event of default had occurred under the Pre-Petition Credit Facility by reason of a material adverse change in the Debtors' business, specifically related to the departure of numerous senior managers and sales personnel of the Debtors, as discussed above.  As a result of this asserted event of default under the Pre-Petition Credit Facility, during July 2013, the Pre-Petition Lenders began to significantly restrict the Debtors' ability to access the cash generated by their businesses, including for purposes of purchasing supplies and inventory crucial to the ongoing operation of the Debtors' business.

In the face of the severe financial and operational challenges described above, the Debtors made a concerted effort to consider all of their strategic alternatives.  In July 2013, the Debtors retained Carl Marks to analyze and determine the Debtors' cash flow and sale prospects.  With no realistic opportunity to obtain replacement debt or equity financing to support its business operations, the Debtors' Board of Directors determined, in consultation with the Debtors' advisors, that the only option for preserving the value of the Debtors' business was to pursue a going-concern sale of the assets comprising the Debtors' business.  Accordingly, the Debtors began to re-market their assets.  As a result of the earlier efforts undertaken by the Debtors in 2012 with the assistance of an investment banker to identify and negotiate with potential financial and strategic buyers for the Debtors' business, the Debtors were already familiar with the universe of likely interested buyers.  Beginning in late July 2013 and continuing until shortly before the Petition Date, the Debtors' advisors reached out to these likely buyers to determine their potential interest in acquiring the Debtors' business and/or assets.  Through those discussions, three potential buyers emerged as possible stalking horse bidders.  After intensive negotiations with each of these three entities, the Debtors determined that the bid submitted by an affiliate of Quadrant Management, Inc. ("Quadrant") was the best bid to serve as a stalking horse for an auction sale of the Debtors' business to be consummated in the context of a chapter 11 bankruptcy case.  The Debtors then proceeded to finalize the negotiation of an Asset Purchase Agreement with Quadrant in the days leading up to the Petition Date and reached an agreement with the affiliate of Quadrant on a form of Stalking Horse Purchase Agreement that

---

[17]  Approximately two years prior, in 2011, LMI received a federal grand jury subpoena from the White Plains office of the U.S. Attorney's Office for the Southern District of New York seeking documentation relating to specifically identified patients, certain employee records for the period of January 1, 2007 through the date of the subpoena, and certain other agreements and contracts entered into by LMI.  LMI is not aware of any wrongdoing and fully cooperated with the government's requests in response to the subpoena.  All requested documentation was provided and there has been no further communications from the U.S. Attorney's office on this matter since 2012.

contemplated a sale of the assets pursuant to section 363 of the Bankruptcy Code, subject to higher and better offers received after the commencement of these Chapter 11 Cases. As discussed further below, that initial sale process was adjourned for a period of time while the parties pursued a plan of reorganization, which itself was later abandoned in favor of the ultimate Sale to the Secured Lender.

To fund the bankruptcy process, the Debtors reached agreement with the Pre-Petition Lenders on the use of their cash collateral, as set forth in the Cash Collateral Motion and Cash Collateral Orders described more fully below. The Pre-Petition Lenders had conditioned the use of their cash collateral on, among other things, approval of a sale procedures order, in form and substance satisfactory to the Pre-Petition Lenders, by a date certain.

Accordingly, after considering all available options, the Debtors determined that commencement of these cases would be in their best interests, as well as those of their creditors and other parties in interest, and filed for chapter 11 bankruptcy relief on August 16, 2013 (the "Petition Date").

## VI. EVENTS OF THE CHAPTER 11 CASES

### A.    Overview of Chapter 11

The following is a general summary of the Chapter 11 Cases, including, without limitation, the administration of the Chapter 11 Cases, and the Debtors' actions since the chapter 11 filings.

#### 1.    **Customary "First Day" and Related Orders**

As in many large chapter 11 cases, the Debtors filed a variety of customary motions on the Petition Date or shortly thereafter which were designed to facilitate their smooth transition into bankruptcy.

##### (a)    *Joint Administration*

On August 20, 2013, the Bankruptcy Court entered a final order allowing the joint administration of these Chapter 11 Cases solely for procedural purposes.

##### (b)    *Employee Wage Order*

On August 20, 2013, the Bankruptcy Court entered a final order granting the Debtors authority to pay pre-petition wages and benefits owed to the Debtors' approximately 650 employees (including, but not limited to, paid time off, medical, dental, and vision insurance, and other benefits) in the ordinary course of the Debtors' businesses.

##### (c)    *Cash Management Order*

On August 20, 2013, the Bankruptcy Court entered a final order authorizing the Debtors to continue using their established cash management system, bank accounts, and business forms in the ordinary course of their business so as not to disrupt the Debtors' collections from rentals

- 24 -

and sales of medical equipment.

(d)   _Tax Order_

On August 20, 2013, the Bankruptcy Court entered an order authorizing the Debtors to remit and pay certain sales, use, personal property, and other taxes as well as other governmental charges (such as franchise, regulatory, permit, and annual reporting fees) to various federal, state, local, and foreign taxing authorities incurred in the ordinary course of business as such payments became due.

(e)   _Insurance Order_

On August 20, 2013, the Bankruptcy Court entered a final order authorizing the Debtors to continue their insurance policies, which provide coverage for various liabilities, including workers' compensation, general and excess liability, automobile liability, and director and officer liability.  The Debtors were authorized to pay any pre-petition premiums or costs related thereto to avoid cancellation, default, alteration, or lapse to the coverage, benefits, or proceeds provided under such policies and to renew or purchase new policies in the ordinary course of business.

(f)   _Interim Compensation Order_

Shortly after the Petition Date, the Debtors sought to establish procedures whereby professionals retained in these Chapter 11 Cases could be compensated on a monthly and interim basis by receiving a percentage of their fees billed and expenses incurred for services performed. On September 10, 2013, the Court entered an order granting the relief requested and establishing interim compensation procedures for professionals utilized by the Debtors and the Creditors' Committee.

(g)   _Ordinary Course Professionals Order_

On August 23, 2013, the Debtors filed a motion requesting authority to employ and pay the reasonable fees and expenses of professionals such as attorneys, accountants, and other consultants utilized in the ordinary course of business to advise and assist the Debtors in the operation of their business and to defend the Debtors in matters arising in the ordinary course of business.  The services provided by these professionals were necessary to the Debtors' ongoing business operations and to preserve the value of their assets.  On September 12, 2013, the Court granted the motion and permitted the Debtors to retain and compensate such professionals subject to an individual monthly cap set forth in the order.  To date, the Debtors have retained several professionals under this order to assist with certain litigation and regulatory matters, although following the Sale, the work being done by these professionals has significantly decreased, if not ceased entirely, as a result of the Debtors no longer having any operations.

(h)   _Cash Collateral Order_

- 25 -

On the Petition Date, the Debtors sought authority to use cash collateral, with the consent of the Pre-Petition Lenders, in accordance with a budget attached to the motion in order to maintain and preserve their property, operate their business, and pay the costs and expenses of administering these Chapter 11 Cases. Following an interim hearing prior to the formation of the Creditors' Committee on August 20th, a second interim hearing subsequent to the formation of the Creditors' Committee on September 4th and a final hearing on September 12th, the Court entered orders authorizing the Debtors' use of cash collateral through the expected sale of substantially all of their assets to Quadrant, as discussed further below.

The Creditors' Committee provided substantial input into the forms of Cash Collateral Order entered by the Bankruptcy Court in order to further protect the interests of the Debtors general unsecured creditors during the conduct of the cases obtaining significant concessions from the Pre-Petition Lenders and Secured Lender to the ultimate benefit of the Debtors' general unsecured creditors. The Pre-Petition Lenders were granted adequate protection in connection therewith. Had the Debtors not been authorized to use cash collateral, they would have ceased operations immediately, thereby significantly reducing the value of their assets.

On September 23, 2013, the Secured Lender purchased the Pre-Petition Credit Facility Claim and the Debtors, in consultation with the Creditors' Committee, changed direction from pursuing a sale of substantially all of the Debtors' assets to Quadrant pursuant to Section 363 to a plan of reorganization. Soon thereafter, the Debtors filed their Joint Plan of Reorganization (the "Plan of Reorganization"). To provide the parties time to finalize the changed direction of these Chapter 11 Cases, the Bankruptcy Court extended the Debtors' use of cash collateral to December 31, 2013 by entry of the First Amendment to the Final Cash Collateral Order in order to accommodate the timeline needed to seek confirmation of the Plan of Reorganization by the end of the calendar year.

At a status conference on December 10, 2013, and as discussed further below, the Debtors announced their intention to abandon their Plan of Reorganization and resume a sale process. To accommodate this resumed sale process, the Bankruptcy Court further extended the Debtors' use of cash collateral to an outside termination date of February 1, 2014 by entry of the Second Amendment to the Final Cash Collateral Order dated December 20, 2013. That termination date was later extended to February 8, 2014 by agreement of the parties, as permitted thereunder. The Sale closed on February 7, 2014, following which, the Debtors are now authorized to use their cash on hand for the purposes set forth in the Second Amendment to the Final Cash Collateral Order, subject only to the Secured Lender's right to receive a refund, if any, of amounts reserved for certain specified items in connection with the Sale.

2.    **Appointment of the Creditors' Committee**

On August 26, 2013, the Office of the United States Trustee appointed the Creditors' Committee pursuant to section 1102 of the Bankruptcy Code. The members of the Creditors' Committee are (a) ResMed Corp., (b) Philips Respironics Inc., (c) Automotive Rentals, Inc., (d) Invacare Corporation, and (e) RGH Enterprises, d/b/a Independence Medical. The Creditors' Committee retained Landis Rath & Cobb LLP as its counsel and Deloitte Financial Advisory Services LLP as its financial advisor.

- 26 -

Since its formation, the Creditors' Committee has played an active and important role in the Chapter 11 Cases. The Debtors have consulted with the Creditors' Committee on a regular basis concerning all aspects of the Chapter 11 Cases. The Debtors have kept the Creditors' Committee informed about their operations and have sought its participation in the bankruptcy process. Additionally, the Debtors have met regularly and have made documents available to the Creditors' Committee and its advisors on numerous occasions in connection with the development of the Debtors' strategy to sell their assets and in the formulation of the Plan.

3.    **Employment and Compensation of Professionals**

The Debtors filed retention applications for certain professionals to represent and assist them in the administration of these Chapter 11 Cases. Many of these professionals were intimately involved in negotiating and developing the terms of the Sale and Plan, and all of these professionals will continue to provide vital services throughout the duration of the Chapter 11 Cases. The Bankruptcy Court has approved the Debtors' retention of the following professionals: (a) K&L Gates, LLP as bankruptcy counsel for the Debtors; (b) Young Conway Stargatt & Taylor, LLP, as co-bankruptcy counsel for the Debtors; (c) Epiq Bankruptcy Solutions, LLC as Notice, Claims, and Balloting Agent to the Debtors; and (d) Maillie, LLP as tax accounts to the Debtors. Additionally, the Bankruptcy Court has approved the employment of Mark L. Claster and Michael Flynn of Carl Marks Advisory Group, LLC as Co-Chief Restructuring Officers for the Debtors.

B.    **Section 363 Sale of Debtors' Assets**

Prior to the Petition Date, LMI's Board of Directors determined that a sale of substantially all of the Debtors' assets was in the best interests of all parties in interest. With the loss of certain of their key employees, the inability to serve new Medicare patients, and restrictions on their use of cash, each as discussed above, the Debtors could not generate new business to continue operations. Accordingly, to preserve and maximize the value of the Debtors' assets, the Debtors decided it was necessary to sell their business pursuant to Section 363 of the Bankruptcy Code.

On the Petition Date (i.e., August 16, 2013), the Debtors entered into an Asset Purchase Agreement with LMI DME, an affiliate of Quadrant, as stalking horse bidder, for the sale of substantially all of the Debtors' assets, subject to the solicitation of higher and better offers and the approval of the Bankruptcy Court. The purchase price consisted of $22,000,000.00 in cash, subject to downward adjustment, and the assumption of certain liabilities.

On September 12, 2013, after negotiation among and with the agreement of the Debtors, the Creditors' Committee, Quadrant and the Pre-Petition Lenders, the Bankruptcy Court established bidding procedures in connection with a sale of the Debtors' assets. By the bid deadline of 10:00 a.m. on September 23, 2013, the Debtors did not receive any other "Qualified Bids" for their assets. The Debtors did, however, receive a counteroffer from LMI Acquisition LLC, a wholly-owned subsidiary of Passaic Healthcare Services, LLC doing business as Allcare Medical. In consultation with the Creditors' Committee, the Debtors determined that LMI Acquisition LLC's counteroffer was deficient in several material respects, including without limitation, in failing to satisfy the "Initial Overbid Amount Requirement" and the "Minimum

Deposit" required by the bid procedures (as defined therein).  Throughout the day and evening of September 23rd, and notwithstanding LMI Acquisition LLC's failure to have met the deadlines in the applicable bidding procedures order, the Debtors and Creditors' Committee alerted LMI Acquisition LLC to those deficiencies and offered suggestions on how they could be cured so that its counteroffer would be deemed a "Qualified Bid" and it would be eligible to participate in an auction the following day.  At approximately 10:00 p.m. that evening, LMI Acquisition LLC notified the Debtors and Creditors' Committee that it was not willing to make such modifications and was withdrawing its counteroffer.

On September 23, 2013, the same day as the bidding deadline, Quadrant advised the Debtors and the Creditors' Committee that Herbard Ltd. ("Herbard"), an affiliate of Quadrant, purchased the outstanding Pre-Petition Credit Facility from the Pre-Petition Lenders and became the "Secured Lender."  With LMI DME declared the winning bidder (having received no other "Qualified Bids") and with the Secured Lender thereafter holding the Pre-Petition Credit Facility (having purchased it from the Pre-Petition Lenders), the Debtors, in consultation with the Creditors' Committee and the Secured Lender, elected to suspend the sale process in favor of pursuing confirmation of the Plan of Reorganization.

The following day, the Debtors convened at the time and place scheduled for the auction to announce on the record the receipt and withdrawal of LMI Acquisition LLC's counteroffer, the selection of LMI DME as the winning bidder, the purchase by Herbard of the Pre-Petition Credit Facility Claim, and the determination by the Debtors, in consultation with the Creditors' Committee, to suspend the sale process to explore the possibility of conveying the assets to the LMI DME through a chapter 11 plan.  At a status conference on September 26th, the Debtors notified the Bankruptcy Court of the events that had transpired over the prior few days and the Creditors' Committee advised the Bankruptcy Court of the Settlement Agreement (and the motion to approve same, which had been filed on September 25th), as well as the parties' desire to pursue a plan process.  The Bankruptcy Court held a hearing on October 4th with respect to certain preliminary matters necessary in connection therewith, including a further extension of the Debtors' authority to use cash collateral, interim approval of a management services agreement with an affiliate of Quadrant, and establishment of the Claims Bar Date.  That hearing set up the procedural path to pursue confirmation of the Plan of Reorganization, a path the Debtors continued down until early December 2013, when they announced a need to return to a sale process.

## C.    Settlement Agreement -- Creation of the GUC Trust

On September 25, 2013, the Settlement Agreement was entered into by and between, the Creditors' Committee, LMI DME, and Quadrant, and/or its assigns, dated September 25, 2013.  The Settlement Agreement provides for, among other things, (i) the Creditors' Committee waiver and release of any prepetition claims or defenses against Quadrant and the Secured Lender; (ii) the creation of the GUC Trust; and the (iii) the GUC Trust Payment.  As a result of this Settlement Agreement and the Sale Order, the GUC Trust holds or will in the future hold all of the GUC Trust Assets, including: (a) GUC Trust Funds Carveout; (b) the GUC Trust Causes of Action; (c) GUC Trust Insurance Proceeds; and (d) the Promissory Notes, and all of the proceeds of the foregoing, which assets are held in trust for the sole benefit of holders of General Unsecured Claims, and, if the Plan is confirmed, Allowed Convenience Class Claims and to be

- 28 -

distributed in accordance with the Settlement Agreement and the provisions of Article III of the Plan. The Bankruptcy Court approved the Settlement Agreement on October 22, 2013 and the GUC Trust Causes of Action were transferred to the GUC Trust by operation of the Sale Order.

A copy of the Settlement Agreement, and the order approving it, is attached hereto as Exhibit B.

**D.    Abandoned Reorganization Plan Process**

At a hearing on September 26, 2013, the Debtors advised the Court and parties in interest that they intended to pursue confirmation of the Plan of Reorganization following Herbard's purchase of the Pre-Petition Credit Facility Claim, which gave the Debtors the runway necessary to pursue a plan process. Transferring the Debtors' business to LMI DME through a plan, as opposed to an asset sale, was attractive because of the ability to retain continuity of the Debtors' Medicare provider numbers. To that end, the Debtors obtained orders establishing a General Bar Date and Governmental Unit Bar Date of November 8, 2013 and February 12, 2014, respectively. A further order established a bar date of November 26, 2013 for all Administrative Claims arising prior to October 22, 2013. Those deadlines have all since passed.

On October 10, 2013 the Debtors filed their Plan of Reorganization and Disclosure Statement (the "Prior Disclosure Statement"). The Debtors filed amended versions of the Plan of Reorganization and Prior Disclosure Statement in late November and the Court set a hearing to approve the Prior Disclosure Statement for December 10, 2013. Prior to the continued hearing, the Debtors received several objections and comments to the prior versions and resolved each of them. Nevertheless, for other reasons, the Debtors announced at that hearing their intention to abandon their reorganization efforts because LMI DME was no longer willing to proceed with confirmation given the issues related to the Debtors' alleged liability under the False Claims Act. By that point, it had become clear that the Plan of Reorganization suffered from a potentially significant defect that made continued pursuit of it too risky, time consuming, and costly.

**E.    Sale of the Debtors' Assets and Name Changes**

Following the abandonment of the Plan of Reorganization, the Debtors resumed their efforts to sell substantially all of their assets to LMI DME under Section 363 of the Bankruptcy Code. The Court entered an order approving the Sale on January 6, 2014 and the Sale closed on February 7, 2014.

As set forth in the *Debtors' Motion for Order Amending Case Caption*, filed on February 10, 2014 and approved by the Bankruptcy Court on February 27, 2014, the terms of the Sale required the Debtors to each change their names within five (5) days of the closing of the Sale. Accordingly, Landauer Healthcare Holdings, Inc. changed its name to LMI Legacy Holdings Inc.; Landauer-Metropolitan, Inc. changed its name to LMI Legacy Holdings II Inc.; Miller Medical & Respiratory, Inc. changed its name to LMI Legacy Holdings III Inc.; American Homecare Supply New York, LLC changed its name to LMI Legacy Holdings I LLC; American Homecare Supply Mid-Atlantic, LLC changed its name to LMI Legacy Holdings II LLC; Denmark's LLC changed its name to LMI Legacy Holdings III LLC; Genox Homecare, LLC

changed its name to LMI Legacy Holdings IV LLC; and C.O.P.D. Services, Inc. changed its name to LMI Legacy Holdings IV, Inc.

### F.    Insurance Claims

The Debtors' business operations were significantly impacted by the landfall of Superstorm Sandy on the northeast coast of the United States on October 29, 2012. Specifically, the storm disabled the telephone and information systems located at the Debtors' Mt. Vernon, NY headquarters and at other business locations used by the Debtors, and disrupted the Debtors' ability to process new orders and to deliver and service products for their customers for more than a week after the storm subsided. In addition, for days after the storm, many of the Debtors' employees were not even able to get to their respective offices, further impacting the Debtors' ability to operate their business. Because a significant portion of the Debtors' revenues were derived from long-term equipment rentals, the financial impact of any temporary inability to process new orders continued long after the operational impairment was resolved.

The Debtors have historically maintained business interruption insurance to protect against the financial impact of events that disrupt the operation of their business. In connection with the losses sustained as a result of the impact of Superstorm Sandy, the Debtors timely filed a business interruption claim with their insurer, Hartford Fire Insurance Company. The insurer has already received various financial and other information from the Debtors to substantiate the claim, and has conducted various investigations and analysis of the Debtors' facilities and hardware systems that were impacted by the storm. To date, the Debtors have received $527,490 on account of this claim, which funds are being held by the GUC Trust pursuant to the Settlement Agreement. The Debtors anticipate that additional sums will be paid, although no assurances can be given as to what total amounts the Debtors will recover on account of the claim, or of the projected timing of the Debtors' receipt of any such payments.

### G.    Status of the Allcare Litigation[18]

As discussed in Section V- "Events Leading to the Chapter 11 Filings," Allcare is one of LMI's competitors that had previously showed an interest in acquiring LMI. Prior to providing Allcare with its confidential information and trade secrets about its business and employees in connection with the proposed transaction, Allcare and LMI entered a confidentiality agreement (the "Confidentiality Agreement"), dated as of April 4, 2012. The Confidentiality Agreement contains a non-hire provision (the "Non-Hire Provision"), providing that in the event a transaction did not result, Allcare would not solicit or hire any LMI employees for two years after the negotiations ended. On May 15, 2013, LMI and Allcare entered into an Exclusivity Agreement, whereby both sides agreed to hold exclusive merger discussions with each other and no other parties for a 15 day period. On June 14, 2013, the merger discussions between LMI and Allcare terminated.

On June 26, 2013, Allcare commenced an action against LMI, Clairvest Group, Inc., and LMI Healthcare Holdings, Inc. in Nassau County Supreme Court in New York, captioned *Passaic Healthcare Services, LLC d/b/a Allcare Medical v. Landauer-Metropolitan, Inc.*, Index

---

[18] Allcare disputes the characterization of the facts set forth herein, as well as the characterization of the decision entered in the state court litigation on August 13, 2013.

No. 7775-13 (Sup. Ct. Nassau Co.), seeking a declaration voiding the Confidentiality Agreement as a result of LMI's alleged breach of the Exclusivity Agreement and other related breach of contract claims. On July 1, 2013, Allcare moved for injunctive relief to prevent LMI from enforcing the Confidentiality Agreement. On July 30, 2013, LMI asserted counterclaims against Allcare for breaches of the Confidentiality Agreement stemming from Allcare's raid of LMI's employees, clients and referral sources, and seeking damages in an amount to be determined at trial. LMI moved for injunctive relief to enjoin Allcare from violating the Confidentiality Agreement. The Court granted LMI's application for injunctive relief in part, enjoining Allcare from soliciting any current LMI employees, and denied Allcare's application for injunctive relief entirely in a written order dated August 13, 2013.  Allcare subsequently moved for reargument and renewal of the injunctive relief, which the Court denied by order dated February 4, 2014.

On October 23, 2013, LMI moved for an order holding Allcare in contempt of Court based on evidence that Allcare violated the Court's order not to solicit LMI employees.  By order dated February 4, 2014, the Court directed an evidentiary hearing on LMI's contempt motion. At the request of Allcare and the Debtors, however, such hearing will not be held prior to June 4, 2014, in accordance with the litigation stay discussed below.  Accordingly, the Court has scheduled a conference for June 18, 2014, at which conference the Court will set a date for the evidentiary hearing on the contempt motion.

Separately, Louis Rocco and Sal Burdi sued LMI on July 17, 2013 in Nassau County Supreme Court in New York, captioned *Burdi, et al. v. Landauer-Metropolitan, Inc., et al.*, Index No. 8622-13 (Sup. Ct. Nassau Co.), seeking a ruling voiding the restrictive covenants contained in their employment agreements with LMI that prevent them from working for a competitor, such as Allcare, for two years after the end of their employment with LMI - which occurred on July 10, 2013. Mr. Rocco and Mr. Burdi moved for injunctive relief to prevent LMI from enforcing those restrictive covenants which the Court denied in a written order dated September 17, 2013. Sometime after that ruling, LMI learned that Mr. Rocco and Mr. Burdi started performing services for Allcare.  Subsequently, the Court entered a temporary restraining order preventing Mr. Rocco and Mr. Burdi from working for Allcare or any other DME business.

Thereafter, the parties reached agreement on a limited settlement regarding the restrictive covenant litigation (the "Non-Compete Litigation") between the Debtors and Messrs. Rocco and Burdi (the "Non-Compete Litigation Settlement").  The Debtors filed a motion with the Bankruptcy Court to approve the Non-Compete Litigation Settlement on January 31, 2014 [Docket No. 542], and the Bankruptcy Court entered an order approving the Non-Compete Litigation Settlement on February 18, 2014 [Docket No. 479].  Pursuant to the Non-Compete Litigation Settlement, Allcare, Mr. Rocco and/or Mr Burdi agreed to pay $400,000.00 to the Purchaser in exchange for the a termination of Mr. Rocco and Mr. Burdi's respective employment agreements with LMI as of January 31, 2014, with LMI reserving its ability to enforce certain contractual rights thereunder, and the dismissal of the Non-Compete Litigation (without any admission of liability relating thereto).  The Non-Compete Litigation Settlement also provided for a stay of the litigation between Allcare and the Debtors until June 4, 2014.

### H.    Causes of Action

As part of the Sale, all GUC Trust Causes of Action were transferred to the GUC Trust.

These include any and all Claims or Causes of Action of the Debtors that are not (i) against any Entity that is a vendor, supplier, lessor, employee, contract counterparty or other Entity with whom LMI DME is doing business on or after February 7, 2014; (ii) related to any physical or intangible purchased asset acquired by LMI DME pursuant to the written Asset Purchase Agreement dated as of August 16, 2013 (as amended) that is used or to be used in LMI DME's operations on or after February 7, 2014; (iii) related to any property damage or business interruption claim other than solely with respect to a property damage or business interruption claim related to Hurricane Sandy; (iv) related to deposits or accounts receivable (v) against any or all of LMI DME, the Pre-Petition Lender, and/or TD Bank, N.A., as former administrative agent under the Pre-Petition Credit Facility and such entity's successors and assigns, subsidiaries, Affiliates, managed accounts or funds, current directors and officers, principals, shareholders, members, partners, employees, agents, advisory board members, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, management companies, fund advisors and other professionals, each in its respective capacity as such or (vi) the "Non-Compete Litigation," as defined in Amendment No.1 to Asset Purchase Agreement, [Exhibit A to Docket No. 477].

I.      **Claims Bar Dates**

The Claims Bar Dates with respect to pre-petition Claims against the Debtors were November 8, 2013 for non-governmental units and February 12, 2014 for governmental units. By February 13, 2014, approximately $283,300 in Priority Tax Claims, $72,000 in Priority Non-Tax Claim, and approximately $180 million in General Unsecured Claims were filed. The Debtors have conducted a preliminary review of such claims and believe there are procedural and substantive grounds to object to certain of them, such that the actual amount of claims Allowed in each of these classes may be substantially less.

## VII. RISK FACTORS

Holders of Claims should read and consider carefully the risk factors set forth below before voting to accept or reject the Plan. Although there are many risk factors discussed below, these factors should not be regarded as constituting the only risks present in connection with the Debtors' businesses or the Plan and its implementation.

A.      **The Debtors May Not Be Able To Obtain Confirmation of the Plan**

The Debtors cannot ensure they will receive the requisite acceptances to confirm the Plan. But, even if the Plan does receive the requisite acceptances, there can be no assurance that the Bankruptcy Court will confirm the Plan. The Bankruptcy Court could still decline to confirm the Plan if it were to determine that any of the statutory requirements for confirmation had not been met, including a determination that the terms of the Plan are not fair and equitable to non-accepting Classes. Therefore, there can be no assurance that modifications of the Plan will not be required for confirmation or that such modifications would not necessitate the re-solicitation of votes.

01:15144890.2

Furthermore, the Debtors cannot ensure that they will have sufficient Cash on hand to pay all Allowed Administrative Claims, Priority Tax, and Priority Non-Tax Claims, and Fee Claims in full, in which case the Plan cannot be confirmed.

**B.      Debtors Cannot State with any Degree of Certainty What Recovery Will Be Available to Holders of Allowed Claims in Voting Classes**

A number of unknown factors make certainty in creditor recoveries impossible.  The Debtors cannot know with any certainty, at this time, the number or amount of Claims in Voting Classes that will ultimately be Allowed.

**C.      Actual Amounts of Allowed Claims May Differ from the Estimated Claims and Adversely Affect the Percentage Recovery on Unsecured Claims**

The Claims estimates set forth herein are based on various assumptions.  The actual amounts of Allowed Claims may differ significantly from those estimates should one or more underlying assumptions prove to be incorrect.  Such differences may adversely affect the percentage recovery to holders of such Allowed Claims under the Plan.

## VIII. VOTING PROCEDURES

**THE DISCUSSION OF THE VOTING PROCESS SET FORTH IN THIS DISCLOSURE STATEMENT IS ONLY A SUMMARY. PLEASE REFER TO THE SOLICITATION ORDER ATTACHED HERETO FOR A MORE COMPREHENSIVE DESCRIPTION OF THE SOLICITATION AND VOTING PROCESS.**

**A.      Holders of Claims Entitled to Vote on the Plan**

Pursuant to the Bankruptcy Code, only Classes of Claims and Interests that are "impaired" (as defined in section 1124 of the Bankruptcy Code) under the Plan are entitled to vote to accept or reject the Plan.  A Class is impaired if the legal, equitable or contractual rights to which the Claims or Interests of that Class are entitled are modified, other than by curing defaults and reinstating the debt.  Classes of Claims and Interests that are not impaired are not entitled to vote on the Plan and are conclusively presumed to have accepted the Plan.  In addition, Classes of Claims and Interests that receive no distributions under the Plan are not entitled to vote on the Plan and are deemed to have rejected the Plan.

The following Classes of Claims are or may be impaired under the Plan and are entitled to vote on the Plan (the "Voting Classes"):

| IMPAIRED CREDITORS ENTITLED TO VOTE | |
| --- | --- |
| Class 2 | Convenience Class Claims |
| Class 3 | General Unsecured Claims |

Acceptances of the Plan are being solicited only from those holders of Claims in impaired Classes that will or may receive a distribution under the Plan.  Accordingly, the Debtors are soliciting acceptances from holders of Claims in Class 2 and Class 3.

- 33 -

**B.      Voting Record Date**

**The Voting Record Date is March 13, 2014**. The Voting Record Date is the date on which it will be determined which holders of Claims in the Voting Classes are entitled to vote to accept or reject the Plan and whether Claims have been properly assigned or transferred under Bankruptcy Rule 3001(e) such that an assignee can vote as the holder of a Claim.

**C.      Voting on the Plan**

VOTING ON THE PLAN BY EACH HOLDER OF AN IMPAIRED CLAIM ENTITLED TO VOTE ON THE PLAN IS IMPORTANT.  IF YOU HOLD CLAIMS IN MORE THAN ONE CLASS, YOU MAY RECEIVE MORE THAN ONE BALLOT.  YOU SHOULD COMPLETE, SIGN AND RETURN EACH BALLOT YOU RECEIVE.

**1.      Ballots**

In voting for or against the Plan, please use only the Ballot or Ballots sent to you with this Disclosure Statement.  If you are a member of a Voting Class and did not receive a Ballot, if your Ballot is damaged or lost or if you have any questions concerning voting procedures, please call the Notice, Claims and Balloting Agent, Epiq Bankruptcy Solutions, LLC, (646) 282-2500, ATTN: Landauer Ballot Processing.  Each Ballot enclosed with this Disclosure Statement has been encoded with the amount of your Claim for voting purposes and the Class in which your Claim has been classified.  If your Claim is a Disputed Claim this amount may not be the amount ultimately allowed for purposes of distributions under the Plan.  PLEASE FOLLOW THE DIRECTIONS CONTAINED ON THE ENCLOSED BALLOT CAREFULLY.

**2.      Returning Ballots.**

IF YOU ARE A HOLDER OF A CLASS 2 OR CLASS 3 CLAIM ENTITLED TO VOTE, YOU SHOULD COMPLETE AND SIGN YOUR BALLOT AND RETURN IT IN THE ENCLOSED ENVELOPE VIA FIRST CLASS MAIL, OVERNIGHT COURIER OR HAND DELIVERY TO:

VIA FIRST CLASS MAIL:

**Landauer Ballot Processing**
**c/o Epiq Bankruptcy Solutions, LLC**
**FDR Station, PO Box 5014**
**New York, NY 10150-5014**

OR

VIA HAND DELIVERY OR OVERNIGHT CARRIER:

**Epiq Bankruptcy Solutions, LLC**
**757 Third Avenue, 3rd Floor**
**New York, NY 10017**
**Attn: Landauer Ballot Processing**

- 34 -

IF YOU HAVE ANY QUESTIONS ON THE PROCEDURES FOR VOTING ON THE PLAN, PLEASE CALL THE NOTICE, CLAIMS AND BALLOTING AGENT AT THE FOLLOWING TELEPHONE NUMBER: (646) 282-2500 OR EMAIL ADDRESS: TABULATION@EPIQSYSTEMS.COM, ATTN: LANDAUER BALLOT PROCESSING.

TO BE COUNTED, YOUR ORIGINAL BALLOT INDICATING ACCEPTANCE OR REJECTION OF THE PLAN MUST BE ACTUALLY RECEIVED BY THE NOTICE, CLAIMS AND BALLOTING AGENT NO LATER THAN **4:00 P.M. (PREVAILING EASTERN TIME) ON APRIL 15, 2014.**  YOUR BALLOT MAY BE SENT VIA U.S.  FIRST CLASS MAIL, OVERNIGHT COURIER OR HAND DELIVERY.  ALL BALLOTS MUST BE SIGNED.

Prior to deciding whether and how to vote on the Plan, each holder in a Voting Class should consider carefully all of the information in this Disclosure Statement.

D.      **Ballots Not Counted**

NO BALLOT WILL BE COUNTED TOWARD CONFIRMATION IF, AMONG OTHER THINGS**:** (a) it is illegible or contains insufficient information to permit the identification of the holder of the Claim; (b) it was transmitted by facsimile, email or other electronic means; (c) it was cast by an entity that is not entitled to vote on the Plan; (d) it was cast for a Claim listed in the Schedules as contingent, unliquidated or disputed for which the applicable bar date has passed and no proof of claim was timely filed; (e) it was cast for a Claim that is subject to an objection pending as of the Voting Record Date (unless temporarily allowed in accordance with the Solicitation Order); (f) it was not received by the Notice, Claims and Balloting Agent by the Voting Deadline; (g) it is unsigned; or (h) it is not clearly marked to either accept or reject the Plan or it is marked both to accept and reject the Plan.

PLEASE REFER TO THE SOLICITATION ORDER FOR ADDITIONAL REQUIREMENTS WITH RESPECT TO VOTING TO ACCEPT OR REJECT THE PLAN.

## IX. TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

A.      **Assumption of Executory Contracts and Unexpired Leases.**

In connection with the Sale, LMI DME assumed the majority of the Debtors' Executory Contracts and Unexpired Leases.  On February 10, 2014, as supplemented on February 24, 2014, the Debtors moved to reject their remaining Executory Contracts and Unexpired Leases that LMI DME did not assume.  To the extent any Executory Contracts and Unexpired Leases were not previously rejected by motion, they will be rejected under the Plan.  On the Effective Date, any remaining Executory Contracts and Unexpired Leases shall be deemed rejected and the Debtors shall have no further liability thereunder.  Entry of the Confirmation Order shall constitute a Bankruptcy Court order approving the rejections of such Executory Contracts or Unexpired Leases as set forth in the Plan pursuant to sections 365(a) and 1123 of the Bankruptcy Code.  Rejection of all remaining Executory Contracts and Unexpired Leases pursuant to the Plan is effective as of the Effective Date.

### B.     Claims Based on Rejection of Executory Contracts or Unexpired Leases.

Proofs of Claim with respect to Claims arising from the rejection of Executory Contracts or Unexpired Leases, if any, must be Filed with the Bankruptcy Court within 30 days after the date of entry of an order of the Bankruptcy Court (including the Confirmation Order) approving such rejection.  Any Claims arising from the rejection of an Executory Contract or Unexpired Lease not Filed within such time will be automatically disallowed, forever barred from assertion and shall not be enforceable against the Debtors, the Estates, their property or the GUC Trust without the need for any objection by the Debtors or the GUC Trust or further notice to, or action, order or approval of the Bankruptcy Court.  Claims arising from the rejection of the Debtors' Executory Contracts or Unexpired Leases shall be classified as General Unsecured Claims and shall be treated in accordance with Article III of the Plan, as applicable.

**Rejection Claims for which a Proof of Claim is not timely Filed will be forever barred from assertion against the Debtors, their Estates, their property, and the GUC Trust unless otherwise ordered by the Bankruptcy Court.  Such Rejection Claims shall, as of the Effective Date, be subject to the permanent injunction set forth in Article VIII of the Plan.**

### C.     Indemnification Obligations Regarding Prepetition Acts or Omissions

Any obligation of the Debtors to indemnify, reimburse or limit the liability of any Person, including, but not limited to, any officer or director of the Debtors, or any agent, professional, financial advisor, or underwriter of any securities issued by the Debtors, relating to any acts or omissions occurring before the Petition Date, whether arising pursuant to charter, bylaws, contracts or applicable state law, shall be deemed to be, and shall be treated as, an Executory Contract and (i) shall be and hereby is deemed rejected and termination as of the Effective Date and (ii) any and all Claims resulting from such obligations shall be, and hereby are, disallowed pursuant to Bankruptcy Code section 502(e).  Notwithstanding any foregoing contrary provision, nothing contained in the Plan shall modify the rights of any Person (including any former officer or director of the Debtor) to be indemnified, reimbursed or to obtain contribution or exculpation to the extent of proceeds or coverage available under any D&O Policy.

## X. CONFIRMATION OF THE PLAN

### A.     Requirements for Confirmation of the Plan

The Bankruptcy Code requires that, in order to confirm the Plan, the Bankruptcy Court must make a series of findings concerning the Plan and the Debtors, including that (i) the Plan has classified Claims and Interests in a permissible manner; (ii) the Plan complies with applicable provisions of the Bankruptcy Code; (iii) the Debtors have complied with applicable provisions of the Bankruptcy Code; (iv) the Debtors have proposed the Plan in good faith and not by any means forbidden by law; (v) the disclosure required by section 1125 of the Bankruptcy Code has been made; (vi) the Plan has been accepted by the requisite votes of creditors (except to the extent that cramdown is available under section 1129(b) of the Bankruptcy Code); (vii) the Plan is feasible and confirmation is not likely to be followed by the liquidation or the need for further financial reorganization of the Debtors under the Plan except as proposed in the Plan;

- 36 -

(viii) the Plan is in the "best interests" of all holders of Claims or Interests in an impaired Class by providing such holders on account of their Claims or Interests property of a value, as of the Effective Date, that is not less than the amount that such holder would receive or retain in a chapter 7 liquidation, unless each holder of a Claim or Interest in such Class has accepted the Plan; and (ix) all fees and expenses payable under 28 U.S.C. § 1930, as determined by the Bankruptcy Court at the hearing on confirmation, have been paid or the Plan provides for the payment of such fees on the Effective Date, among other things.

At the Confirmation Hearing, the Bankruptcy Court will confirm the Plan only if all of the requirements of the Bankruptcy Code are met.

### B.      Best Interests of Creditors/ Liquidation Analysis

Before the Plan may be confirmed, the Bankruptcy Court must find (with certain exceptions) that the Plan provides, with respect to each Class, that each holder of a Claim or Equity Interest in such Class either: (a) has accepted the Plan; or (b) will receive or retain under the Plan property of a value, as of the Effective Date, that is not less than the amount that such person would receive or retain if Debtors liquidated under chapter 7 of the Bankruptcy Code.

In chapter 7 liquidation cases, unsecured creditors and interest holders of a debtor are paid from available assets generally in the following order, with no junior Class receiving any payments until all amounts due to senior Classes have been paid fully or any such payment is provided for:

- Secured creditors (to the extent of the value of their collateral);

- Administrative and other priority creditors;

- Unsecured creditors;

- Debt expressly subordinated by its terms or by order of the Bankruptcy Court; and

- Interest holders.

Following the Sale, the Debtors' Estates received approximately $700,000 in cash to wind down the Chapter 11 Cases. That cash is the Debtors' only remaining asset and thus a chapter 7 case would not involve the liquidation of any other assets, but merely the distribution of that cash to holders of Allowed Claims. The Debtors believe that the value of any distributions in a chapter 7 case would be less than the value of distributions under the Plan because, among other reasons, distributions in a chapter 7 case may not occur for a longer period of time, thereby reducing the present value of such distributions. It is possible that such distributions could be delayed for a period in order for a chapter 7 trustee and its professionals to become knowledgeable about the Chapter 11 Cases and the Claims against the Debtors. Such distributions are likely to be further diminished due to fees and expenses associated with a chapter 7 trustee and his or her own professional advisors, which would likely exceed those of the professionals retained by the Debtors in seeking confirmation of this Plan.

- 37 -

### C.    Feasibility

Section 1129(a)(11) of the Bankruptcy Code requires that confirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization of the debtor, or any successor to the debtor (unless such liquidation or reorganization is proposed in the plan of reorganization).  In this case, the Plan meets this feasibility requirement as the Debtors are proposing to wind-down their affairs and distribute their remaining cash.  The Debtors believe that the Plan and the distributions contemplated thereunder is the most efficient and economical way to maximize the recovery for creditors and, therefore, is not likely to be followed by conversion of the Chapter 11 cases to chapter 7 of the Bankruptcy Code.

### D.    Acceptance by Impaired Classes

As a condition to confirmation, the Bankruptcy Code requires that each class of impaired claims or interests vote to accept a plan, except under certain circumstances.  See "Confirmation Without Acceptance of All Impaired Classes" below.  A plan is accepted by an impaired class of claims if holders of at least two-thirds in dollar amount and more than one-half in number of claims of that class vote to accept the plan.  Only those holders of claims or interests who actually vote count in these tabulations.  Holders of claims who fail to vote are not counted as either accepting or rejecting a plan.

In addition to this voting requirement, section 1129 of the Bankruptcy Code requires that a plan be accepted by each holder of a claim or interest in an impaired class or that the plan otherwise be found by the Bankruptcy Court to be in the best interests of each holder of a claim or interest in such class.  See Section X.B "Best Interests of Creditors" above.  In addition, each impaired class must accept the plan for the plan to be confirmed without application of the "fair and equitable" and "unfair discrimination" tests in section 1129(b) of the Bankruptcy Code discussed below.  See Section X.F "Confirmation Without Acceptance of All Impaired Classes" below.

### E.    Confirmation without Acceptance by All Impaired Classes

The Bankruptcy Code contains provisions for confirmation of a plan even if the plan is not accepted by all impaired classes, as long as at least one impaired class of claims has accepted it.  These so-called "cramdown" provisions are set forth in section 1129(b) of the Bankruptcy Code.

A plan may be confirmed under the cramdown provisions if, in addition to satisfying all other requirements of section 1129(a) of the Bankruptcy Code, it (a) "does not discriminate unfairly," and (b) is "fair and equitable," with respect to each class of claims or interests that is impaired under, and has not accepted, the plan.  As used by the Bankruptcy Code, the phrases "discriminate unfairly" and "fair and equitable" have specific meanings unique to bankruptcy law.

In general, the cramdown standard requires that a dissenting class receive full compensation for its allowed claim or interests before any junior class receives any distribution. More specifically, section 1129(b) of the Bankruptcy Code provides that a plan can be confirmed under that section if: (a) with respect to a secured class, (i) the holders of such claims retain the

- 38 -

liens securing such claims to the extent of the allowed amount of such claims and that each holder of a claim of such class receive deferred cash payments equaling the allowed amount of such claim as of the plan's effective date or (ii) such holders realize the indubitable equivalent of such claims; (b) with respect to an unsecured claim, either (i) the impaired unsecured creditor must receive property of a value equal to the amount of its allowed claim, or (ii) the holders of claims and interests that are junior to the claims of the dissenting class may not receive any property under the plan; or (c) with respect to a class of interests, either (i) each holder of an interest of such class must receive or retain on account of such interest property of a value, equal to the greater of the allowed amount of any fixed liquidation preference to which such holder is entitled, any fixed redemption price to which such holder is entitled or the value of such interest, or (ii) the holder of any interest that is junior to the interest of such class may not receive or retain any property on account of such junior interest.

The "fair and equitable" standard, also known as the "absolute priority rule," requires, among other things, that unless a dissenting unsecured class of claims or a class of interests receives full compensation for its allowed claims or allowed interests, no holder of claims or interests in any junior class may receive or retain any property on account of such claims or interests. With respect to a dissenting class of secured claims, the "fair and equitable" standard requires, among other things, that holders either (i) retain their liens and receive deferred cash payments with a value as of the plan's effective date equal to the value of their interest in property of the estate, or (ii) otherwise receive the indubitable equivalent of these secured claims. The "fair and equitable" standard has also been interpreted to prohibit any class senior to a dissenting class from receiving under a plan more than 100% of its allowed claims. The requirement that a plan not "discriminate unfairly" means, among other things, that a dissenting class must be treated substantially equally with respect to other classes of equal rank.

Because certain Classes are deemed to have rejected the Plan, the Debtors will request confirmation of the Plan, as it may be modified from time to time, under the "cramdown" provisions of section 1129(b) of the Bankruptcy Code. The Debtors will also seek confirmation of the Plan over the objection of individual holders of Claims who are members of an accepting Class, and may seek confirmation of the Plan over the rejection of one or more Voting Classes.

The Debtors reserve the right to alter, amend, modify, revoke or withdraw the Plan, any exhibit or schedules thereto, or any Plan document in order to satisfy the requirements of section 1129(b) of the Bankruptcy Code, if necessary. The Debtors believe that the Plan will satisfy the "cramdown" requirements of section 1129(b) of the Bankruptcy Code. However, there can be no assurance that the Bankruptcy Court will determine that the Plan meets the requirements of section 1129(b) of the Bankruptcy Code.

## XI. CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

Attached as Exhibit C is a summary of certain United States ("U.S.") federal income tax consequences of the implementation of the Plan to the Debtors and certain holders of Claims and Interests. The summary is based on the Internal Revenue Code of 1986, as amended (the "Tax

- 39 -

Code"), the U.S. Treasury Regulations promulgated thereunder (the "Regulations"), judicial decisions and published administrative rules and pronouncements of the Internal Revenue Service (the "IRS"), all as in effect on the date hereof (collectively, "Applicable Tax Law"). Changes in the rules or new interpretations of the rules may have retroactive effect and could significantly affect the U.S. federal income tax consequences described below. The Debtors have not requested, and will not request, any ruling or determination from the IRS or any other taxing authority with respect to the tax consequences discussed herein, and the discussion below is not binding upon the IRS or the courts. No assurance can be given that the IRS would not assert, or that a court would not sustain, a different position than any position discussed herein.

The summary does not apply to holders of Claims or Interests that are not "United States persons" (as such phrase is defined in the Tax Code). The summary does not address foreign, state or local tax consequences of the Plan, nor does it purport to address all aspects of U.S. federal income taxation that may be relevant to a holder in light of its individual circumstances or to a holder that may be subject to special tax rules (such as Persons who are related to the Debtors within the meaning of the Tax Code, foreign taxpayers, broker-dealers, banks, mutual funds, insurance companies, financial institutions, small business investment companies, regulated investment companies, tax exempt organizations, pass-through entities, beneficial owners of pass-through entities, subchapter S corporations, persons who hold Claims or Interests as part of a straddle, hedge, conversion transaction or other integrated investment, persons using a mark-to-market method of accounting, and holders of Claims or Interests who are themselves in bankruptcy). Furthermore, the summary assumes that a holder of a Claim holds only Claims in a single Class and holds a Claim only as a "capital asset" (within the meaning of Section 1221 of the Tax Code). The summary also assumes that the various debt and other arrangements to which any of the Debtors are a party will be respected for U.S. federal income tax purposes in accordance with their form.

ACCORDINGLY, THE SUMMARY OF CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED UPON THE INDIVIDUAL CIRCUMSTANCES PERTAINING TO A HOLDER OF A CLAIM OR INTEREST. ALL HOLDERS OF CLAIMS OR INTERESTS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS AS TO THE FEDERAL, STATE, LOCAL AND NON-U.S. INCOME, ESTATE AND OTHER TAX CONSEQUENCES OF THE PLAN.

IRS CIRCULAR 230 DISCLOSURE: TO ENSURE COMPLIANCE WITH REQUIREMENTS IMPOSED BY THE IRS, ANY TAX ADVICE CONTAINED IN THIS DISCLOSURE STATEMENT (INCLUDING ANY ATTACHMENTS) IS NOT INTENDED OR WRITTEN TO BE USED, AND CANNOT BE USED, BY ANY TAXPAYER FOR THE PURPOSE OF AVOIDING TAX-RELATED PENALTIES UNDER THE TAX CODE. TAX ADVICE CONTAINED IN THIS DISCLOSURE STATEMENT (INCLUDING ANY ATTACHMENTS) IS WRITTEN IN CONNECTION WITH THE PROMOTION OR MARKETING OF THE TRANSACTIONS OR MATTERS ADDRESSED BY THIS DISCLOSURE STATEMENT. EACH TAXPAYER SHOULD SEEK ADVICE BASED ON THE TAXPAYER'S PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.

HOLDERS SHOULD CONSULT THEIR OWN TAX ADVISORS CONCERNING THE RECOGNITION OF GAIN OR LOSS, FOR FEDERAL INCOME TAX PURPOSES, ON THE SATISFACTION OF THEIR GENERAL UNSECURED CLAIMS.

THERE ARE MANY FACTORS THAT WILL DETERMINE THE TAX CONSEQUENCES TO EACH HOLDER OF AN EQUITY INTEREST IN THE DEBTORS. HOLDERS SHOULD CONSULT THEIR OWN TAX ADVISORS CONCERNING THE RECOGNITION OF GAIN OR LOSS, FOR FEDERAL INCOME TAX PURPOSES, ON THE CANCELLATION AND DISCHARGE OF THEIR EQUITY INTERESTS.

HOLDERS SHOULD CONSULT THEIR OWN TAX ADVISORS CONCERNING THE ALLOCATION OF CONSIDERATION RECEIVED IN SATISFACTION OF THEIR CLAIMS AND THE FEDERAL INCOME TAX TREATMENT OF ACCRUED BUT UNPAID INTEREST.

HOLDERS SHOULD CONSULT THEIR OWN TAX ADVISORS CONCERNING THE APPLICATION OF THE MARKET DISCOUNT RULES TO THEIR CLAIMS.

THE FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ARE COMPLEX. THE FOREGOING SUMMARY DOES NOT DISCUSS ALL ASPECTS OF FEDERAL INCOME TAXATION THAT MAY BE RELEVANT TO A PARTICULAR HOLDER IN LIGHT OF SUCH HOLDER'S CIRCUMSTANCES AND INCOME TAX SITUATION. ALL HOLDERS OF CLAIMS AND INTERESTS SHOULD CONSULT WITH THEIR TAX ADVISORS AS TO THE PARTICULAR TAX CONSEQUENCES TO THEM OF THE TRANSACTIONS CONTEMPLATED BY THE PLAN, INCLUDING THE APPLICABILITY AND EFFECT OF ANY STATE, LOCAL OR FOREIGN TAX LAWS, AND OF ANY CHANGE IN APPLICABLE TAX LAWS.

## XII. CONCLUSION AND RECOMMENDATION

The Debtors believe the Plan is in the best interests of all holders of claims, and urge those holders of Claims entitled to vote to accept the Plan and to evidence such acceptance by returning their Ballots so they are RECEIVED, in accordance with the instruction set forth therein, by the Notice, Claims and Balloting Agent, Epiq Bankruptcy Solutions, LLC, no later than the Voting Deadline.

01:15144890.2

Dated: March 12, 2014

Respectfully Submitted,

LMI LEGACY HOLDINGS INC.,
 *et al.*

By:

[_____]
Michael Flynn
Co-Chief Restructuring Officer